# EX. A

**Unpublished opinions cited in Plaintiffs' Reply in Support of Their
Motion for a Preliminary Injunction,
pursuant to Local Rule 7.8(a)**

515 Fed.Appx. 114 (Table)
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA3 RULE 28.0 and CTA3 APP I, IOP 5.2 regarding the publication and citation of unpublished opinions.)
United States Court of Appeals,
Third Circuit.

Scott LANIN; Lisa Lanin, Appellants,

v.

THE BOROUGH OF TENAFLY; The Tenafly Board of Education.

No. 12–3399.
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) March 12, 2013.
|
Opinion filed: March 12, 2013.

**Synopsis**

**Background:** Residents filed suit pro se under state law and § 1983, challenging ordinance turning the road in front of their house into a one-way street. The United States District Court for the District of New Jersey, Esther Salas, J., denied the residents' motion for a preliminary injunction allowing them to use the road in front of their house in at least one direction to the west. Residents appealed.

**Holding:** The Court of Appeals, held that residents would not suffer irreparable harm in absence of injunction.

Affirmed.

 **\*115** On Appeal from the United States District Court for the District of New Jersey (D.C. Civ. No. 12–cv–02725) District Judge: Honorable Esther Salas.

**Attorneys and Law Firms**

Scott Lanin, Tenafly, NJ, pro se.

Lisa Lanin, Tenafly, NJ, pro se.

William R. McClure, Esq., Picinich & McClure, Hackensack, NJ, Jennifer A. McLaughlin, Esq., Cullen & Dykman, Garden City, NY, for The Borough of Tenafly; The Tenafly Board of Education.

Before: RENDELL, FISHER and GARTH, Circuit Judges.

OPINION

PER CURIAM.

 **\*\*1**  Appellants Scott and Lisa Lanin appeal an order of the District Court denying their motion for a preliminary injunction. For the reasons that follow, we will affirm.

The Lanins, married residents of Tenafly, New Jersey, live on Lower Downey Drive, a public two-way street. Their house is located near a public elementary school. In June, 2010, the Borough of Tenafly adopted Ordinance No. 10–19, which turned Lower Downey Drive into a one-way street going eastbound and past the school during the school day, 8:00 a.m. to 4:00 p.m. The Borough also adopted Ordinance No. 10–20, which eliminated parking on Upper Downey Drive and shifted more cars onto Lower Downey Drive.

On May 8, 2012, the Lanins filed suit pro se under state law and 42 U.S.C. § 1983 in the United States District Court for the District of New Jersey.[1] The Lanins raised numerous federal constitutional and state law claims, including a claim that their rights to substantive due process and to be free from unreasonable seizures had been violated by the Borough's and Board of Education's actions in depriving them of the right to freely travel on Lower Downey Drive. They later filed an amended complaint. Among other things, the Lanins complained that, after the passage of Ordinance 10–19, they (and eight other similarly situated families) could no longer exit their driveway, turn west on Downey Drive, and thereby avoid the school and its traffic altogether. Instead, as a result of the ordinance and the particular way that it was being implemented, the Lanins were forced to proceed eastbound, and, during the morning drop-off and afternoon pick-up, merge into heavy school traffic, where they would then make the same loop onto and off of school property that parents make when they drop their children off at school. The Lanins alleged that the trip is time-consuming and wasteful, and that their property has been devalued as a result of the traffic scheme. Prior to Ordinance 10–19, the school used the traffic circle on its own property in the front of the school for drop-off and dismissal of students.

Mr. Lanin, who suffers from juvenile diabetes and wears an insulin pump, also sought an injunction in the amended complaint under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* to prevent the Borough and Board from constructing a sidewalk adjacent to his property, which he contended they would inevitably neglect to maintain and keep accessible to persons with disabilities. Moreover, he contended that Ordinance 10–19 would interfere with the free passage of emergency vehicles to and from his home.

On July 30, 2012, the Lanins filed a motion for a temporary restraining order or preliminary injunction,  **\*116**  Fed. R. Civ. Pro. 65, and numerous supporting affidavits. In a supporting brief, the Lanins cited our decision in *Lutz v. City of York,* 899 F.2d 255 (3d Cir.1990) (right to move freely about one's neighborhood by automobile is "implicit in the concept of ordered liberty" and "deeply rooted in the Nation's history" but cruising ordinance was reasonable time, place and manner restriction on right of localized intrastate travel), and noted that section 1983 applies to municipalities under *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

 **\*\*2**  On the same day the motion was filed, the District Court held a hearing. The Lanins appeared, as did counsel for the Borough and counsel for the Board of Education. At the hearing, Mr. Lanin answered the District Court's questions about the basis for federal subject matter jurisdiction by expressly noting the right to substantive due process and our decision in *Lutz.* (N.T., 7/30/12, at 3.) The court, in turn, expressed an interest in the Lanins' Fourth Amendment unreasonable seizure argument. *See id.* at 5 The court then expressed considerable doubt about whether the Lanins could show immediate irreparable harm, given that Ordinance 10–19 was enacted back in June, 2010. Mr. Lanin explained that, initially, he was led to believe that the changes were temporary, but in April, 2012, he realized they were not temporary when the Borough began to construct a particular sidewalk. *See id.* at 8–10.

Counsel for the Borough then argued that the Lanins simply wanted to prevent the construction of the sidewalk, that the matter had no federal constitutional significance, that the traffic scheme was only a minor inconvenience for the affected residents of Lower Downey Drive, and that the school's traffic scheme was necessary for the safety of children, as established by a

consulting report the Borough had obtained. Counsel also stated that Borough police had chosen to direct all traffic, including non-school traffic, onto school property; the ordinance itself did not require this redirection of traffic. *See id.* at 17–18. On rebuttal, Mr. Lanin disputed the assertion that the inconvenience was minor and stated that there are times when Lower Downey Drive "is blocked off for several hours in the morning and in the afternoon. This is not about inconvenience. This is about the total deprivation of the use of that street." *Id.* at 21. Mrs. Lanin noted that she is a working mother and "[t]hose 45 minutes in the morning and the afternoon is a time that I most use that public road." *Id.* at 27.

Following argument, the District Court denied the motion for a preliminary injunction and explained the decision on the record. The court questioned whether it had jurisdiction, but ruled that the Lanins had not shown a reasonable likelihood of success on the merits because the Borough's interest in the safety of school children outweighed the Lanins' interests. But the "bigger issue" for the court was immediate irreparable harm. *Id.* at 33. The District Court held that the Lanins had not made the required showing because Ordinance 10–19 was enacted in June, 2010, and they waited two years before seeking a preliminary injunction. The court was not convinced that the impending construction of a sidewalk was sufficient to show that they would be immediately irreparably harmed. The next day the District Court issued a written order denying the Lanins' motion for the reasons set forth on the record.

The Lanins appeal. We have jurisdiction to review an order denying a motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). In their brief, the Lanins contend that the District Court erred (1) in denying them an injunction to **\*117** allow them to use Lower Downey Drive "in at least one direction to the west;" (2) in considering irreparable harm because the traffic scheme is invalid and *ultra vires;* (3) in failing to make findings of fact and conclusions of law, Fed. R. Civ. Pro. 52(a); and (4) in failing to identify any level of scrutiny to test the constitutionality of Ordinance 10–19. *See* Appellants' Brief, at 3–4. The Borough has noted that, "[i]nasmuch as the existing traffic pattern is the result of ordinances adopted by the Borough and a temporary roadblock enforced by members of its police department, the task of defending this appeal properly lies with the Borough, not the Board." Appellee's Brief, at 1 n. 1.

**\*\*3** We will affirm. The District Court assumed, for the purpose of deciding the motion for a preliminary injunction, that federal subject matter jurisdiction was not lacking. Any argument to the contrary is not supported by the record. We are also satisfied that the District Court properly considered Borough counsel's assertions and argument relating to the reasons for the traffic scheme, *cf. University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"). And we are satisfied that the District Court's decision and the full hearing transcript collectively provide sufficient factual findings and conclusions of law to give us a clear understanding of the decision, *see H. Prang Trucking Co., Inc. v. Local Union No. 469,* 613 F.2d 1235, 1238 (3d Cir.1980), and allow for meaningful appellate review.

We exercise plenary review over the District Court's conclusions of law and its application of the law to the facts, see *Marco v. Accent Publishing Co.,* 969 F.2d 1547, 1548 (3d Cir.1992). Findings of fact are reviewed for clear error, *see Oberti by Oberti v. Board of Education of Borough of Clementon Sch. Dist.,* 995 F.2d 1204, 1220 (3d Cir.1993), which occurs when we are "left with a definite and firm conviction that a mistake has been committed," *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). As a practical matter, our scope of review tends to be narrow because "the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing ... [that] is the responsibility of the district judge." *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 101–02 (3d Cir.1988) (quoting *United States Steel Corp. v. Fraternal Ass'n of Steelhaulers,* 431 F.2d 1046, 1048 (3d Cir.1970)).

Regardless of their claimed entitlement to a permanent injunction at the conclusion of this case, the Lanins were required to establish the need for a *preliminary* injunction. In ruling on the Lanins' motion for a preliminary injunction, the District Court was required to consider: (1) the likelihood that they will prevail on the merits of their amended complaint; (2) the extent to which they are being irreparably harmed by the conduct complained of; (3) the extent to which the Borough of Tenafly and Tenafly Board of Education will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *See*

Case 1:22-cv-00361-SHR   Document 12-1   Filed 04/12/22   Page 5 of 100
Lanin v. Borough of Tenafly, 515 Fed.Appx. 114 (2013)
294 Ed. Law Rep. 528

*Duraco Products, Inc. v. Joy Plastic Enterprises,* 40 F.3d 1431, 1438 (3d Cir.1994). All four factors must favor preliminary relief. *See id.*

We affirm on the basis of the District Court's irreparable harm determination. A plaintiff has the burden of proving a "clear showing of immediate irreparable injury." *Hohe v. Casey,* 868 F.2d 69, 72 (3d Cir.1989) (internal quotation marks removed). "[P]reliminary injunctions are generally granted under the theory that **\*118** there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985). "Delay in seeking enforcement of those rights ... tends to indicate at least a reduced need for such drastic, speedy action." *Id.* The traffic scheme challenged by the Lanins was adopted on June 22, 2010 and has continued to impact them during the school year in exactly the same fashion since that time, and yet they did not move for a preliminary injunction until July 30, 2012. The District Court properly relied on their two-year delay in seeking a preliminary injunction as sufficient proof that the risk of immediate irreparable harm did not exist.

 **\*4** When the District Court asked the Lanins what had changed during the intervening two-year period, they pointed to the impending construction of the sidewalk as proof positive that their portion of Lower Downey Drive would never again be a two-way road. (N.T., 7/30/12, at 8.) Mr. Lanin said that "[t]he last thing we wanted to do was to file a lawsuit and we waited until there was no other alternative." *Id.* We note that delay may be excused where the party seeking a preliminary injunction delays only in the reasonable belief that negotiations may resolve the dispute, *see Atari Corp. v. Sega of America, Inc.* 869 F.Supp. 783, 790 (N.D.Cal.1994), but, even applying that rule here, the proceedings below still amply support the District Court's conclusion that the Lanins will not suffer irreparable harm before a decision on the ultimate merits of their case can be reached.

The Lanins argue that they were not required to prove irreparable injury because their case involves irreparable injury per se. They argue that the District Court erred by requiring them to prove irreparable injury because they have shown interference with their fundamental right to travel, *see* Appellant's Brief at 53–54, but "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction," *Hohe,* 868 F.2d at 73. A party seeking a preliminary injunction must ordinarily prove irreparable injury, *see id.;* the Lanins' case does not warrant an exception to this requirement. The Lanins also argue that they are not required to prove irreparable harm because the Borough's traffic scheme is invalid and *ultra vires,* citing our decision in *OFC Comm Baseball v. Markell,* 579 F.3d 293 (3d Cir.2009). *See* Appellants' Brief, at 24. In *Markell,* we found it unnecessary on appeal to "consider the parties' arguments regarding irreparable harm and the balancing of the equities," 579 F.3d at 300 n. 4, because we reached the merits of the appeal. *Markell* reflects our decision about what issues we needed to reach on appeal; it did not hold that a party seeking a preliminary injunction at the trial court level need not prove irreparable harm.

Because the District Court properly denied the Lanins' motion for a preliminary injunction on the basis of their failure to show irreparable harm, and because all four factors must favor preliminary relief, *see Duraco Products,* 40 F.3d at 1438, we find it unnecessary to reach the "likelihood of success on the merits" issue. However, we note that the Lanins contend that, in crediting the Borough's safety arguments, the District Court *appears* to have applied only rational basis scrutiny in finding Ordinance 10–19 legitimate. *Lutz* says intermediate scrutiny is the most generous standard that could apply to the right to intrastate travel. In Lutz, we explained that:

> Not every governmental burden on fundamental rights must survive strict scrutiny.... We believe that reviewing all infringements on the right to travel under **\*119** strict scrutiny is just as inappropriate as applying no heightened scrutiny to any infringement on the right to travel not implicating the structural or federalism-based concerns of the more well-established precedents. For this conclusion, we rely heavily on the time, place and manner doctrine so firmly entrenched in the jurisprudence of free speech.... [S]tate and local governments must enjoy some degree of flexibility to regulate access to, and use of, the publicly held instrumentalit[y] of ... travel.

**\*5** 899 F.2d at 269.

The Lanins' case was reassigned to a new District Judge following the denial of their motion for a preliminary injunction. Because our review here is narrow, we leave all issues relating to the applicability of *Lutz* to the newly assigned District Judge to address in the first instance.

294 Ed. Law Rep. 528

For the foregoing reasons, we will affirm the order of the District Court denying the Lanins' motion for a preliminary injunction.

**All Citations**

515 Fed.Appx. 114 (Table), 2013 WL 936363, 294 Ed. Law Rep. 528

Footnotes

1        Mr. Lanin is a licensed attorney in the State of New York.

---

**End of Document**                                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 593603
Only the Westlaw citation is currently available.
United States District Court, D. Oregon,
Portland Division.

COURTHOUSE NEWS SERVICE, Plaintiff,

v.

Nancy COZINE, in her official capacity as Oregon State Court Administrator, Defendant.

Case No. 3:21-CV-00680-YY
|
Signed February 14, 2022

**Attorneys and Law Firms**

Jonathan G. Fetterly, Pro Hac Vice, Katherine Keating, Pro Hac Vice, Bryan Cave Leighton Paisner LLP, San Francisco, CA, Eric D. Lansverk, Hillis Clark Martin & Peterson, Seattle, WA, for Plaintiff.

Abigail Fallon, Christina L. Beatty-Walters, Carla Scott, Oregon Department of Justice, Special Litigation Unit - Trial Division, Portland, OR, for Defendant.

FINDINGS AND RECOMMENDATIONS

YOU, Magistrate Judge.

**\*1** Plaintiff Courthouse News Service brings this 42 U.S.C. § 1983 action against the Oregon State Court Administrator, Nancy Cozine ("defendant"), asserting that Oregon state court policies regarding public access to newly filed civil complaints violate the First and Fourteenth Amendments. Compl., ECF 1. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory relief).

Defendant has filed a motion for summary judgment, Mot., ECF 13, which should be DENIED for the reasons discussed below.

**FINDINGS**

**I. Background Facts and Procedural History**

Plaintiff is a media organization that provides coverage for filings and proceedings in state and federal trial and appellate courts nationwide. Compl. ¶ 7, ECF 1. As relevant to this case, plaintiff publishes the *Oregon Report*, an evening newsletter featuring news on civil actions filed in this district court and Oregon circuit courts. *Id.* ¶ 16. Defendant, in her capacity as the Oregon State Court Administrator, is responsible for the oversight and administration of Oregon circuit courts. *Id.* ¶ 8.

The crux of this dispute centers on the timeliness of media access to new civil complaints filed in Oregon's circuit courts. Plaintiff alleges that filing procedures associated with mandatory electronic filing ("e-filing") practices adopted by the Office of the State Court Administrator ("OSCA"), of which defendant is in charge, unconstitutionally infringe upon the media's First Amendment right of access to newly filed civil complaints. *See generally* Compl., ECF 1.

To provide context for plaintiff's allegation, the court first describes the OSCA's past procedures for providing access to complaints physically filed in circuit court, and then illustrates OSCA's current procedures, which require nearly all documents to be e-filed. Prior to the OSCA's adoption of a mandatory e-filing system, litigants who wished to file a civil complaint had to either physically bring their documents or mail them to the courthouse. Cozine Decl. ¶ 5, ECF 14; *see also id.*, Ex. 1, at 1, ECF 14-1. Upon receiving these paper complaints, court staff reviewed the documents for proper form and legibility and checked to ensure the payment or waiver of court fees. *Id.* If these requirements were met, the documents were considered "accepted" and staff began "manual processing," a procedure that included stamping documents, processing payments, creating and entering case information into the Oregon Judicial Information Network (OJIN), and preparing a physical case file for the court's use. *Id.* As the manual processing occurred, court staff also made non-confidential public documents available for members of the media to review and photocopy.[1] *Id.* This process allowed members of the media, including plaintiff's reporters, to see "all or nearly all of the new civil complaints filed" every day. Brown Decl. ¶ 5, ECF 18.

**\*2** Between 2012 and 2016, OSCA implemented its current e-filing requirements at courts across the state. These requirements mandated that nearly all court documents, including new civil complaints, be e-filed instead of physically submitted to the court. Compl. ¶ 21, ECF 1. Because new civil complaints were being e-filed, Oregon courts ceased their practice of providing physical documents to media reporters for review. Instead, to gain access to new civil complaints, reporters must wait until the complaint is "accepted"[2] and "automated processing" is complete, at which point electronic copies of documents are available via remote access or courthouse computer terminals. Cozine Decl. ¶ 6, ECF 14; *see also id.*, Ex. 1, at 2, ECF 14-1. In the context of this lawsuit, "automated processing" is simply a digitized form of "manual processing": the court's systems automatically charge fees, generate party records and case numbers, stamp documents, and create case entries. *See id.*, Ex. 1, at 1-2, ECF 14-1.

It is the timeliness of the "accepted" and "automated processing" procedures within e-filing that forms the crux of plaintiff's lawsuit. Defendant alleges that automated processing "automatically happens after acceptance," ensuring that most complaints are made available to the press within "two to three minutes" of the procedure. Cozine Decl. ¶ 6, ECF 14; *id.*, Ex. 1 at 2, ECF 14-1. Plaintiff, however, has produced evidence of "significant" delays between the time a document is electronically submitted to the court and the time it is made available to media members—delays that are sometimes "several days or longer." *See* Brown Decl. ¶¶ 11-12, ECF 18. Plaintiff's allegations revolve around this delay: documents filed in-person at the courthouse under prior OSCA procedures were made available to the media on the same day, while "with e-filing, ... there are regular and ongoing delays" that "can be several days or longer." *Id.*

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (citing Fed. R. Civ. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## III. Law Regarding First Amendment Right of Access to Court Filings

As an initial matter, the parties agree that the Ninth Circuit's decision in *Courthouse News Service v. Planet* ("*Planet III*") provides the applicable standard for evaluating whether a court's administrative procedures violate the media's "right of timely

access to newly filed nonconfidential complaints." 947 F.3d 581, 585 (2020). *Planet III* established a two-pronged test for this analysis. First, a reviewing court must determine whether "the qualified First Amendment right of access" exists as to the judicial record in question. In making this determination, the court considers "(1) whether that proceeding or record 'ha[s] historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular [governmental] process in question.' " *Id.* at 590 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986)). If both elements are met, a qualified First Amendment right of access attaches to the implicated judicial records, and the reviewing court then considers whether a restriction on that right "is essential to preserve higher values and is narrowly tailored to serve those interests." *Id.* at 595 (quoting *Press-Enterprise*, 478 U.S. at 13-14). Importantly, here, defendant seeks summary judgment on the first prong alone; in other words, she has not asked the court to evaluate the second prong, which requires an analysis of whether the OSCA's procedures survive a "balancing test" that is "rigorous, but not strict [ ] scrutiny." *Id.* at 596 (citing *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012)).

**\*3** While the parties agree on the applicability of *Planet III* to this case, they greatly differ on its persuasive weight to the unique facts of this case. Thus, before analyzing arguments regarding defendant's motion, it is prudent to detail the *Planet* trilogy of cases that form the Ninth Circuit's jurisprudence.

The *Planet* cases involved legal challenges against two distinct case filing procedures adopted by the Ventura County Superior Court in California ("Ventura Court"). In the first procedure, adopted between November 2010 and June 2014, the Ventura Court offered a physical bin where members of the media could access new filings after they had been processed. *Id.* at 586. Before new civil complaints were placed in the bin, however, the Ventura Court required court staff to follow a seven-step procedure:

> First, a [court assistant] reviews the documents to determine that the complaint is being filed in the correct court and the documents necessary to initiate the case are presented with the correct filing fee or fee waiver. Second, the [court assistant] enters all the required case information to "create" a new case in [the court's case management system]. Third, all accompanying instruments, for example checks, are entered and the receipt is generated. Fourth, any summons required are issued. Fifth, the documents are stamped as "Filed." Sixth, the labels generated from [the court's case management system] are placed on the physical case file, along with the filing date, courtroom assignment, and case destruction stamp. Finally, the documents are placed in a physical case file.

*Courthouse News Serv. v. Planet*, No. CV1108083SJOFFMX, 2016 WL 4157210, at \*4 n.6 (C.D. Cal. May 26, 2016), *judgment entered*, No. CV1108083SJOFFMX, 2016 WL 4157354 (C.D. Cal. June 14, 2016), *aff'd in part, rev'd in part and remanded*, 947 F.3d 581 (9th Cir. 2020).

In addition to the seven-step procedure, some complaints were also subjected to a quality check process that took "one to several days to complete." *Id.* at \*4. Further, complaints requiring "immediate judicial review" were immediately sent to judges, with copies of only the first pages of the complaint placed in the physical bin. *Planet III*, 947 F.3d at 586-87. The overall policy created "significant delays between the filing of a complaint and its viability" to the press; certain documented periods had "half of the filed complaints [take] two or more court days to become publicly available." *Id.* at 587.

In June 2014, after the *Planet III* plaintiff filed suit over the seven-step policy, the Ventura Court instituted a new "scanning policy." *Id.* This procedure required court clerks to "scan all new civil complaints before reviewing or processing them." *Id.* The scanned complaints were accessible via computer terminals located in the Ventura Court's clerk's office; press reporters could view the documents during a seven-hour window on the days the court was open. *Id.* Scans of cases filed after the conclusion of each seven-hour window were made available on the terminals the next day. *Id.*

After multiple rounds of litigation, the Ninth Circuit addressed the constitutionality of the Ventura Court's policies in *Planet III*.[3] The court began its analysis by detailing a "long presumed [ ] First Amendment 'right of access to court proceedings and documents.' " *Id.* at 589 (quoting *Oregonian Publishing Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990)). Importantly, this right of access extended to news organizations because the "press serves ... to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Id.* (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975)).

**\*4**  Next, the Ninth Circuit presented its test for evaluating whether "the qualified First Amendment right of access" attaches to a particular judicial record. *Id.* at 590. Such a right exists if (1) the "proceeding or record ha[s] historically been open to the press and general public" and (2) "public access plays a significant positive role in the functioning of the particular [governmental] process in question." *Id.* at 590 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986)). If both elements are met, a qualified First Amendment right of access attaches to the implicated judicial records, and the reviewing court then considers whether a restriction on that right "is essential to preserve higher values and is narrowly tailored to serve those interests." *Id.* at 595.

Importantly, the first question—whether the qualified right of access applies to newly filed civil complaints—was easily resolved in *Planet III*. The Ninth Circuit concluded that "the First Amendment right of access to information reaches civil judicial proceedings and records," and the parties agreed the Ventura Court had a "long-standing policy of providing timely access to court records" and that "experience and logic support a public right of access to newly filed civil complaints." *Id.* at 590-91.

However, the parties disagreed as to *when* this qualified First Amendment right attached to newly filed civil complaints. Specifically, the *Planet III* defendant argued the right attached "only at the moment [the pleading becomes] the subject of some type of judicial action." *Id.* at 591. The Ninth Circuit rejected this argument, finding that "absent ... a substantial showing in the private nature of a judicial record, once documents have been filed in judicial proceedings, a presumption arises that the public has the right to know the information they contain." *Id.* at 592 (citing *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)). In short, the *Planet III* court established that the media's qualified First Amendment right attached to newly filed civil complaints as soon as they are "filed in judicial proceedings"; the parties in the instant case do not dispute this proposition. *Id.*

After finding that a First Amendment right of access attached to newly filed complaints, the *Planet III* court scrutinized the Ventura Court's two different filing processes. The panel ultimately concluded that only the seven-step process unconstitutionally infringed upon the media's right of access, i.e., the second prong of the analysis; the more recent "scanning" procedure survived scrutiny and was deemed constitutional.[4] *Id.* at 595-600. While making these rulings, however, the court clearly identified the tension between a court's need to administratively process complaints and the media's desire to deliver news to the general public. The panel reasoned:

> Though we conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court, we do not view that conclusion as demanding immediate, pre-processing access to newly filed complaints. At the same time, however, we recognize, like the district court, that a necessary corollary of the right to access is a right to timely access. [The plaintiff's] reporting on complaints must be timely to be newsworthy and to allow for ample and meaningful public discussion regarding the functioning of our nation's court systems.

*Id.* at 594. This court recognizes that a similar tension applies to the parties involved in this case.

## IV. Analysis

**\*5**  In her motion for summary judgment, defendant posits that the OSCA's procedures do not unconstitutionally infringe upon plaintiff's qualified First Amendment right of access to newly filed civil complaints. Mot., ECF 13. Defendant offers two interlocking arguments to support this claim. First, defendant alleges that e-filed complaints are immediately made available to media reporters after they are considered filed under Oregon law. *Id.* at 6-7. Second, defendant asserts that current procedures associated with e-filing are superior to past procedures involving physically filed complaints, thus warranting summary judgment. *Id.* at 7-8.

### A. General Applicability of *Planet III*

Defendant first notes that while *Planet III* recognizes a First Amendment right of access for media organizations, the right only attaches to civil complaints *at the time of filing*. Mot. 6, ECF 13. She then alleges the Oregon Uniform Trial Court Rules

(UTCR), the administrative rules that apply to Oregon's circuit courts, differentiate between the electronic "submission" of a document and when the document is considered "filed" by the court. *Id.* at 7. Defendant specifically points to the UTCR's definition of "electronic filing," which reads:

21.060 FILES OF THE COURT

(1) Electronic Filing

(a) The electronic filing of a document is accomplished when a filer submits a document electronically to the court, the electronic filing system receives the document, and the court accepts the document for filing.

(b) When the court accepts the electronic document for filing, the electronic document constitutes the court's record of the document.

Or. Unif. Trial Ct. Rules § 21.060 (2022). In short, defendant alleges an e-filed civil complaint is not considered "filed" until court staff examine the pleading for compliance with court regulations and formally accept the document. Thus, defendant argues the OSCA's procedures, which provide public access to documents after they are formally accepted and processed by court clerks, are consistent with *Planet III*'s conclusion that the First Amendment right of access attaches at the time a document is filed.

This argument, while colorable, is unpersuasive for several reasons. First, defendant's position contradicts the language employed in *Planet III*. In describing the district court's decision, the Ninth Circuit noted that the "right to timely access attaches at the moment of filing, *i.e., when the complaint is received by the court.*" *Planet III*, 947 F.3d at 588 (emphasis added). This description describes a point in time consistent with the UTCR's definition of when a document is considered "submitted":

21.080 ELECTRONIC FILING AND ELECTRONIC FILING DEADLINES ...

(3) The court considers a document submitted for an electronic filing when the *electronic filing system receives the document.* The electronic filing system will send an email to the filer that includes the date and time of receipt, unless the filer has elected through system settings not to receive the email.

Or. Unif. Trial Ct. Rules § 21.060 (2022) (emphasis added). In other words, regardless of various labels and terminology employed by the OSCA, the *Planet III* right of access attaches when the court receives the document; that specific time aligns with the UTCR's description of when a document is considered "submitted" to the court.

Second, defendant's position on when a document is considered "filed" is inconsistent with the definition of the term. In the judicial context, "filed" is defined as "to *submit* documents necessary to initiate a legal proceeding." *Filed*, Merriam-Webster, https://www.merriam-webster.com/dictionary/filed (last visited February 7, 2012) (emphasis added). Importantly, the definition only contemplates the *submission* of the document; it does not consider any review by court personnel. Thus, the plain meaning of "filed" supports the *Planet III* court's holding that the moment of filing occurs when the document is received by the court.

 **\*6** Third, the Ninth Circuit declined to address the very argument defendant now advances in earlier iterations of the *Planet* jurisprudence. In *Planet II*, the Ventura Court executive offered the following "question presented":

Whether the First Amendment creates a right to access civil complaints on the same day they are received by [Ventura Court] clerks, even before these complaints are processed, filed, and entered into the court's official records.

Appellee's Ans. 2, Docket Entry 20, *Courthouse News Service v. Planet*, 14-5644 (9th Cir., Dec. 19, 2014). The Ventura Court executive argued that "scanned complaints do not constitute official records ... and may ultimately be rejected for failure to comply with the California Rules of Court" and specified that complaints could become official records "only after they are assigned a case number, stamped 'filed' and placed in a file folder." *Id.* at 21-22 (some internal quotations removed).

Instead of addressing the merits of the presented question, the panel remanded the case yet again because the district "erred" by "narrow[ing] the legal question" to one "divorced from the legal framework discussed in [*Planet I*]." *Courthouse News Serv. v. Planet*, 614 F. App'x 912, 914–15 (9th Cir. 2015).[5] While the Ninth Circuit's actions in *Planet II* did not unequivocally

reject the Ventura Court executive's position—a position defendant now adopts—it *did* choose to remand the case instead of finding, for example, that the First Amendment right of access to newly filed civil complaints does not attach until court staff process the document. Thus, the Ninth Circuit's actions in *Planet II* raise significant concern on the overall persuasiveness of the defendant's position.

In addition to the time-of-filing argument discussed above, defendant also opines that the *Planet III* opinion is of little persuasive value when applied to this case. Defendant identifies two distinctions between the facts in the *Planet* trilogy and this action: (1) the implicated procedures in the *Planet* cases only concerned physical filings as opposed to electronic submissions, and (2) Oregon and California's administrative rules surrounding document filing are distinguishable. Mot. 8-9, ECF 13; Reply 2, ECF 21. Defendant alleges that these crucial distinctions make the *Planet* cases "not on all fours" with the present facts. Mot. 9, ECF 13; Reply 4, ECF 21.

While these distinctions do exist, they do not diminish *Planet III*'s value to a point where summary judgment for the defendant is warranted. First, while the procedures analyzed in *Planet III* only involved in-person court filings, the Ninth Circuit found that a First Amendment right of access applies to all newly filed civil complaints; that right is not affected by the method by which the document was submitted. 947 F.3d at 590-91. If anything, the opinion reinforces the importance of this right as society continues to digitize: the Ninth Circuit recognized that "the need for immediacy of reporting news is even more vital in the digital age, where timeliness is measured in terms of minutes or seconds." *Id.* at 594 (internal quotation removed). These words suggest the media's right of access to newly filed complaints remains even when a court transitions to mandatory e-filing.

**\*7** Second, the parties disagree as to whether substantial differences exist between Oregon and California's court rules surrounding e-filing. *See* Mot. 8-9, ECF 13; Opp. 8-10, ECF 16; Reply 2-4, ECF 21. However, the labels and terminology a state court employs to identify different parts of the filing process cannot have a determinative effect on *when* the First Amendment right of access attaches. Put differently, if defendant's position was correct, court administrators could potentially evade the *Planet III* holding—and abrogate the media's First Amendment right of access—by adopting administrative rules that define a document as "filed" much later in the judicial review process. Such a proposition not only contradicts the Supreme Court's jurisprudence, which makes clear that administrative rules cannot abrogate constitutional rights, but also is antithetical to the importance of media access that *Planet III* identified. *See Washington-S. Nav. Co. v. Baltimore & Philadelphia Steamboat Co.,* 263 U.S. 629, 635–36 (1924) ("The function of rules is to regulate the practice of the court and to facilitate the transaction of its business. But no rule of court can ... abrogate or modify the substantive law."); *Planet III,* 947 F. 3d at 589-92 (discussing the vital role media plays in making the public aware of court filings).

### B. Historical Nature of the Right of Access in Oregon Courts

Defendant also invokes the first factor in the *Planet III* test, and argues the OSCA's current access procedures are superior to previous policies surrounding access to in-person filings. Specifically, defendant argues that current OSCA procedures make documents accessible "from any location in the world, moments after acceptance," and contends this access is relatively easier than that of prior OSCA policies, which, at minimum, required a reporter to be physically present at the courthouse. Mot. 7, ECF 13.

Defendant's argument is flawed in two respects. First, it mischaracterizes the inquiry that the court employs to assess whether a qualified First Amendment right of access applies to newly filed civil complaints in Oregon courts. The relevant inquiry is simply "whether that proceeding or record has historically been open to the press and general public." *Press-Enterprise,* 478 U.S. at 8. It is not a comparison of whether current procedures are more accessible than historical counterparts; it is simply a question of whether the court system historically made that type of filing available for public review. *See Planet III* at 591 (noting that "Ventura County has a longstanding policy of providing timely access to court records") (internal quotation removed).

Second, even if the inquiry necessitated a comparison of present and former policies, the question of whether current OSCA procedures offer improved access to newly filed complaints remains unresolved. Defendant's pleadings make clear that at least on a theoretical level, access to filings is improved because scanned complaints are immediately available to anyone via remote

access. Mot. 7, ECF 13; *see also* Cozine Decl. ¶¶ 5-7, ECF 14. But whether the change has actually improved access is disputed, as plaintiff has provided evidence, obtained through discovery and via declaration, detailing "regular and ongoing delays" of "several days or longer" in accessing e-filed complaints. *See* Brown Decl. ¶¶ 11-12, ECF 18 (alleging that complaints filed in person were made available by the end of the day, while e-filed complaints face delays of "several days or longer").

### C. Availability of Relief

Defendant separately seeks summary judgment by arguing "there is no relief the Court could award to redress [plaintiff's] alleged harm." Mot. 10, ECF 13. Specifically, defendant alleges that plaintiff "asks this court to order OSCA to provide the same access to press as existed before e-filing," and claims plaintiff "already has that access." *Id.*

Defendant's argument is unpersuasive on two grounds. First, as described above, there is an unresolved question of fact as to whether plaintiff currently possesses a similar right of access to newly filed civil complaints to the one it previously held under OSCA's physical filing procedures. Simply put, while defendant may posit that current administrative processes surrounding the availability of e-filed documents are similar to previous policies involving physically filed documents, plaintiff has presented evidence suggesting "regular and ongoing delays" of "several days of longer" before certain new civil complaints are made available to the public. *See* Brown Decl. ¶ 12, ECF 18.

**\*8** Second, defendant mischaracterizes plaintiff's prayer for relief. In addition to a request for declaratory judgment, plaintiff seeks a preliminary and permanent injunction prohibiting defendant from "continuing her policies and practices that deny [plaintiff] timely access to new nonconfidential civil complaints." Compl. 16-17, ECF 1. Plaintiff has not requested that defendant restore a similar right of access to the one that existed prior to the adoption of e-filing; it simply asks that defendant be barred from using practices that unconstitutionally infringe upon the qualified First Amendment right of access described in *Planet III*.

To be clear, this court cannot mandate that defendant provide plaintiff with "immediate, pre-processing access to newly filed complaints." *Planet III, 947 F.3d at 594.* However, "a necessary corollary of the right to access is a right to timely access." *Id.* Defendant, as the movant for summary judgment, bears the burden of demonstrating "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). At a minimum, there remain issues of material fact regarding timely access, and thus, summary judgment is improper at this time.

### RECOMMENDATIONS

For the reasons set forth above, defendant's Motion for Summary Judgment (ECF 13) should be DENIED.

### SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Monday, February 28, 2022. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

### NOTICE

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

**All Citations**

Slip Copy, 2022 WL 593603

Footnotes

1    For example, in Multnomah County Circuit Court, documents collected throughout the day were retained and placed in a physical press review box. At 4:00 p.m. every court day, the clerk's office made this physical press review box available for reporters to review until the courthouse closed. Cozine Decl. ¶ 5, ECF 14; *see also id.*, Ex. 1, at 1, ECF 14-1. At the same time, documents filed and accepted by the court after 4:00 p.m. but before closing were brought over to reporters who were reviewing filings in a nearby cubicle. *See* Brown Decl. ¶ 5, ECF 18. Documents brought to reporters between 4:00 p.m. and closing "had been stamped 'filed' and assigned a case number by the intake clerk, but they were not yet docketed." *Id.* This process ensured that reporters "saw all or nearly all the new civil complaints filed that day." *Id.*

2    Acceptance is the same in both physical and e-filing procedures: it occurs after a court clerk has assessed the documents for proper form and legibility and checked for the payment of fees.

3    In the original *Planet* suit, the district court dismissed the case under the *Pullman* and *O'Shea* abstention doctrines. *Courthouse News Serv. v. Planet,* No. CV11-08083 R MANX, 2011 WL 11715054 (C.D. Cal. Nov. 30, 2011). In *Planet I*, the Ninth Circuit reversed the decision to abstain and remanded the case to the district court. 750 F.3d 776 (9th Cir. 2014). Upon remand, the district court "erroneously interpret[ed]" the Ninth Circuit's mandate and "ruled on a different issue entirely." *See Courthouse News Serv. v. Planet,* No. 2:11-CV-08083-R-MAN, 2014 WL 12740134 (C.D. Cal. Aug. 28, 2014), *rev'd and remanded,* 614 F. App'x 912 (9th Cir. 2015). This led the Ninth Circuit to again reverse in *Planet II* and reassign the case to a different judge. 614 F. App'x 912 (9th Cir. 2015). The new judge ultimately issued a declaratory judgment and permanent injunction in plaintiff's favor, and cross-appeals at the Ninth Circuit followed, resulting in the decision in *Planet III. Courthouse News Serv. v. Planet,* No. CV1108083SJOFFMX, 2016 WL 4157354 (C.D. Cal. June 14, 2016), *vacated and remanded,* 947 F.3d 581 (9th Cir. 2020).

4    The specific facts and rationale underlying this decision are immaterial to this motion, as defendant does not argue for consideration of this factor while seeking summary judgment.

5    While *Planet II* is an unpublished opinion, this court cites to it pursuant to Ninth Circuit Rule 36-3.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by COURTHOUSE NEWS SERVICE v. GABEL, 2nd Cir., December 21, 2021

2021 WL 5416650

Only the Westlaw citation is currently available.

United States District Court, D. Vermont.

COURTHOUSE NEWS SERVICE; Vermont Press Association, Inc.; New England First Amendment Coalition; Gray Media Group, Inc. d/b/a WCAX-TV; Gannett Vermont Publishing, Inc. d/b/a Burlington Free Press; Sample News Group, LLC d/b/a Barre-Montpelier Times Argus and Rutland Herald; VTDigger, a project of the Vermont Journalism Trust, Ltd.; Vermont Community Newspaper Group, LLC d/b/a Stowe Reporter, News & Citizen, South Burlington Other Paper, Shelburne News, and The Citizen; and Da Capo Publishing, Inc. d/b/a Seven Days, Plaintiffs,

v.

Patricia GABEL, in her official capacity as the State Court Administrator of the Supreme Court of the State of Vermont; Amanda Stites, in her official capacity as Clerk of Court for Addison, Bennington, and Rutland Counties; Margaret Villeneuve, in her official capacity as Clerk of Court for Caledonia, Essex, Orleans, and Washington Counties; Christine Brock, in her official capacity as Clerk of Court for Chittenden County; Gaye Paquette, in her official capacity as Clerk of Court for Franklin, Grand Isle, and Lamoille Counties; and Anne Damone, in her official capacity as Clerk of Court for Orange, Windham, and Windsor Counties, Defendants.

Case No. 2:21-cv-000132
|
Signed 11/19/2021

## Attorneys and Law Firms

Jonathan E. Ginsberg, Esq., William Hibsher, Esq., Pro Hac Vice, Bryan Cave Leighton Paisner LLP, New York, NY, Robert B. Hemley, Esq., Gravel & Shea PC, Burlington, VT, for Plaintiffs.

David A. Boyd, Esq., Office of the Vermont Attorney General, Montpelier, VT, for Defendants.

**OPINION AND ORDER DENYING AS MOOT PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, DENYING DEFENDANTS' MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART PLAINTIFFS' REQUEST FOR PERMANENT INJUNCTIVE RELIEF, AND DENYING PLAINTIFFS' REQUEST FOR DECLARATORY RELIEF** (Docs. 16, 26, & 43)

Christina Reiss, District Judge

**\*1** Plaintiffs Courthouse News Service; Vermont Press Association, Inc.; New England First Amendment Coalition; Gray Media Group, Inc. d/b/a WCAX-TV; Gannett Vermont Publishing, Inc. d/b/a Burlington Free Press; Sample News Group, LLC d/b/a Barre-Montpelier Times Argus and Rutland Herald; VTDigger, a project of the Vermont Journalism Trust, Ltd.; Vermont Community Newspaper Group, LLC d/b/a Stowe Reporter, News & Citizen, South Burlington Other Paper, Shelburne News, and The Citizen; and Da Capo Publishing, Inc. d/b/a Seven Days (collectively, "Plaintiffs") bring this action under 42 U.S.C. §

1983 against Defendants Patricia Gabel, in her official capacity as State Court Administrator of the Supreme Court of the State of Vermont; Amanda Stites, in her official capacity as Clerk of Court for Addison, Bennington, and Rutland Counties; Margaret Villeneuve, in her official capacity as Clerk of Court for Caledonia, Essex, Orleans, and Washington Counties; Christine Brock, in her official capacity as Clerk of Court for Chittenden County; Gaye Paquette, in her official capacity as Clerk of Court for Franklin, Grand Isle, and Lamoille Counties; and Anne Damone, in her official capacity as Clerk of Court for Orange, Windham, and Windsor Counties (collectively, "Defendants").

Plaintiffs allege that Defendants' failure to make newly filed civil complaints available to the public prior to Defendants' pre-access review process violates Plaintiffs' First Amendment rights. Plaintiffs seek injunctive and declaratory relief and an award of attorneys' fees under 42 U.S.C. § 1988.

**I. Procedural Background.**

Plaintiffs filed a complaint for injunctive and declaratory relief on May 20, 2021 and amended it on June 7, 2021. (Docs. 1 & 16.) The parties filed a Stipulation and Proposed Order regarding a briefing schedule for a motion for preliminary injunction by Plaintiffs and a motion to dismiss by Defendants, which the court adopted on July 8, 2021. (Doc. 25.) Plaintiffs moved for a preliminary injunction on July 12, 2021, seeking to enjoin Defendants from denying Plaintiffs access to newly filed civil complaints until after they were processed pursuant to the rules promulgated by the Vermont Supreme Court. (Doc. 26.) On August 18, 2021, Defendants filed a motion to dismiss (Doc. 43) and opposed Plaintiffs' motion for a preliminary injunction (Doc. 44). On September 24, 2021, Plaintiffs filed a reply in support of their motion for a preliminary injunction (Doc. 50) and a response in opposition to Defendants' motion to dismiss (Doc. 51). Defendants replied in support of their motion to dismiss on October 15, 2021. (Doc. 52.)

Pursuant to Federal Rule of Civil Procedure 65(a)(2), with the parties' consent, the court consolidated the hearing on the preliminary injunction with a trial on the merits. The consolidated hearing and trial were held on October 25, 2021. The parties stipulated to a trial without live witnesses, asking the court to make its factual findings based on the materials they submitted. Because there has been a trial on the merits, Plaintiffs' motion for preliminary injunction (Doc. 26) IS DENIED AS MOOT.

**\*2** On October 29, 2021, Defendants moved for leave to file a supplemental submission, which Plaintiffs opposed as inconsistent with the parties' stipulation.[1] The court granted leave in part "to the extent Defendants present new evidence regarding when newly filed complaints that are not made publicly available on the date of filing become accessible[,]" and denied it in part "to the extent it presents new arguments based on case law which predates the trial." (Doc. 60.) Plaintiffs responded to Defendants' supplemental submission on November 5, 2021, at which point the court took the pending motions under advisement. (Doc. 61.)

Plaintiffs are represented by William Hibsher, Esq., Jonathan E. Ginsberg, Esq., and Robert B. Hemley, Esq. Defendants are represented by Assistant Attorney General David Boyd.

**II. Findings of Fact.**

Pursuant to Federal Rule of Civil Procedure 52(a)(1) and the parties' stipulation, the court makes the following findings of facts.

**A. The Parties.**

1. With the exception of New England First Amendment Coalition, a regional group interested in protecting First Amendment freedoms, Plaintiffs are media companies that report on court proceedings in the Vermont Superior Courts and elsewhere.

2. Plaintiff Courthouse News Service ("CNS") is a nationwide news service which employs approximately 240 people, most of them editors and reporters, covering state and federal trial and appellate courts in all fifty states in the United States. It currently employs reporters who cover the state and federal trial and appellate courts of Vermont.

3. Plaintiff CNS offers a variety of publications, including its "New Litigation Reports," which contain original, staff-written summaries of significant new civil complaints. New Litigation Reports focus on general jurisdiction civil complaints against business institutions, public entities, prominent individuals, or other civil actions of interest to CNS subscribers. New Litigation Reports do not cover criminal or family law matters, nor do they include residential foreclosures or probate filings.

4. Among Plaintiff CNS's other publications are its two print newsletters and an electronic "Daily Brief" which cover published nationwide appellate rulings, including all U.S. Supreme Court and federal circuit decisions, as well as significant rulings from federal district courts, including the District of Vermont. In addition, Plaintiff CNS publishes a website featuring news reports and commentary, which functions much like a daily newspaper.

5. To prepare New Litigation Reports and identify new cases that may warrant coverage, Plaintiff CNS's reporters have traditionally visited their assigned courts to review all newly filed complaints in order to determine which ones are newsworthy. However, as the federal courts and an increasing number of state courts are making court records available online, and in light of the ongoing COVID-19 pandemic, Plaintiff CNS also covers courts remotely through the Internet.

6. Reporters for the other media Plaintiffs also review newly filed civil complaints to identify cases that may be newsworthy. Any delay in the ability of a reporter to obtain and review a newly filed complaint necessarily creates a delay in the ability to inform subscribers and the public of the factual and legal allegations in those complaints.

7. Defendants are state officials responsible for the administration of the Vermont Superior Courts. The Vermont Superior Courts are comprised of fourteen county-based units.[2]

**\*3**  8. Vermont Superior Courts are the trial courts that hear the majority of civil actions.

9. Vermont Superior Court Clerks are responsible for, among other things, the administration of civil court records and the provision of public access to those records.

**B. Transition to Odyssey Electronic Filings.**

10. From April 20, 2017 to March 2020, Plaintiffs were able to review newly filed paper complaints, including, in some cases, complaints that had yet to be docketed in the Vermont Superior Courts. Before providing complaints to the press or the public, court staff would complete a "quick file audit" to confirm the absence of confidential information or remove previously identified confidential information. (Doc. 50-3 at 3.)

11. In March 2020, the Vermont Judiciary implemented a new electronic case management system "Odyssey," which is hosted by a third-party vendor, Tyler Technologies, Inc.

12. The Vermont Superior Courts transitioned to Odyssey's electronic filing system in three phases. The Orange, Windham, and Windsor units began the transition to electronic records in March 2020 and began accepting electronic filings in April 2020. The Addison, Bennington, Chittenden, and Rutland units began the transition to electronic records in September 2020 and began accepting electronic filings in October 2020. The Caledonia, Essex, Franklin, Grand Isle, Lamoille, Orleans, and Washington units began the transition to electronic records in February 2021 and began accepting electronic filings on March 15, 2021.

13. As of March 15, 2021, with limited exceptions, all documents filed in the Vermont Superior Courts are required to be electronically filed. *See* 2020 Vermont Rules for Electronic Filing Rule 3(a).

14. Public access to filings is available only at designated display terminals located in courthouses and judiciary offices during regular business hours. Each unit must have at least one public access terminal. Remote access to publicly accessible case records, except for criminal, family, or probate records, may be provided at the discretion of the Court Administrator.

15. During the rollout of Odyssey, the Vermont Superior Courts experienced COVID-19-related challenges including work restrictions, equipment shortages, training delays, and the reallocation of information technology professionals to tasks related to remote connectivity rather than electronic filing.

16. The Vermont Superior Courts continue to suffer a high employee attrition rate and continue to experience difficulties in recruiting necessary staff to assist in Odyssey's implementation as well as other court-related tasks.

**C. The Rules Authorizing the Pre-Access Review Process.**

17. The 2020 Vermont Rules for Electronic Filing ("V.R.E.F.") and Vermont Rules for Public Access to Court Records ("V.R.P.A.C.R.") control the process for electronic filing in the Vermont Superior Courts.

18. Under V.R.E.F. 5(b), the electronic filer must:

(1) prepare and format the efiling in accordance with Rule 5(f) and (g), and Rule 7;

 **\*4**  (2) sign the efiling as provided in Rule 9;

(3) provide a mailing address and email address on the documents electronically filed;

(4) satisfy payment requirements of Rule 10;

(5) take any actions required under Rule 7(a)(1) of V.R.P.A.C.R.;

(6) certify that each document filed complies with V.R.P.A.C.R.; and

(7) for initial filings, provide service contacts that will enable post-commencement service on the efiler and maintain updated contacts.

19. Under V.R.E.F. 5(d), Vermont Superior Court staff are required to perform the following processing:

(1) Court Staff Review. Court staff will review all electronic filings for compliance with these rules and Rule 7(a)(1) of V.R.P.A.C.R.

(2) Accepting or Rejecting a Filing. Court staff will electronically notify the efiler either that the efiling has been accepted or that it cannot be accepted until specified actions required under these rules have been taken.

(3) Correcting an eFiling. An efiler may submit a corrected efiling within seven days after receiving the notification if the efiler follows the instructions for efiling a correction on the electronic filing system. The court may extend the time for correction for good cause. Court staff will accept a corrected efiling if all requirements of those rules and the instructions for correction have been met.

(4) Filing Date. When an efiling has been accepted, the date and time of efiling for all purposes under the applicable rules of procedure are the date and time that the initial efiling was submitted if the corrected filing complied with the time limits in (d)(3).

(5) Assigning Case Number. The electronic filing system will provide a case number for a new case filing that has been accepted in the acceptance notification. The assigned case number must appear on all subsequent efilings pertaining to the case.

20. Under V.R.P.A.C.R. 6(b), the public "does not have access" to certain court records, including the following:

(1) Records which by statute, court rule, or other source of law are designated confidential or to which access is prohibited by a similar term. An appendix to this rule lists all statutes and court rules containing a prohibition or restriction on public access, existing on the date of promulgation of this rule, and a summary of the extent and terms of the prohibition or restriction. Annually before January 1 of each year the Court Administrator will update the list in the appendix.

...

(14) The following personally identifying data elements filed in a case record that is otherwise publicly accessible under these rules:

(i) A social security number;

(ii) A passport number;

(iii) A taxpayer identification number;

(iv) A financial account number, including a credit or debit card number; or

(v) In a criminal case, the name of a child alleged to be a victim. In lieu of a social security, passport, taxpayer identification or financial account number, the filer may include the last four digits of that number. In lieu of the name of a child victim, the filer may include the initials of the first and last name of the child.

**\*5** 21. Although none of the Vermont Judiciary's electronic filing rules clearly state that the public shall not have access to a newly filed complaint until a pre-access review process is completed, Defendants contend that the rules, when read collectively, authorize a process which entitles the Vermont Superior Courts to withhold access to newly filed complaints until a manual review for certain information takes place. The rules impose no deadlines or other temporal restraints on how long the pre-access review process may take, how it is staffed, or impose any consequences if the pre-access review process is unduly delayed.

22. Plaintiffs contend that as of July 1, 2021, Vermont was the only state in the nation that requires court clerks to independently review electronic court filings in a non-public queue for confidential information before those filings are accessible to the public. Defendants offered no evidence to rebut that contention.

**D. Protection of Confidential Records and Consequences of Noncompliance.**

23. V.R.P.A.C.R. 2(e) states: "To the extent reasonably practicable, restriction of access to confidential information is implemented in a manner that does not restrict access to any portion of the record that is not confidential."

24. V.R.P.A.C.R. 7(a)(1) imposes the following responsibilities on filers:

(A) In General. It is the responsibility of the filer of a case record, whether in physical or electronic form, to determine whether all or part of the record being filed is not publicly accessible.

(B) Certifying Compliance. The filer must certify that the filer has reviewed the case record, and that the filing specifies the nonpublic records and protects those records from disclosure to the public consistent with these rules. The certificate must detail any actions taken to comply with these rules and the reasons for the actions.

(C) Separating Nonpublic Records in Public Files. If the record is not filed in a type of case that is closed to the public by statute, the filer must separate the part of the record that is subject to public access from the part that is not subject to public access by redaction or other similar method. The filer may separately file the omitted or redacted part of the record or may additionally file a separate complete record.

(D) Identifying Nonpublic Records. The filer of a record that is not publicly accessible under these rules or under statute must identify the record as not publicly accessible at the time of filing. After acceptance of the filing, court staff will place that document, or any other document not publicly accessible, in the section of the electronic or physical file of the case that is not publicly accessible.

25. V.R.P.A.C.R. 7(a)(3) and (4) set forth the following court staff responsibilities and powers:

(3) Responsibility of Court Staff When Document is Filed. The Court Administrator will establish the procedures for staff to discharge the record custodian's responsibility to provide public and special access to records as provided in these rules and to implement exceptions to public access established by these rules and by statute. If staff determine that a filing does not fully comply with these rules, including with respect to one or more personal identifiers, staff must take an action specified in paragraph (4). If a court staff person or judicial officer discovers that a case record that is publicly accessible may be in that status in violation of these rules, the staff or officer must act to temporarily restrict public access to the record and notify the Court Administrator. If the Court Administrator determines that public access to the record is not authorized under these rules, the Court Administrator will direct that the record be removed from public access. The Court Administrator may direct that the record be redacted or otherwise modified to allow public access to parts that are publicly accessible under these rules. If the record was filed by or on behalf of a party or another person who is not court staff or a judicial officer, the Court Administrator may direct that the filer make the record compliant with these rules within a specified time. If the filer provides a compliant filing on or before the specified time limit, the filing date will be the date of the original filing. Otherwise, the filing date will be the date of the compliant filing. The Court Administrator may appoint a designee to discharge the Court Administrator's responsibility under this rule.

**\*6** (4) Actions When a Filing is Noncompliant with Rules.

(A) The staff person who reviews the filing may:

(i) Change the public-access status or redact the filing to comply with these rules; or

(ii) Reject the filing until it is made compliant with these rules and specify the time limit to do so.

(B) In addition, the staff person may refer the matter to an assigned judge who, after notice and hearing, may:

(i) Impose any sanction authorized by V.R.C.P. 11(c), regardless of whether that rule is otherwise applicable to the proceeding involved;

(ii) Reference the matter to the Professional Responsibility Program if the court finds that there is probable cause to conclude that a lawyer has violated Rule 3.4(c) of the Rules of Professional Conduct; and/or

(iii) If the court finds a violation of these rules occurred and excusable neglect is not present, order that the date of the corrected filing is the date of filing for all purposes; or remedial action appropriate to the circumstances.

26. "For case records, the rules recognize that it is the responsibility of both filers of case records and the Judiciary to protect confidentiality and privacy where public access is restricted by such requirements." V.R.P.A.C.R. 3(b). The Judiciary is required to "take reasonable steps to comply with these rules." *Id.* A non-compliant filer is subject to penalties set forth in V.R.P.A.C.R. 7(a)(4), including sanctions and referral to the bar for violation of the Rules of Professional Conduct.

27. From the transition to electronic filing through September 3, 2021, the Vermont Superior Courts rejected sixty-six proposed filings across all filing types under rejection code RR11—Public Documents Containing Nonpublic Information and seventy-two additional proposed filings across all filing types with comments indicating rejection was related to nonpublic information. Nineteen of those were civil filings and four were listed as confidential by the filer in the Filing Code Description. Of those four, one was an unredacted check and three were exhibits to two civil complaints. (Doc. 50-3 at 4-5.)

28. Defendants' pre-access review for confidential information has thus led to a rejection of three exhibits related to two out of 4,156 newly filed civil complaints during Odyssey's implementation. This means that the pre-access review process for confidential information identified a violation in only 0.048% of newly filed complaints.

E. **Delays Occasioned by the Pre-Access Review Process.**

29. After they are electronically filed in the Vermont Superior Courts, newly filed complaints are placed in an electronic review queue which is not accessible to the public. A clerk checks for a signature, unredacted personally identifying information exempt from disclosure, and comments left by the filer. The clerk verifies that the complaint is correctly designated as public, confidential, or sealed; that the right filing codes are selected; and that the filing fee and case type selected are correct. The clerk then accepts or rejects the filing. Accepted nonconfidential filings become available for public viewing only after this review process is complete.

 **\*7** 30. The pre-access review process for new civil filings typically takes approximately twenty minutes to complete. Odyssey's software performs a verification process that duplicates the clerk's pre-access review except for the review for confidential information, which must be undertaken manually.

31. Because Defendants provide no evidence that their ministerial review of a newly filed complaint (for signature, fee payment, coding, etc.) takes twenty minutes, nor would it be reasonable to make such a claim, it appears that the majority of the pre-access review process is devoted to a manual review of the complaint for confidential information. This is also the only portion of the pre-access review process which is not duplicated by Odyssey's software.

32. If a filing is accepted, it becomes available electronically for public viewing upon acceptance.

33. But for the Vermont Superior Courts' pre-access review process, newly filed complaints could be made accessible to the public immediately upon filing.

34. Since the implementation of Odyssey, delays in access to newly filed complaints have been pervasive throughout the Vermont Superior Courts. Of the 4,156 newly filed civil complaints filed in the fourteen Vermont Superior Courts from the first implementation of Odyssey until August 6, 2021 (the "Designated Period"), on average:

a. 54.8% were made available to the public on the same day as filing;

b. 22.6% were made available to the public one day after filing;

c. 4.6% were made available to the public two days after filing;

d. 6.7% were made available to the public three days after filing; and

e. 11.4% were made available to the public four or more days after filing.

35. On a weekly basis, the percentage of newly filed civil complaints made available on the same day as filing ranged, on average, from a low of 0% for weeks starting May 3, 2020; May 17, 2020; and October 4, 2020, to a high of 91.7% for the week starting November 22, 2020.

36. Among the fourteen Vermont Superior Courts during the Designated Period, the percentage of newly filed civil complaints made available on the same day as filing ranged from a low of 3.8% to a high of 81.6%. Specifically:

a. In the Addison Unit, 33.9% were made available to the public on the same day as filing;

b. In the Bennington Unit, 51.0% were made available to the public on the same day as filing;

c. In the Caledonia Unit, 11.1% were made available to the public on the same day as filing;

d. In the Chittenden Unit, 61.1% were made available to the public on the same day as filing;

e. In the Essex Unit, 3.8% were made available to the public on the same day as filing;

f. In the Franklin Unit, 58.2% were made available to the public on the same day as filing;

g. In the Grand Isle Unit, 53.1% were made available to the public on the same day as filing;

h. In the Lamoille Unit, 50.7% were made available to the public on the same day as filing;

i. In the Orange Unit, 39.5% were made available to the public on the same day as filing;

j. In the Orleans Unit, 28.0% were made available to the public on the same day as filing;

k. In the Rutland Unit, 64.9% were made available to the public on the same day as filing;

l. In the Washington Unit, 67.6% were made available to the public on the same day as filing;

m. In the Windham Unit, 81.6% were made available to the public on the same day as filing; and

**\*8** n. In the Windsor Unit, 37.8% were made available to the public on the same day as filing.

37. The Vermont Superior Courts' pre-access review process results in delay that varies significantly between court units and within each court unit:


**F. The Centralization Process.**

38. The Vermont Superior Courts are in the process of centralizing the pre-access review process on a division-by-division basis as part of a pilot approach that will be evaluated and adjusted as necessary before becoming permanent. Centralized review for five Vermont Superior Court units began in July of 2021 but staffing constraints have not allowed for the other units to be centralized. Defendants' goal is to have the civil pilot program cover the remaining units in October of 2021 and make it permanent by the end of 2021. (Docs. 44-14 and 55.)

**G. Whether Media Coverage has been Impaired by Defendants' Pre-access Review Process and Whether Plaintiffs are Entitled to Special Access.**

39. Defendants argue that Plaintiffs fail to prove that their ability to provide timely coverage of court cases has been impaired by Defendants' pre-access review process. They ask the court to use Plaintiff CNS's publication dates to determine whether there has been unconstitutional delay. Not only does this approach reflect a misallocation of the burden of proof, Defendants' evidence in support of this argument is unreliable. Many factors contribute to when Plaintiff CNS provides media coverage of a newly filed complaint. To measure delay by publication dates thus fails to yield an accurate determination of when a newly filed complaint becomes accessible to the public.

40. Plaintiffs' suggestion that Defendants create a media queue that affords the media preferential access is equally misplaced. Although Plaintiffs point to states which use the same technology as Odyssey that have chosen to implement a media queue,[3] Plaintiffs' First Amendment right of access does not exceed that of the general public. A media queue would thus not provide an adequate remedy for any unconstitutional delay. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 773-74 (1985) (White, J., concurring) (observing that the First Amendment does not guarantee the press a constitutional right and special access to information not available to the public generally); *Courthouse News Serv. v. Schaefer,* 2 F.4th 318, 326 n.5 (4th Cir. 2021) ("The media's rights of access are co-extensive with and do not exceed those rights of members of the public in general.") (internal quotation marks omitted).

### III. Conclusions of Law and Analysis.

#### A. Whether Plaintiffs Have a First Amendment Right of Access to Newly Filed Civil Complaints.

**\*9** "[I]t is well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.' " *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (recognizing a right of access "implicit in the guarantees of the First Amendment").[4] "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Id.* at 575-76 (internal quotation marks omitted) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)).

The Second Circuit has recognized a First Amendment right of public access "to civil trials and to their related proceedings and records." *New York Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012) (collecting cases). "[T]he need for public access ... is grounded in the 'need for federal courts ... to have a measure of accountability and for the public to have confidence in the administration of justice.' " *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).

[The Second Circuit has] applied two different approaches when deciding whether the First Amendment right applies to particular material. The "experience and logic" approach applies to both judicial proceedings and documents, and asks "both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." The second approach—which we adopt only when analyzing judicial documents related to judicial proceedings covered by the First Amendment right—asks whether the documents at issue "are derived from or are a necessary corollary of the capacity to attend the relevant proceedings."

*Id.* (citations omitted).

In *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, the Second Circuit applied the "experience and logic" approach and found a presumptive First Amendment right of access to civil complaints. 814 F.3d 132, 141 (2d Cir. 2016). In so ruling, the Second Circuit noted that when a complaint is withheld, it "leaves the public unaware that a claim has been leveled and that state power has been invoked—and public resources spent—in an effort to resolve the dispute." *Id.* The public right of access generally attaches when a newly filed civil complaint is received by a court. *See Lugosch*, 435 F.3d at 126 (emphasizing "the importance of immediate access where a right to access is found[ ]").

Defendants contend Plaintiffs seek instantaneous access to newly filed complaints akin to allowing a reporter to go behind the clerk's desk and open a Vermont Superior Court's mail. This comparison is nonsensical in the context of an electronic filing system. In Odyssey, there is no opening of an envelope or other physical handling that would make access upon filing impracticable. Instead, the only obstacle to immediate access to newly filed complaints is Defendants' pre-access review process. In effect, Defendants purposefully withhold immediate access by placing newly filed complaints in a review queue where they may be reviewed in a matter of minutes, hours, or days with virtually no guarantee as to when they will become accessible to the public. The delay differs significantly among and within the fourteen Vermont Superior Courts, varies day by day, and occurs with no predictability. It is Defendants' placement of newly filed complaints in this queue which must be justified under the First Amendment.

**\*10** Because Plaintiffs have identified a First Amendment right to access to newly filed complaints, Defendants' motion to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a plausible claim for relief must be DENIED.

#### B. Whether the Case Should Be Dismissed as Moot.

Defendants argue the Complaint is partially moot and will soon be completely moot because the Vermont Superior Courts are centralizing their review process for civil filings which will expedite review. Defendants anticipate centralization will be made

permanent by the end of 2021. By Defendants' own admission, "[t]hese goals, of course, depend on the judiciary being able to fill all of the necessary positions, which it is working to do." (Doc. 44 at 32.)

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009)). "When a case becomes moot, the federal courts 'lack[ ] subject matter jurisdiction over the action.' " *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994) (alteration in original) (quoting *N.Y.C. Emps.' Ret. Sys. v. Dole Food Co.*, 969 F.2d 1430, 1433 (2d Cir. 1992)).

"[T]he party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.' " *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Id.* "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings." *Id.* (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).

"[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Instead, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see also Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 375 (2d Cir. 2004) ("The voluntary cessation of allegedly illegal conduct usually will render a case moot 'if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.' ") (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002)). "Where, as here, the defendant is a government entity, '[s]ome deference must be accorded to a [governmental body's] representations that certain conduct has been discontinued.' " *Lamar Advert. of Penn, LLC*, 356 F.3d 365 (first alteration in original). In this case, however, Defendants do not claim pre-access delay has ceased; they merely assert they are working on the Odyssey rollout and a centralization process and should be afforded additional time to complete those tasks.

**\*11**  As Plaintiffs point out, this case has been pending since May 20, 2021, Odyssey was first implemented in March 2020, and newly filed complaints still "sit in electronic queues, sometimes for days, waiting to be reviewed and processed before being made public." (Doc. 26 at 8.) Plaintiffs therefore contend that their claims are not moot. The court agrees.

Because Defendants have not voluntarily ceased the pre-access review process which Plaintiffs challenge, Plaintiffs' First Amendment claim is not moot. *See Schaefer*, 2 F.4th at 323 ("While the [Defendants'] improvements in rates of access are commendable, absent the relief Courthouse News [seeks], 'nothing bars [Defendants] from reverting' to the allegedly unconstitutional rates of access in the future.") (quoting *Porter v. Clarke*, 852 F.3d 358, 365 (4th Cir. 2017)). Defendants' motion to dismiss on mootness grounds is therefore DENIED.

### C. Whether the Court Should Abstain From Exercising Jurisdiction.

As an alternative ground for dismissal, Defendants argue the court should abstain from exercising jurisdiction based on principles of comity, equity, and federalism.[5] In the Second Circuit, abstention is "not a jurisdictional bar based on Article III requirements, but instead a prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." *Kaufman v. Kaye*, 466 F.3d 83, 88 n.1 (2d Cir. 2006) (quoting *Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65, 74 (2d Cir. 2003)).

Ordinarily, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." But the Supreme Court has recognized some "carefully defined" situations in which courts may abstain. To ensure that abstention remains "the exception, not the rule," federal courts may abstain only if a case falls into one of these "specific doctrines[.]"

*Schaefer*, 2 F.4th at 324 (citations omitted).

Defendants cite *Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir. 2018), in support of abstention. In that case, the Court of Appeals for the Seventh Circuit concluded that the "principle of comity takes on special force when federal courts are asked to decide how state courts should conduct their business[,]" and a federal court should therefore "step back" while a state court transitions to electronic filing and works through the "implementation challenges and resource limitations" associated with the transition. *Id.* at 1074. The Seventh Circuit recognized that none of the "principal categories of abstention" were applicable but nonetheless found abstention "avoid[s] the problems that federal oversight and intrusion ... might cause." *Id.* at 1071. In *Courthouse News Service v. Gilmer*, the Eastern District of Missouri followed *Brown* and abstained because it did not want to "dictate to, oversee, or otherwise insert itself into the ... operations and administration of its co-equal Missouri state courts" nor "impose on a state court a practice which is not currently employed by the Supreme Court of the United States." 2021 WL 2438914, at *9 (E.D. Mo. June 15, 2021). Other courts have not followed suit, and *Brown* and *Gilmer* remain outliers.

 **\*12**  The Second Circuit has not ruled on abstention in the context of a challenge to pre-access review but has found abstention appropriate in cases "challenging the internal workings of state courts." *Kaufman*, 466 F.3d at 86 (collecting cases). In *Kaufman*, the plaintiff sought a declaratory judgment that New York state judicial appellate panel assignment procedures violated due process and requested the court to mandate by way of an injunction a new system for appellate panel assignments. *Id.* at 84. The Second Circuit found abstention appropriate because, among other things:

> [A]ny remedy fashioned by the state would then be subject to further challenges in the district court. Appellant—or any state court litigant dissatisfied with the panel of judges assigned to his or her appeal—could raise compliance issues under the putative federal injunction claiming that the state court's chosen remedy violated the Constitution or the terms of that injunction. Such challenges would inevitably lead to precisely the kind of "piecemeal interruptions of ... state proceedings" condemned in *O'Shea* [*v. Littleton*, 414 U.S. 488 (1974)]. In short, we cannot resolve the issues raised here as to present assignment procedures without committing to resolving the same issues as to the remedy chosen by the state and as to the subsequent case-by-case implementation of the assignment procedures in the Second Department. This is exactly what *O'Shea* forbids.

*Id.* at 87.

Similarly, in *Disability Rights New York v. New York*, 916 F.3d 129, 134 (2d Cir. 2019), the Second Circuit rejected a request for an injunction requiring the New York courts to (1) notify litigants about rights to request modifications to proceedings; (2) hold proceedings that "provide augmented and substantive and procedural rights[;]" and (3) cease adjudications "until defendants ensure that the proceedings provide [requested] substantive and procedural rights[.]" *Id.* at 136. In upholding the district court's abstention, the Second Circuit cited *Brown* with approval and found that a federal court's ruling would govern "the occurrence of specific events that might take place" in future state court proceedings and therefore represented the same threat of "ongoing, case-by-case oversight of state courts" present in *Kaufman. Id.*

An adjudication of this case does not require the piecemeal disruption to and intervention in state proceedings at issue in *Kaufman* and *Disability Rights*. There is no risk of "case-by-case implementation[,]" *Kaufman*, 466 F.3d at 87, because the remedy here is "more akin to [a] bright-line finding ... than [an] ongoing monitoring of the substance of state proceedings[,]" and because "[a]n injunction requiring the [state courts] to provide ... access to filed ... civil complaints poses little risk of an 'ongoing federal audit' or 'a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state ... proceedings.' " *Courthouse News Serv. v. Planet*, 750 F.3d 776, 791-92 (9th Cir. 2014) (quoting *O'Shea*, 414 U.S. at 500). The Southern District of New York reached this same conclusion in a pre-access review case strikingly similar to the instant one. *See* Transcript of Hearing on Plaintiff's Motion for Preliminary Injunction at 47-48; *Courthouse News Serv. v. Tingling*, 2016 WL 8505086, at *1 (S.D.N.Y. Dec. 16, 2016), 2016 WL 8739010 (hereinafter, "*Tingling*").

The Second Circuit, itself, has cautioned that "the weight of the First Amendment issues involved counsels against abstaining." *Hartford Courant Co.*, 380 F.3d at 85, 100 (declining to abstain in right of access case where court was asked to determine "whether the public and press have a qualified First Amendment right to inspect docket sheets and, if so, the appropriate remedy

for its violation by state courts"); *see also Planet*, 750 F.3d at 787 ("We disfavor abstention in First Amendment cases because of the risk ... that the delay that results from abstention will itself chill the exercise of the rights that the plaintiffs seek to protect by suit") (ellipsis in original) (internal quotation marks and citations omitted). It has thus "carefully defined ... the areas in which such abstention is permissible, and [abstention] remains the exception, not the rule." *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998) (internal quotation marks omitted).

**\*13**  Because this case does not fit within traditional abstention categories and because it will neither result in piecemeal litigation, nor require continuing federal oversight of state court proceedings, abstention on the grounds of comity, equity, and federalism is not required. *See Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239, 1245 (2d Cir. 1992) ("[T]here is little or no discretion to abstain in a case which does not meet traditional abstention requirements.") (internal quotation marks omitted) (quoting *Mobil Oil Corp. v. City of Long Beach*, 772 F.2d 534, 540 (9th Cir. 1985)). Defendants' motion to dismiss on abstention grounds is therefore DENIED.

### D. Whether Plaintiffs' First Amendment Right of Access Was Violated.

A qualified First Amendment right of access attaches when a complaint is electronically filed. *See Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (9th Cir. 2020) ("[T]he press has a qualified right of timely access to newly filed civil nonconfidential complaints that attaches when the complaint is filed."); *Courthouse News Serv. v. New Mexico Admin. Off of the Cts.*, 2021 WL 4710644, at \*39 (D.N.M. Oct. 8, 2021) ("The qualified right 'attaches when the complaint is filed' in a traditional sense —when it is in the court's possession[.]") (quoting *Planet*, 947 F.3d at 585). "[The Second Circuit's] public access cases and those in other circuits emphasize the importance of immediate access where a right to access is found." *Lugosch*, 435 F.3d at 126 (collecting cases). "The constitutional right of access, however, is not absolute and must, in certain circumstances, 'give way ... to other rights or interests[.]' " *ABC, Inc. v. Stewart*, 360 F.3d 90, 98 (2d Cir. 2004) (alteration in original) (citing *Waller v. Georgia*, 467 U.S. 39, 45 (1984)).

"Once a First Amendment right of access to judicial documents is found, the documents 'may be [removed from public access] only if specific, on the record findings are made demonstrating that [this restriction] is essential to preserve higher values and is narrowly tailored to serve that interest.' " *United States v. Erie Cnty.*, 763 F.3d 235, 239 (2d Cir. 2014) (addressing document sealing) (alteration in original) (quoting *Lugosch*, 435 F.3d at 120); *see also Planet*, 947 F.3d at 596 ("[Defendant] must demonstrate first that there is a 'substantial probability' that its interest in the fair and orderly administration of justice would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest.") (citations omitted). "Broad and general findings and conclusory assertions are insufficient to justify deprivation of public access to the record[.]" *Bernstein*, 814 F.3d at 144-45 (internal quotation marks and citations omitted) (alteration accepted).

Defendants must justify withholding a document to which there is a First Amendment right of access. *See, e.g., Bernstein*, 814 F.3d at 144 ("To overcome the First Amendment right of access, the proponent of sealing must 'demonstrat[e] that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' ") (alterations in original) (quoting *In re N. Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).[6] In order to find this burden has been satisfied, a court must make " 'specific, on the record findings ... demonstrating that [withholding] is essential to preserve higher values and is narrowly tailored to serve that interest.' " *In re N.Y. Times Co.*, 828 F.2d at 116 (quoting *Press-Enter. Co.*, 478 U.S. 13-14).

**\*14**  Although courts agree on the importance of First Amendment access, they differ as to how much delay, if any, can be tolerated consistent with the U.S. Constitution. Some courts have held that the First Amendment "does not require ... instantaneous access" and provides "some leeway where same-day access would be impracticable[.]" *Schaefer*, 2 F.4th at 328. The Second Circuit has held that public access must be immediate and contemporaneous:

In light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous.... The newsworthiness of a particular

story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression.

*Lugosch*, 435 F.3d at 127 (quoting *Grove Fresh Distrib., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) (internal quotation marks omitted)). Courts, in turn, have grappled with the correct definition of "contemporaneous." For example, although the Eastern District of Virginia noted that Black's Law Dictionary defined "contemporaneous" as "occurring ... at the same time" and Merriam-Webster's dictionary used similar language, it nonetheless defined "contemporaneous" "in this context" to mean "on the same day of filing, insofar as practicable and if not practicable within one court day." *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 559 (E.D. Va. 2020). The Fourth Circuit endorsed this "flexible standard" and found it consistent with its case law defining "contemporaneous" to mean "as expeditiously as possible." *Schaefer*, 2 F.4th at 328. In *New Mexico Admin. Off. of the Cts.*, 2021 WL 4710644, at *41, the court permitted no greater than five business hours of pre-access delay because that "comes closest to the traditional right of access that the press had to civil complaints" prior to efiling.

Although some courts have sought to impose a bright-line rule for permissible delay, here the focus must be on whether *any* delay is appropriate because any restriction on the First Amendment right of access must have "sufficient justification." *Newsday*, 730 F.3d at 165; *see also Planet*, 947 F.3d at 596 (requiring justification for any delay to "immediate access" to newly filed complaints); *Tingling* (questioning defendant's justification of First Amendment restriction for "ministerial review"). As the Second Circuit has observed, when a governmental entity contends that the "limited denial of access" is insubstantial, it "begs the question of whether there was a sufficient factual basis for denying access at all." *ABC, Inc.*, 360 F.3d at 100.

Defendants urge this court to find that their stated interests in the administration of justice and confidentiality justify a delay in the First Amendment right of access. Their proof in support of these stated interests is scant. They claim their rates of access are fast by national standards,[7] but they exclude the federal courts from their analysis and use unreliable data from Plaintiff CNS's publication dates as support for an acceptable period of delay. The issue before the court is not how fast Plaintiffs cover new filings or whether Defendants' delay is comparable to that of other courts, but whether Defendants' pre-access review process is necessary to protect a higher interest and is narrowly tailored to achieve it. As this court noted, but for the pre-access review process, there would be no delay:

  **\*15**  [T]here would be no delay in an e-filing system. There could be 1,000 complaints; there could be 100,000 complaints. There's no delay. The only delay that's going to show up in e-filing is when you insert a staff member into it to do something else. Right? Because [efilers are filing] with all of the document information that they need, and it's hitting the docket, and there isn't any step in between there by staff.... So that, by definition, means that the delay is in this review process.
(Doc. 57 at 26:24-27:10.)

Defendants seek to justify much of the delay inherent in their pre-access review process by citing the Vermont Superior Courts' interest in the protection of the privacy of litigants and third-parties in confidential information. This interest is an important one. *See United States v. Doe*, 63 F.3d 121, 127 (2d Cir. 1995) ("[T]he privacy interests of individuals may also warrant [courtroom] closure orders in certain circumstances.") (collecting cases); *cf. Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984) (recognizing "substantial interest" in, among other things, the "privacy interests of litigants and third parties"). It does not, however, trump the First Amendment right of access unless the pre-access review process is also narrowly tailored and "essential to preserve higher values[.]" *Bernstein*, 814 F.3d at 144.

### E. Whether Defendants' Pre-Access Review Process is Narrowly Tailored.

To be narrowly tailored, Defendants must prove that "reasonable alternatives" to their pre-access review process cannot "adequately protect" their asserted interests. *Id.*

Defendants offer no evidence that staff review of signatures, filing fees, and filing codes is necessary to protect the orderly administration of justice. *See Planet*, 947 F.3d at 597 (finding no evidence that immediate access resulted in "accounting issues[,]" "compromised the quality and accuracy of information logged into the [case management system,]" "created efficiency problems[,]" or "resulted in loss, destruction, or mutilation of, or otherwise compromised the 'integrity' of, case

files"); *see also Courthouse News Serv. v. Jackson*, 2009 WL 2163609, at *4 (S.D. Tex. July 20, 2009) (finding twenty-four to seventy-two hour delays to verify correct case number, proper court, accurate title, and proper filing category were not narrowly tailored). Indeed, Odyssey's software system performs these same functions.

It is only Defendants' pre-access review for confidential information which is not automated in any respect. Although Defendants claim this review can be performed in approximately twenty minutes, it often takes several days to complete. Because it requires human intervention, the amount of time involved varies from day to day and court to court. At times, the delay involved is unjustifiable by any measure. There is, moreover, no guarantee when public access will be provided. Although centralization has improved the degree of delay it, too, involves human intervention which, in turn, is dependent on adequate staffing and other resource considerations.

As for protecting privacy interests, out of 4,156 electronically filed civil complaints, only three exhibits to two complaints were rejected during the pre-access review process because they contained confidential information. This is a minute fraction of the total complaints filed and demonstrates that the pre-access review process is not "essential to preserve higher values[.]" *Bernstein*, 814 F.3d at 144. Defendants cite no evidence that they experienced significant confidentiality breaches prior to the implementation of pre-access review, nor do they cite any court in the country that has found a similar process necessary.

**\*16**  Although Defendants argue that the absence of pre-access review would place "the onus solely on filers" and would "less effectively protect the integrity of the civil litigation process and privacy interests," (Doc. 44 at 30), the Vermont Superior Court filing rules already place primary responsibility on filers. *See* V.R.P.A.C.R. 7(a)(1)(A) ("[T]he filer of a case record, whether in physical or electronic form, [must] determine whether all or part of the record being filed is not publicly accessible"); V.R.P.A.C.R. 7(a)(1)(B) (requiring filer to certify compliance with V.R.P.A.C.R.). Defendants provide no evidence that these safeguards, combined with post-access review, are insufficient. To the contrary, Defendants' own evidence reveals that placing the onus on filers has been overwhelmingly effective.

The *Tingling* decision is instructive. There, the clerk in a New York state court "review[ed] the proposed filing for [compliance] with venue, caption, case type, as well as the attorney's signature certification required by court rule[ ]" "to ascertain whether they contain materials that, by operation of law, may not be made available to the general public." Only after completing the review process were complaints made available to the public. The clerk argued that the review was necessary to ensure compliance with filing rules and "to prevent a narrow category of errant pleadings at the outset in order to prevent confusion and waste." The Southern District of New York rejected this argument and found the clerk "failed to meet its burden of demonstrating that its policy of refusing to provide the public and press access to newly filed complaints until after they are reviewed and logged is either essential to preserve higher values or is narrowly tailored to serve that interest." A similar outcome is warranted here.

Because Defendants fail to demonstrate a "substantial probability" that the orderly administration of justice and privacy rights of litigants and third parties would be significantly impaired without their pre-access review, that practice cannot withstand constitutional scrutiny. *Press-Enter. Co.*, 478 U.S. 1, 14. A policy is not narrowly tailored if "a substantial portion of the burden ... does not serve to advance [Defendants'] goals." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006). Against this backdrop, "it is the responsibility of the district court to ensure that [any restriction on access to] documents to which the public has a First Amendment right is no broader than necessary[.]" *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008).

Timely public access to court documents "allows the public to understand the activity of the ... courts, enhances the court system's accountability and legitimacy, and informs the public of matters of public concern." *Bernstein*, 814 F.3d at 141. Defendants' pre-access review thwarts these objectives in an inconsistent, unpredictable, and unjustifiable manner.

Because Defendants have failed to sustain their burden to demonstrate that their pre-access review process is justified by higher interests and narrowly tailored to advance those interests, Defendants have violated the public's and Plaintiffs' First Amendment right of access to newly filed complaints.

### F. Whether Plaintiffs Are Entitled to Injunctive Relief.

A plaintiff seeking a permanent injunction must establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

**\*17**  To demonstrate irreparable harm, the moving party must establish an injury that is not remote or speculative but "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). "Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor.' " *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)); *see also SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021) ("The presence of irreparable injury to First Amendment rights, however, 'turns on whether the plaintiff has shown a clear likelihood of success on the merits[.]' ") (quoting *Beal v. Stern*, 184 F.3d 117, 123-24 (2d Cir. 1999)).

Plaintiffs have established that Defendants are violating their First Amendment right of access to newly filed complaints through the Vermont Superior Courts' pre-access review process and that an "injunction will prevent the feared deprivation." *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 350 (2d Cir. 2003). They have thus established irreparable harm. *See New York Civ. Liberties Union*, 684 F.3d at 305 (holding plaintiffs "would be irreparably harmed through the continued violation of [their First Amendment right of access]"). They have further established that their irreparable harm is ongoing. As the Ninth Circuit recently explained:

> CNS's reporting on complaints must be timely to be newsworthy and to allow for ample and meaningful public discussion regarding the functioning of our nation's court systems.... [T]he public interest in obtaining news is an interest in obtaining contemporaneous news.... Thus, that "old" news is not worthy of, and does not receive, much public attention has been widely recognized ... [and] the need for immediacy of reporting news "is even more vital in the digital age," where timeliness is measured in terms of minutes or seconds.

*Planet*, 947 F.3d at 594 (citations omitted).

"In a suit against the government, balancing of the equities merges into our consideration of the public interest." *SAM Party of N.Y.*, 987 F.3d at 278 (citing *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020)). In this case, the balance of hardships tips in Plaintiffs' favor because the public interest is served by timely reporting on the operations of the courts and because "securing First Amendment rights is in the public interest." *NY. Progress & Prot. PAC*, 733 F.3d at 488. Correspondingly, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am.*, 983 F.3d at 637.

Although "the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (internal quotation marks omitted), and "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction[,]" the court can safeguard these interests by limiting the scope of its injunction. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citations omitted). Plaintiffs' request for an injunction prohibiting enforcement of all "policies and practices that deny Plaintiffs contemporaneous access to newly filed civil complaints" and "prohibiting [Defendants] from applying [V.R.P.A.C.R.] 7(a)(3)" is overbroad. (Doc. 16 at 21.) An injunction addressing only the specifically challenged pre-access review process and leaving internal procedures to the Vermont Superior Courts is more appropriate. This type of injunction "in no way restricts or comments on the regulations that are in place for [Defendants] to review and accept for filing ... complaints when they are filed." *Tingling*.

**\*18**  For the foregoing reasons, Plaintiffs' request for permanent injunctive relief is GRANTED IN PART and DENIED IN PART. Defendants are hereby ENJOINED from prohibiting public access to newly filed civil complaints which have not been designated confidential by the filer until the Vermont Superior Court has completed a pre-access review process. Defendants may continue to restrict public access post-filing where a potential violation of their filing rules has been found.

**G. Whether Plaintiffs Are Entitled to Declaratory Relief.**

The Second Circuit has identified five factors to consider in deciding whether to issue a declaratory judgment:

(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy.

*New York Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-360 (2d Cir. 2003)). Declaratory relief in this case would serve no purpose which the court's permanent injunction has not achieved. Accordingly, Plaintiffs' request for declaratory relief is DENIED.

**CONCLUSION**

For the foregoing reasons, the court DENIES AS MOOT Plaintiffs' motion for preliminary injunction (Doc. 26), DENIES Defendants' motion to dismiss (Doc. 43), GRANTS IN PART and DENIES IN PART Plaintiffs' request for permanent injunctive relief, and DENIES Plaintiffs' request for declaratory relief. (Doc. 16.) Defendants are HEREBY ENJOINED from delaying public access to electronically filed civil complaints until the Vermont Superior Courts' pre-access review process is complete.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 5416650

Footnotes

1    "[T]he parties' agreement to consolidate without live witnesses means the Court can reach the factual findings it thinks [are] appropriate based on the record before it[.]" (Doc. 57 at 55.)

2    Addison, Bennington, Caledonia, Chittenden, Essex, Franklin, Grand Isle, Lamoille, Orange, Orleans, Rutland, Washington, Windham, and Windsor.

3    "In California, Georgia, and Nevada, for example, courts which use the same electronic filing and case management system [as Odyssey], based on software developed by Tyler Technologies, Inc., which is also Vermont's vendor, have provided timely access to CNS, and other credentialed members of the press, through a 'Press Review Queue' feature that allows CNS, at no cost to the court, to view newly filed complaints as soon as they are received by the court and without waiting for court staff to process them." (Doc. 61 at 8 n.6) (internal quotation marks omitted) (alteration accepted).

4    There is also a common law "general right to inspect and copy public records and documents, including judicial records and documents." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)). Plaintiffs allege only a violation of a First Amendment right of access, which provides more "substantive protection to the interests of the press and the public" than the common law. *Lugosch*, 435 F.3d at 124 (quoting *Rushford v. New Yorker Mag, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)).

5    Whether abstention is properly analyzed under Fed. R. Civ. P. 12(b)(1) is not settled law. *Compare Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 374 (S.D.N.Y. 2020) ("A motion to abstain is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to [Federal] Rule [of Civil Procedure] 12(b)(1).") (alteration in original) (quoting *Wilmington Tr., Nat'l Ass'n*

*v. Est. of McClendon*, 287 F. Supp. 3d 353, 360 (S.D.N.Y. 2018))) *with Kilroy v. Mayhew*, 841 F. Supp. 2d 414, 416 (D. Me. 2012) ("This Court has previously noted that 'abstention is a prudential rather than a jurisdictional ground for dismissal,' and, therefore, when considering abstention it does 'not rely upon the pleading or burden requirements of either Rule 12(b)(1) or Rule 12(b)(6).'") (quoting *Christian Action Network v. Maine*, 679 F. Supp. 2d 140, 143 n.2 (D. Me. 2010)); *see also Vereline v. Woodsville Guar. Sav. Bank*, 2015 WL 9216684, at *2 (D. Vt. Dec. 16, 2015) ("A motion to dismiss based on the abstention doctrine *may* be analyzed under Rule 12(b)(1).") (emphasis supplied) (collecting cases).

6   *See also Tingling*, 2016 WL 8739010 (finding "the clerk" had the "burden of demonstrating that its policy of refusing to provide public and press access to newly filed complaints until they are processed is [ ] essential to preserve higher values [and] is narrowly tailored to serve a substantial government interest"); *Planet*, 947 F.3d at 596 ("[Defendants] must demonstrate [rigorous scrutiny is satisfied.]"); *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021) ("Clerks offered no evidence ... to carry the government's burden.") (internal quotation marks and citation omitted); *Courthouse News Serv. v. New Mexico Admin. Off. of the Cts.*, 2021 WL 4710644, at *41 (D.N.M. Oct. 8, 2021) (relying on *Planet*).

7   Defendants' reliance on the "experience and logic" test for this argument is misplaced. In the Second Circuit, the "experience and logic" approach merely determines "whether the First Amendment right applies *to particular material*[,]" *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013) (emphasis supplied), it does not dictate the acceptable measure of delay.

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

38 Media L. Rep. 1890

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Sullo & Bobbitt, PLLC v. Abbott, N.D.Tex., July 10, 2012

2009 WL 2163609
United States District Court,
S.D. Texas,
Houston Division.

COURTHOUSE NEWS SERVICE, Plaintiff,

v.

Loren JACKSON, in his official capacity as Harris County District Clerk, and Wes McCoy, in his official capacity as Chief Deputy—Services for the Harris County District Clerk's Office, Defendants.

Civil Action No. H–09–1844.
|
July 20, 2009.

## OPINION AND ORDER OF PRELIMINARY INJUNCTION

MELINDA HARMON, District Judge.

**\*1** Presently before the Court is Plaintiff Courthouse News Service's (CNS) motion for injunctive relief (Doc. 2). Upon review and consideration of this document, the responses and replies thereto, the relevant legal authority, and the testimony provided and evidence introduced at the June 25, 2009, preliminary injunction hearing, the Court finds that Plaintiff's motion should be granted.

### I. Background and Relevant Facts

On June 12, 2009, Plaintiff CNS initiated suit against Defendants Loren Jackson, in his official capacity as Harris County District Clerk, (Jackson) and Wes McCoy, in his official capacity as Chief Deputy—Services for the Harris County District Clerk's Office, (McCoy) (collectively, Defendants) for violations of the First Amendment to the United States Constitution, federal common law, the Texas Constitution, Texas common law, and Rule 76a of the Texas Rules of Civil Procedure. (Pl.'s Compl., Doc. 1).

Plaintiff is a 19–year–old nationwide legal news service for lawyers and the news media, and it has over 2,500 subscribers nationwide. (Girdner Decl., Doc. 5 Ex. 1 at ¶ 3). Plaintiff's list of subscribers includes lawyers, law firms, and media entities, including *The Dallas Morning News*. (*Id.* at ¶ 9). Plaintiff offers various services to its subscribers including daily new litigation reports, news alerts via email, and four different print publications. (*Id.* at ¶¶ 5–7). The service allegedly affected by Defendants' actions in this case is the "Houston State Report," a daily new litigation report that includes a list of the significant civil complaints filed in Harris County District Court on that date. (*Id.* at ¶ 7).

Plaintiff claims that there is a longstanding tradition for state and federal courts around the country to provide reporters who make daily visits to these courts with access to newly filed complaints or petitions at the end of the business day on which these documents are filed. (*Id.* at ¶¶ 11–14; *see also* Girdner Decl., Doc. 5 Ex. 1–C). Specifically, Plaintiff asserts that, since it began visiting the Harris County District Court in 1999, reporters were permitted to review most new civil petitions in their original paper form on the same day that they were filed regardless of whether they had been fully processed, scanned, or posted online. (*Id.* at ¶ 15).

Until October 2008, Cameron Langford (Langford), CNS's reporter assigned to the Harris County District Court, would follow the procedure below. (Langford Decl., Doc. 5 Ex. 3 at ¶ 4). Prior to each visit, Langford would examine docket information on the new petitions using the Clerk's Office online JIMS system to determine which petitions were likely to be newsworthy. (*Id.*). He would then collect newly-filed petitions from the cashier and review them in an empty cubicle behind the intake counter. (*Id.*). If any petitions had been transferred to intake clerks for processing before Langford was able to review them, the cashiers would help him locate them. (*Id.*). While in the Clerk's Office, Langford would either take notes about or, if necessary, make photocopies of the newly-filed petitions. (*Id.*).

 **\*2**  In October 2008, Jackson's predecessor as Harris County District Clerk began to review the protocol that permitted Langford or any non-deputized person access to secure areas behind the service counters of the Harris County District Clerk's Office. (Jackson Aff ., Doc., 14 Ex. A at ¶ 3). In accordance with the Harris County Auditor's cash handling guidelines and recommendations, the Clerk's Office began to prevent access behind service counters for all non-deputized persons. (*Id.*). As a result, Langford was no longer granted behind-the-counter access. (*Id.*).

In November 2008, the Harris County District Clerk's Office began implementing new procedures that would provide the press and public with greater access to view and print case filings using its online service and that would encourage the use of electronically filed documents. (*Id.* at ¶ 4). In doing so, Harris County District Clerk Jackson hopes to provide equal access to all regardless of status. (*Id.* at ¶ 5). His goal is to make available online all electronically and paper filed petitions in civil matters except those exempted by law, local rule, or Court order, within the guidelines found in the Texas Rules of Judicial Administration. (*Id.*). In practice, most filings are available within 24 to 72 business hours of filing. (*Id.* at ¶ 6). Electronic filings are usually available within 24 business hours, while paper filings are typically available within 72 business hours. (*Id.*). Both electronic and paper filings are verified for correct cause number, proper court, accurate title of document, and proper category before they are made available to the public. (*Id.*). While electronically filed documents are posted online after the indexing and verification process, the paper filed documents are sent to Central Data Processing for digitizing into electronic form before they are posted online. (*Id.*).[1]

Although the parties have attempted to resolve these issues, they have not been successful. Accordingly, Plaintiff has filed the instant motion requesting that Defendants be enjoined from denying Plaintiff timely access to new civil petitions filed in the Harris County Civil District Courts. Specifically, Plaintiff requests that it be given access on the same day the petitions are filed except where the filing party is seeking a temporary restraining order or other immediate relief or has properly filed the pleading under seal .[2] While Defendants admit that Plaintiff has a right of access to newly-filed petitions, they maintain that the new method by which the Clerk's Office is processing case initiating documents is a reasonable time, place, or manner restriction and, as such, survives First Amendment scrutiny.

II. *Legal Standard on Preliminary Injunction*

A party seeking a preliminary injunction must establish the following elements by a preponderance of the evidence: (1) there is a substantial likelihood the party will prevail on the merits; (2) a substantial threat exists that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendants, and (4) the granting of the preliminary injunction will not disserve the public interest. *Karaha Bodas Co. v. Negara,* 335 F.3d 357, 363 (5th Cir.2003); *see also Khan v. Fort Bend Indep. Sch. Dist.,* 561 F.Supp.2d 760, 763 (S.D.Tex.2008). A preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has "clearly carried the burden of persuasion" on all four elements. *Lake Charles Diesel, Inc. v. General Motors Corp.,* 328 F.3d 192, 195–96 (5th Cir.2003) (quoting *Mississippi Power & Light Co. v. United Gas Pipeline Co.,* 760 F.2d 618, 621 (5th Cir.1985)).

III. *Discussion*[3]

Case 1:22-cv-00361-SHR   Document 12-1   Filed 04/12/22   Page 34 of 100
Courthouse News Service v. Jackson, Not Reported in F.Supp.2d (2009)
38 Media L. Rep. 1890

**\*3** The First Amendment to the United States Constitution prohibits any law "abridging the freedom of ... the press." It requires a presumption of openness of both the courtroom and court files. *United States v. Valencia,* No. CRIM H–04–514 SS, 2006 WL 3707867, \* 5 (S.D.Tex. Aug. 25, 2006) (citing *SEC v. Van Waeyenberghe,* 990 F.2d 845, 849–50 (5th Cir.1993); *In re Gannett News Serv., Inc.,* 772 F.2d 113, 115–116 (5th Cir.1985)). Courts have found that the public has a strong common law right to access judicial records and proceedings, although this right is not absolute. *Id.* at \* 5 (citing *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 (1978); *Van Waeyenberghe,* 990 F.2d at 848). Public access serves important interests, such as "to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness." *Id.* (citing *Van Waeyenberghe,* 990 F.2d at 849 (quoting *Littlejohn v. BIC Corp.,* 851 F.2d 673, 682 (3d Cir.1988)). Thus, there is a presumption in favor of public access to judicial records. *See Van Waeyenberghe,* 990 F.2d at 848.

In *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1 (1986) (*Press II* ), the Supreme Court reiterated the two complementary considerations for a case dealing with a First Amendment right of access claim in a criminal proceeding. First, because a "tradition of accessibility implies the favorable judgment of experiences, [the Court] has considered whether the place and process have historically been open to the press and general public." *Id.* at 8 (internal citations and quotations omitted). Second, the Court has considered whether public access plays a "significant positive role in the functioning of the particular process in question." *Id.* (citation omitted). Once the right to access attaches, the presumption of openness can only be overcome by an "overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *United States v. Edwards,* 823 F.2d 111, 115 (5th Cir.1987) (citing *Press II,* 478 U.S. at 14–15). It is the defendant's burden to overcome this presumption. *Press II,* 478 U.S. at 14.

Although "its original inception was in the realm of criminal proceedings, the right of access has since been extended to civil proceedings because the contribution of publicity is just as important there." *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir.1994) (citing *Smith v. United States Dist. Court,* 956 F.2d 647, 650 (7th Cir.1992)). *See also United States v. $9,041,598.68,* 976 F.Supp. 654 (S.D.Tex.1997) ("Many courts have held that the public enjoys a First Amendment right to attend civil as well as criminal proceedings, and therefore have applied similar factors to civil proceedings.").

**\*4** While the parties in the instant case agree that there is a right of access to newly-filed petitions in civil cases, they disagree on whether the delay in the availability of these documents is the "functional equivalent" of an access denial and is, thus, unconstitutional. Defendants argue that the "slight delay" in availability is a reasonable time, place, or manner restriction. For the reasons set forth below, the Court disagrees with Defendants' contention and instead finds that the 24 to 72 hour delay in access is effectively an access denial and is, therefore, unconstitutional.

As the Seventh Circuit has stated,

[i]n light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous ... [t]he newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression ... [E]ach passing day may constitute a separate and cognizable infringement of the First Amendment. *Grove Fresh,* 24 F.3d at 897 (internal citations and quotations omitted). *See also In re Charlotte Observer,* 882 F.2d 850, 856 (4th Cir.1989) (finding that magistrate's closure order "unduly minimizes, if it does not entirely overlook, the value of 'openness' itself, a value which is threatened whenever immediate access to ongoing proceedings is denied, whatever provision is made for later public disclosure.").

Defendants attempt to analogize the 24 to 72 hour delay in access in this case to the district court's refusal to release transcripts of closed proceedings prior to the jury verdict in *Edwards.* In *Edwards,* the Fifth Circuit held that the district court did not err in its decision because it reasonably restricted access given the paramount interest in maintaining an impartial jury. *Edwards,* 823 F.2d at 119. The Fifth Circuit went on to state that the trial court should avoid unnecessary delay in releasing the record of the closed proceedings following the trial. *Id.* The Court is unpersuaded by Defendants' argument and finds that the delay in access to the newly-filed petitions in this case is not a reasonable limitation on access. Defendants' administrative goal of getting online

and not in line fails to rise to the level of significance that a trial court's interest in maintaining an impartial jury does. Assuming, *arguendo,* that Defendants have an overriding interest, the Court finds that they have failed to demonstrate that the 24 to 72 hour delay in access is narrowly tailored to serve such an interest and that no less restrictive means of achieving that interest exists. Accordingly, the Court finds that Plaintiff has established there is a substantial likelihood it will prevail on the merits.

It is well established that a violation of a party's constitutional rights constitutes irreparable harm as a matter of law. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 373–74 (1976); *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981). A denial of First Amendment freedoms, even for a short period of time, constitutes irreparable injury. *New York Times Co. v. United States,* 403 U.S. 713 (1971).[4]

 **\*5**  The threatened injury to Plaintiff outweighs any damage the injunction could cause Defendants. Plaintiff will be denied its First Amendment right of access to new case-initiating documents unless the Court issues this preliminary injunction, while Defendants have alterative, constitutional ways to achieve their goals and address their administrative concerns.[5]

It is clearly in the public interest to enjoin Defendants' conduct. There is an important First Amendment interest in providing timely access to new case-initiating documents. Defendants attempt to argue that providing Plaintiff with same-day access interferes with their important objective of "getting online and not in line." The Court acknowledges that Defendants' goal is also in the public interest. However, as Plaintiff argues, same-day access and online access are not mutually exclusive. Defendants may provide Plaintiff with same-day access to newly-filed petitions while working in furtherance of their goal to make documents available online.


IV. *Conclusion*

Accordingly, it is hereby ORDERED that Plaintiff CNS's motion for injunctive relief is GRANTED. It is further ORDERED that Plaintiff CNS's employee assigned to the Harris County District Court be given access on the same day the petitions are filed except where the filing party is seeking a temporary restraining order or other immediate relief or has properly filed the pleading under seal.

It is further ORDERED that, pursuant to Fed.R.Civ.P. 65(c), Plaintiff CNS shall file with the Clerk of the Court a nominal bond of $1,000.00 as security.

It is further ORDERED that the case be referred to Magistrate Judge, the Honorable, Frances H. Stacy to be scheduled for trial.


**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2163609, 38 Media L. Rep. 1890


Footnotes

1    At the preliminary injunction hearing, Farrah Martinez (Martinez), Director of Legal Affairs for the Harris County Clerk's Office, stated, "... our motto has been, since Mr. Jackson has come into office is, 'Get on line and not in line.' So, we are trying to go green. We're trying to make things more cost effective and more efficient." (Inj. Tr., Doc. 24 at 17:9–12). The Court finds it ironic that, in an effort to become more effective and efficient, it now takes the Harris County Clerk's Office 24 to 72 business hours to make 73% of its newly filed civil petitions available to the public. (*Id.* at 31:20–21, 51:8–12). The Court notes that 24 to 72 business hours is approximately three to five working days.

2    Plaintiff proposes two alternatives if Defendants do not revert to their pre-October 2008 procedure. First, Plaintiff suggests that it be permitted to review the new petitions themselves for 45 minutes at the end of the day on which they are filed regardless of whether they have been verified or scanned. Second, Plaintiff proposes that Defendants scan case-initiating documents immediately on intake and allow the press to immediately access either the paper copy of the complaint or a scanned version of it on a local computer in the Clerk's Office.

38 Media L. Rep. 1890

3       Plaintiff initiated suit for violations of the First Amendment to the United States Constitution, federal common law, the Texas Constitution, Texas common law, and Rule 76a of the Texas Rules of Civil Procedure. However, the Court notes that, because Plaintiff has demonstrated a likelihood of success on the merits of its First Amendment claim, it need not address the merits of the remaining four claims.

4       The Court notes that Plaintiff also argues that prolonged delays in access will diminish the value of its reports to its subscribers, leading to a loss of goodwill which is widely recognized as an injury incapable of ascertainment in monetary terms. The Court need not address this contention or Defendants' objections to it as the Court concludes that Plaintiff has suffered an irreparable injury in the form of a First Amendment violation.

5       *See, e.g.,* the alternatives described in n. 2 of this Opinion and Order.

---

**End of Document**                                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by COURTHOUSE NEWS SERVICE v. NEW MEXICO ADMINISTRATIVE OFFICE OF THE COURTS, ET AL., 10th Cir., October 29, 2021

2021 WL 4710644

Only the Westlaw citation is currently available.

United States District Court, D. New Mexico.

COURTHOUSE NEWS SERVICE, Plaintiffs,

v.

NEW MEXICO ADMINISTRATIVE OFFICE OF THE COURTS; Administrative
Office Director Arthur W. Pepin; New Mexico First Judicial District Court
Clerk's Office and the First Judicial Court Clerk Kathleen Vigil, Defendants.

No. CIV 21-0710 JB/LF
|
Filed 10/08/2021

**Synopsis**

**Background:** News service filed § 1983 action alleging that delays caused by New Mexico courts' policy of denying it access to electronic filings before they were accepted by courts violated its First Amendment right to access court documents. Service moved for preliminary injunction.

**Holdings:** The District Court, James O. Browning, J., held that:

*Younger* abstention was not warranted;

preliminary injunction requiring courts to provide press access to newly filed non-confidential civil complaints within five business hours was warranted; and

service would not be required to secure bond.

Motion granted in part and denied in part.

**Attorneys and Law Firms**

Gregory P. Williams, Peifer, Hanson, Mullins & Baker, P.A., Albuquerque, New Mexico -- and -- John K. Edwards, Jackson Walker, Houston, Texas -- and -- Patrick J. Rogers, Patrick J. Rogers, LLC, Albuquerque, New Mexico, Attorneys for the Plaintiff.

Erin Elizabeth Lecocq, Assistant Attorney General, Nicholas McDonald, New Mexico Office of the Attorney General, Attorneys for the Defendants.

## MEMORANDUM OPINION AND ORDER

James O. Browning, UNITED STATES DISTIRCT JUDGE

**\*1 THIS MATTER** comes before the Court on the Plaintiff Courthouse New Service's Motion for Preliminary Injunction, filed July 30, 2021 (Doc. 2)("PI Motion"). The Court held a hearing on the PI Motion on September 28, 2021. <u>See</u> Clerk's Minutes, filed September 28, 2021 (Doc. 29). The primary issues are whether: (i) the Court should abstain from adjudicating this case under <u>Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971);</u> (ii) the Plaintiff Courthouse News Service ("Courthouse News") has a right under the First Amendment to the Constitution of the United States of America to access non-confidential civil complaints; (ii) if there is such a right, (a) when it attaches, (b) what is its scope, (c) what level of scrutiny is appropriate; (iv) whether the Defendants have likely violated Courthouse News' First Amendment right of timely access; and (v) whether the Courthouse News is entitled to a preliminary injunction ("PI") to prevent the Defendants from continuing to violate Courthouse News' rights. The Court concludes that: (i) the Court will not abstain under <u>Younger,</u> because an injunction would not interfere with an ongoing state proceeding; (ii) there is a qualified right of timely access to civil complaints which (a) attaches upon submission of a complaint, (b) is defined in light of traditional access times, (c) is subject to "more relaxed" or "rigorous" scrutiny; (iv) by not always allowing Courthouse News to access newly filed civil complaints within five business hours after their submission, the Defendants have violated Courthouse News's First Amendment right of timely access as defined by traditional access standards; (v) Courthouse News is entitled to a preliminary injunction enjoining the Defendants from disallowing press or public access to newly filed non-confidential civil complaints for longer than five business hours, but is not entitled to a preliminary injunction which gives them pre-processing, on-receipt, or immediate access to newly filed non-confidential civil complaints; and (vi) Courthouse News will not be required to secure a bond. The Court, therefore, grants in part and denies in part Courthouse News' request for a PI.

**FINDINGS OF FACT**

" '[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.' " <u>Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)</u>(Browning, J.)(quoting <u>Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)</u>)(alteration in <u>Herrera v. Santa Fe Public Schools</u> only). <u>See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)</u>("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); <u>Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)</u>(Browning, J.). The United States Court of Appeals for the Tenth Circuit notes that "when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." <u>Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).</u> Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." <u>Heideman v. S. Salt Lake City, 348 F.3d at 1188.</u> Thus, while the Court does the best it can to make findings from the record that it has and in the short time that it has to make findings, these findings of fact are only to determine whether to issue a PI. These facts do not bind the Court or the parties at trial. Accordingly, the Court finds as follows:

**1. <u>The Parties.</u>**

**\*2** 1. Courthouse News is a California corporation with its principal place of business located in Pasadena, California. <u>See</u> Plaintiff's Original Complaint for Preliminary and Permanent Injunctive and Declaratory Relief ¶ 8, at 3, filed July 30, 2021 (Doc. 1)("Complaint").

2. Courthouse News "is a nationwide news service founded almost 30 years ago," which "employs approximately 240 people, most of them editors and reporters, covering state and federal trial and appellate courts in all 50 states in the United States." Complaint ¶ 8, at 3.

3. Courthouse News has "more than 2300 subscribers nationwide," including the Associated Press and The Wall Street Journal. Complaint ¶ 15, at 6.

4. Courthouse News "publishes a free public website, featuring news reports and commentary" at www.courthousenews.com. Complaint ¶ 12, at 5.

5. Courthouse News covers "new civil cases, general jurisdiction cases against any business or public entities primarily," but does not "cover domestic or criminal or probate [cases]," nor does it "cover cases against only individuals." Transcript of Hearing at 6:20-7:2 (Girdner)(taken September 28, 2021) filed October 5, 2021 (Doc. 28)("Tr.").

6. Courthouse News publishes the "Daily Brief," a "subscription-based report on appellate rulings and select trial court rulings throughout the nation." Complaint ¶ 13, at 5.

7. In addition, Courthouse News publishes "subscription-based reports on new civil actions called 'new litigation reports,' " which contain "staff-written summaries of significant new civil complaints, and are sent to subscribers via email each evening." Complaint ¶ 13, at 5.

8. Courthouse News has a new, subscription-based litigation report for New Mexico called, the "New Mexico Report," which covers civil complaints filed in the United States District Court for the District of New Mexico, "in addition to civil complaints filed in the county district courts of New Mexico." Complaint ¶ 13, at 5.

9. Litigation reports such as the "New Mexico Report" "primarily cover new civil complaints filed against business institutions and public entities," and do not cover family law, probate, or criminal matters. Complaint ¶ 17 at 6.

10. Courthouse News does not review sealed complaints or those filed in non-public categories. Complaint ¶ 17 at 6.

11. Courthouse News has been reporting on new civil complaints filed in New Mexico "since 2005, when it began covering the U.S. District Court in New Mexico and the state district courts in Santa Fe and Albuquerque." Complaint ¶ 18, at 7.

12. William Girdner is the publisher of Courthouse News. See Declaration of William Girdner in Support of Plaintiff Courthouse News Service's Motion for Preliminary Injunction at 1, filed July 30, 2021 (Doc. 2-2)("Girdner Decl.").

13. Defendant New Mexico Administrative Office of the Courts ("NMAOC") is a branch of the New Mexico court system that "exists to enable the courts of New Mexico to accomplish their mission through":

  • Ensuring that the courts have adequate, equitably distributed resources

  • Ensuring that the courts have and use current technology

  • Providing a fair and equitable statewide human resources system

  • Developing and implementing improved court processes and supporting courts in their use

  • Collecting and providing information on and for the courts

  **\*3**  • Managing and accounting for the collection of revenue

  • Ensuring sound financial, budgeting and procurement practices in the management of court resources

  • Providing administrative support for the magistrate courts

  • Maintaining liaison with the legislative and executive branches of state government

Administrative Office of the Courts, AOC, available at https://www.nmcourts.gov/court-administration/administrative-office-of-the-courts-aoc/. See Complaint ¶ 9 at 4.

14. Defendant Arthur Pepin is the Director of NMAOC. See Complaint ¶ 9, at 4.

15. Defendant New Mexico First Judicial District Court Clerk's Office ("Clerk's Office") "is the processing center through which virtually all the court and case documents flow." Complaint ¶ 11, at 4 (quoting First Judicial District Court, Court Clerk's Office, available at https://firstdistrictcourt.nmcourts.gov/home/court-clerks-office/).

16. Defendant Kathleen Vigil is the First Judicial District Court Clerk ("Court Clerk"). See Complaint ¶ 11, at 4.

17. The Judicial Information Division ("JID") is a branch of the NMAOC responsible for the electronic filing system ("e-filing"). See Tr. at 103:17-104:11.

18. The Judicial Technical Counsel ("JTECH") is the statewide technology council, formerly known as "JIFFY." Tr. at 104:17-105:21; Judicial Technical Counsel (JTech), available at https://www.nmcourts.gov/court-administration/judicial-information-systems-council-jiffy/.

19. The Online Access Subcommittee ("OAS") is an advisory committee to JTECH. See Tr. 106: 19-23; Online Access Subcommittee (OAS), available at https://www.nmcourts.gov/court-administration/online-access-subcommittee-oas/.


   **2. New Mexico Courts' Paper Filing System Before 2012.**
20. Before 2012, New Mexico courts used a paper filing system for court records. See Complaint ¶ 20, at 7; Girdner Decl. ¶ 12, at 5.

21. When the New Mexico courts used a paper filing system, Courthouse News reporters would go "in person to those courts" to "review[ ] new paper complaints." Complaint ¶ 18, at 7.

22. Until around 2011, Courthouse News reporters were "allowed behind the counter to review new civil complaints on the day they were filed in Bernalillo, Santa Fe, Sandoval and Valencia counties." Girdner Decl. ¶ 12, at 5.

23. Before the advent of e-filing in New Mexico, paper (or "manual") filing "was essentially a two-step process." Declaration of Judge James Noel, ¶ 5 at 3, filed September 7, 2021 (Doc. 19-1)("Noel Decl.").

24. "An attorney or runner would bring an original paper pleading to the respective state court during regular business hours, M-F 8:00am to 5:00pm, hand it to the clerk who would review it for completeness, and then the clerk would either file it with a hand stamp, or reject it on the spot." Noel Decl. ¶ 5, at 3.

25. "If filed, a copy of that filing would be placed in a box (literally) that [Courthouse News] would review daily." Noel Decl. ¶ 5, at 3.

26. "By virtue of this box of paper filings, [Courthouse News] essentially had same-day access to non-sealed, filed case records." Noel Decl. ¶ 5, at 3.

27. "If a submission was rejected by a clerk however, it would be handed back to the attorney or runner on the spot (not placed in [Courthouse News'] box), who might return the same day or the next business day with a corrected version of the pleading (or in some cases, not even refile the document)." Noel Decl. ¶ 5, at 3.

 **\*4** 28. "The file date reflected the date the pleading was submitted and accepted for filing. In the case of the rejected manual submission, if it was rejected late Friday afternoon, a corrected submission would most likely not make it back to the clerk's office until Monday for filing." Noel Decl. ¶ 5, at 3.

29. "As a result, it carried the Monday filing date, not the Friday filing date." Noel Decl. ¶ 5, at 3.

30. "Traditionally, the intake clerk, when he or she pulled in a civil complaint, put it in a box next to him or her. That was true in federal court and state court. And Judge Noel's declaration quite accurately describes that box." Tr. at 7:17-22 (Girdner).

31. Before the e-filing system, an attorney or a runner would have only been able to file pleadings during regular business hours, so that, for example, an "attorney would not have been able to submit a document for filing at 5:15pm on the Wednesday before Thanksgiving." Noel Decl. ¶ 9, at 5.

32. "Instead, that document would not have been presented for filing until the following Monday morning, at which point, assuming it is without error and is filed into the record, it would have been dropped into [Courthouse News'] box for their review." Noel Declaration ¶ 9, at 5.

33. Courthouse News reporter Victoria Prieskop described the process of reviewing new civil complaints filed before the e-filing system was implemented in New Mexico:

    a. "Every courthouse would be a little different, but I would approach the clerk's desk. I would get the attention of the clerk, and they would let me in behind the desk to the work area behind the desk." Tr. at 52:22-53:1 (Prieskop).

    b. "And then there would be either a stack or a rack or some other holding receptacle of cases that had been received but not yet docketed, and then also of cases had been docketed but not yet filed into the record." Tr. at 53:1-5 (Prieskop).

    c. "I would go through both the docketed cases and the cases that had been received but not yet fully processed ... [and] I'd record them into our system." Tr. at 53:5-8 (Prieskop).

34. "[H]ow long would it take the clerk to perform [the] very first initial review of the complaint?" Tr. at 54:10-12 (Edwards), "It wasn't something I spent a great deal of time observing, but I would say a minute to two minutes at most," Tr. at 54:13-15 (Prisekop).

    **3. <u>New Mexico's Change to E-Filing.</u>**

35. New Mexico began transitioning to e-filing in 2012, and it became mandatory in 2014. <u>See</u> Girdner Decl. ¶¶ 12-13, at 5; Tr. at 52:16-17 (Prieskop).

36. The Court notes the definitions of the following terminology:

    a. The Odyssey Case Management System is "the electronic case management system used by [NMAOC] and New Mexico courts." Noel Decl. ¶ 3, at 2.

    b. Odyssey File & Serve is "the electronic e-filing system used by attorneys to electronically file their pleadings in New Mexico state courts." Noel Decl. ¶ 3, at 2.

    c. Secure Odyssey Public Access ("SOPA") refers to the online access given at different levels to different parties, not all of which is public. <u>See</u> Noel Decl. ¶ 3, at 2 & n. 1.

    d. Case Lookup is the "general access to docket information available to anyone" and is located at https://caselookup.nmcourts.gov/caselookup/app. Noel Decl. ¶ 3, at 2.

37. The NMAOC uses Odyssey File & Serve software for its e-filing system. <u>See</u> Defendants' Response to Plaintiff's Motion for Preliminary Injunction at 6, filed September 7, 2021 (Doc. 19)("Response").

**\*5** 38. The NMAOC entered into a contract with Tyler Technologies, Inc., on June 15, 2018. <u>See</u> re:SearchNM Agreement at 8 (dated June 15, 2018)(admitted at Preliminary Injunction Hearing on September 28, 2021, as Plaintiff's Exhibit 4)("Tyler Agreement").

39. The Tyler Agreement states that:

re:SearchNM will vest in the central registry of eFileNM and maintain a registry that uniquely identifies users, authenticates their sign-on to re:SearchNM, and applies the appropriate security policy to provide access to court documents and information. The integration of accounts for eFileNM, re:Search, and New Mexico's Secured Odyssey Public Access (SOPA) will be seamless to the external user.

Tyler Agreement at 9.

40. Tyler Technologies provides different levels ("tiers") of access to SOPA to, for example, attorneys of record, self-represented litigants, members of the press, State auditors, staff attorneys, law enforcement personnel, and system administrators. Tyler Agreement at 10-11.

41. Tyler Technologies provides five tiers of access: Attorney of Record, Tier 1, Tier 2, Tier 3, and SuperSOPA. <u>See</u> Tyler Agreement at 14.

42. Members of the "press are able to access 'Tier One' files, which include the non-confidential civil cases at issue here." Noel Decl. ¶ 3, at 2.

43. "An application for SOPA access is required, but SOPA access is free." Noel Decl. ¶ 3, at 2.

**4. <u>How New Mexico's Current E-Filing System Works.</u>**

44. In New Mexico, e-filing is mandatory for attorneys, who are "required to redact any protected personal identifying information (PPII) contained within the pleadings," in accordance with rule 1-079(D) NMRA. Response at 7.

45. Laura Orchard has been a senior IT project manager for NMAOC's Judicial Information Division ("JID") for "[a] little over five-and-a-half years." Tr. at 73:23-74:3 (Orchard).

46. A document that is submitted by an attorney through the Odyssey system goes through five phases: (i) the draft phase; (ii) the submitted phase; (iii) the under review phase; (iv) the processing phase; and (v) accepted/transmitted phase. <u>See</u> Tr. 77:11-81:10 (Orchard).

47. The above terms are derived from "Tyler's File and Serve" application, which NMAOC uses. Tr. at 88:1-3 (Orchard).

48. In the first, "draft phase," an

a. "attorney filer is using a[ ] ... File and Serve application to enter ... the case type, the parties involved in the case, and they pick the location for where the case is going to be filed." Tr. at 77:11-23 (Orchard).

b. "Then they upload their pleading documents into what File and Serve refers to as an electronic envelope." Tr. at 77:18-19 (Orchard).

c. "And all of that is compiled into that single envelope, and then the filer presses the submit button." Tr. at 77:20-22 (Orchard).

49. In the second, "submitted" phase,

   a. "[O]nce the filer hits the submit button, that envelope lands in a Tyler Technologies server." Tr. at 78:2-4 (Orchard).

   b. "And it is sorted into queues based on the location that the filer selected when they were creating their envelope." Tr. at 78:4-6 (Orchard).

   c. "So that envelope sits there in that queue until the court clerk goes into the File and Serve review queue and opens the envelope." Tr. at 78:6-8 (Orchard).

50. In the third, "under review" phase,

   a. "once the clerk opens the envelope, the status of that envelope now becomes under review." Tr. at 68:9-10 (Orchard).

   **\*6**  b. "So it went from draft to submitting to submitted to under review. So as the clerk reviews the contents of the envelope, they look at all of the data that was entered by the filer, including the party information and the case type that they chose." Tr. at 78:10-16 (Orchard).

   c. "And they review each of the documents for completeness, for signatures, for the quality of the scan, that sort of thing." Tr. at 78:16-19 (Orchard).

   d. "They add some annotations in some cases." Tr. at 78:19-20 (Orchard).

   e. "They add their signatures in some cases." Tr. at 78:20 (Orchard).

   f. "And they basically look through however many documents have been included in that envelope." Tr. at 78:20-22 (Orchard).

   g. "They look through each one." Tr. at 78:22-23 (Orchard).

   h. "And for each one of those documents there is a filing code attached." Tr. at 78:24-25 (Orchard).

   i. "So if there is a filing code and a document attached, the reviewer has to click the accept button for each one." Tr. at 78:25-79:1 (Orchard).

51. Clerks "review documents for legibility, completeness, for confidentiality," Tr. at 199:3-5 (Baca), and ensure "the correct category was selected, the correct case type was selected," Tr. at 199:5-8 (Baca).

52. Clerks "review for confidential information," and "make sure nothing is included that should be sealed, such as maybe medical records, financial statements, evaluations, and stuff of that nature." Tr. at 200:18-22 (Baca).

53. In the fourth, "processing" phase,

   a. "a number of things happen.... it appears, because it happens so quickly ... it appears that it happens simultaneously, but there is actually a sequence to it." Tr. at 79:13-16 (Orchard).

   b. "The first step in that is that the credit card payment is processed to the bank." Tr. at 79:16-18 (Orchard).

   c. "Now, if that fails, the envelope still in the processing status gets thrown into an error filings queue." Tr. at 79:19-21 (Orchard).

   d. "And there is nothing the court can do if a credit card fails, so they have to return that envelope back to the filer, and nothing happens with that envelope until the filer fixes whatever was wrong." Tr. at 79:21-25 (Orchard).

   e. "If the payment processes correctly, then the next thing that happens is that data is sent to Odyssey from File and Serve." Tr. at 80:1-3 (Orchard).

f. "Odyssey generates a new case and applies a new case number to it, assigns a judge to it, and gives it a case style, so the title of the case." Tr. at 80:3-6 (Orchard).

g. "That information, once it's generated in Odyssey goes back to File and Serve, and it populates all of the pleading documents where there were token fields waiting for that case number or the judge assignment, waiting for that judge's name, and all of that information populates the documents and it populates an e-notification." Tr. at 80:7-13 (Orchard).

h. "So once all of that information is burned into the documents, those documents get transmitted -- and I'm using the word 'transmitted' because that's a File and Serve term." Tr. at 80:14-17 (Orchard).

i. "It gets transmitted to Odyssey, and now the status is called 'Accepted.' " Tr. at 80:17-19 (Orchard).

54. In the fifth, "accepted/transmitted" phase,

a. "once the status changes to accepted, the case is complete in Odyssey." Tr. at 80:19-20 (Orchard).

**\*7** b. "And the e-notification is sent back to the filer, any service contacts and any courtesy copy folks who were added by that filer in that envelope." Tr. at 80:20-23 (Orchard).

c. "[T]hen once the case [is] complete[d] in Odyssey and it's in the accepted status, it immediately is mirrored out to the public through the Secured Odyssey Public Access site." Tr. at 80:24-81:3 (Orchard).

d. "And then a publisher['s] job is run momentarily after the case is completed." Tr. at 81:3-4 (Orchard).

e. "And that gets the information updated to the re:Search NM site." Tr. at 81:4-5 (Orchard).

f. "So the first site where it's available is what we called SOPA, the Secured Odyssey Public Access site." Tr. at 81:5-7 (Orchard).

g. "The second site where it's available is re:Search NM." Tr. at 81:7-8 (Orchard).

h. "And then there is an overnight job run for the Case Lookup site." Tr. at 81:8-10 (Orchard).

55. "If the filing is rejected, a notice is immediately sent back to the filer with an explanation as to why the submission could not be filed." Noel Decl. ¶ 6, at 4.

56. "[I]f the submission is accepted [...] an event publisher notification is immediately sent to the filer with a link to the filed record, and the filed record appears in Odyssey immediately." Noel Decl. ¶ 6, at 4.

57. "Odyssey is constantly syncing with SOPA, so that as new submissions are filed, they are also almost immediately seen in SOPA as well." Noel Decl. ¶ 6, at 4.

58. "[T]here is some delay with the filing event appearing in Case Lookup." Noel Decl. ¶ 7, at 4.

59. "Case Lookup does not provide access to records, but it does provide a register of actions, which includes filing events." Noel Decl. ¶ 7, at 4.

60. "At the end of each day, events that occurred throughout the day are batched and then uploaded into Case Lookup overnight." Noel Decl. ¶ 7, at 4.

61. "During the work week, there is a 24-hour delay in filing events appearing in Case Lookup." Noel Decl. ¶ 7, at 4.

62. Once a file is "considered transmitted to Odyssey, and it has the accepted status, that's when it's considered [by New Mexico to be] in the possession of the court." Tr. at 81:17-20 (Orchard).

63. Instead of using the word "filed," the NMAOC distinguishes between when a document is "submitted" and when it is "transmitted" or "accepted." Tr. at 81:15-20 (Orchard); id. at 82:4-5 (Orchard).

64. "Immediately upon acceptance, [a] pleading is available to the press, who has access through SOPA." Noel Decl. ¶ 15, at 7.

65. "[T]here is no delay between acceptance and viewing by the press as long as press have a free account to view accepted pleadings in SOPA." Noel Decl. ¶ 15, at 7.

66. Tyler Technologies is able to track the time between a document's submission and its transmission or acceptance:

   a. "Tyler Technologies has a system-generated report out of File and Serve that tracks from the moment the filer clicks the submit button." Tr. at 82:1-4 (Orchard).

   b. "So that's called the submitted date and time that ends up being indicated on the file stamp on the document." Tr. at 82:4-6 (Orchard).

   c. "So it tracks from the submitted time to the transmitted time into Odyssey." Tr. at 82:6-7 (Orchard).

67. Odyssey's File and Serve system allows attorneys to file pleadings twenty-four hours a day, seven days a week. See Tr. at 85:4-8 (Orchard).

   **5. Filing Statistics for the Current e-Filing System.**
 **\*8**  68. Between July 26, 2021, and August 25, 2021, 93.05 percent -- 2,102 of 2,259 -- of Statewide Civil District initial filings were accepted by the court within twenty-four hours, see Defendants' Summary Table (dated September 28, 2021)(admitted at Preliminary Injunction Hearing on September 28, 2021, as Defendants' Exhibit B), and 65.56 percent -- 1,481 of 2,259 -- were accepted on the same date as submission, see Defendants' Summary Table; Defendants' Raw Data (dated September 28, 2021) (admitted at Preliminary Injunction Hearing on September 28, 2021, as Defendant's Exhibit C); Tr. at 96:7-13.

69. Between February 23, 2021, and June 30, 2021, 69.47 percent of cases -- 5,330 out of 7,672 -- filed in New Mexico district courts were accepted and available to the press the same business day as they were submitted.[1] See NM District Court Media Access Log 2/23/21 to 6/30/21 at 1, filed July 30, 2021 (Doc. 2-3)("February to June Log").

70. For the same time period, 24.30 percent were accepted the following day, while 2.31 percent had a two-day delay, and 3.92 percent had a delay of three days or more. See February to June Log at 1.

71. Between July 1, 2021, and September 17, 2021, 70.46 percent of cases -- 2734 out of 3880 -- filed in New Mexico district courts were accepted the same day as they were submitted.[2] See NM District Court Media Access Log 7/1/21-9/17/21 at 1 (admitted at Preliminary Injunction Hearing on September 28, 2021, as Plaintiff's Exhibit 5)("July to September Log").

72. For the same time period, 27.22 percent were accepted the next day, while 2.06 percent had two days' delay, and 0.26 percent had a delay of three days or more. See July to September Log at 1.

73. Between July 1, 2021, and September 17, 2021, 43.25 percent of cases -- 157 out of 363 -- that were filed in the Santa Fe District Court were accepted the same day, while 47.11 percent were accepted the next day.[3] See Santa Fe District Court Media

Access Log 7/1/21 to 9/17/21 at 1 (dated September 28, 2021)(admitted at Preliminary Injunction Hearing on September 28, 2021, as Plaintiff's Exhibit 6)("Santa Fe Log").[4]

**\*9**  74. Between January 1, 2021, and June 30, 2021, the average number of days for a case to go from submission to acceptance in the New Mexico courts was less than one day.[5] See Docketing Currency Report at 25, filed September 7, 2021 (Doc. 19-1) ("2021 Docketing Currency Report").

75. Between January 1, 2020, and December 30, 2020, the average number of days for a case to go from submission to acceptance in the New Mexico courts was "1." See Docketing Currency Report at 13, filed September 7, 2021 (Doc. 19-1)("2020 Docketing Currency Report").

76. The Court performed a spot check of the Defendants' Raw Data where the "Formula for Time Elapsed MINUTES" column shows 300 minutes or more (the equivalent of five hours)[6] -- in the first row of Defendants' Raw Data, the case was submitted at 12:26 p.m. on July 23, 2021, and "transmitted" to Odyssey at 8:26 a.m. on July 26, 2021, giving a total of 4080 elapsed minutes and 68 elapsed hours between submission and acceptance -- or transmission. Defendants' Raw Data at 1.

77. The Court takes judicial notice of the fact that, because July 24-25, 2021, was a weekend, the number of business hours -- between 8:00 a.m. and 5:00 p.m., Monday through Friday -- which elapsed between 12:26 p.m. on Friday 23, 2021, and 8:26 a.m. on Monday, July 26, 2021, was five, rather than sixty-eight total hours.

78. The third row of Defendants' Raw Data shows that a case was submitted at 2:27 p.m. on Friday, July 23, 2021, and was accepted at 7:58 a.m. on Tuesday, July 27, 2021, giving an elapsed number of minutes of 5371, or 89.51 hours. Defendants' Raw Data at 1.

79. The Court takes judicial notice of the fact that, because July 24-25, 2021, was a weekend, the number of business hours which elapsed between 2:27 p.m. on Friday, July 23, 2021, and 7:58 a.m. on Tuesday, July 27, 2021, was twelve hours and thirty-one minutes -- the sum of 2 hours and 33 minutes on Friday, nine hours on Monday, and fifty-eight minutes on Tuesday -- rather than 89.51 total hours.

### 6. Other Jurisdictions' E-Filing Systems.

80. The federal court system uses Case Management Electronic Case Files ("CM/ECF"), see Electronic Filing (CM/ECF), available at https://www.uscourts.gov/court-records/electronic-filing-cmecf, which provides on-receipt access to non-restricted civil complaints as soon as the filing is accepted and the system has processed it, see CM/ECF Administrative Procedures Manual at 2-29, filed October 7, 2021 (Doc. 31); CM/ECF Attorney User Manual (August 2016) at 30-54, filed October 7, 2021 (Doc. 31).

**\*10**  81. "The federal courts provide access -- most of them, sorry -- and some state courts provide what's called "Auto Accept," meaning that the case is -- let me just quickly explain, if I can: A filer submits an e-filing; it's caught by an e-file manager [...] [which] can either send the new complaint into a review queue for clerks to look it over and then accept, as they say, or it can process the case on its own right away, and put it into the public queue -- I'm sorry, the public docket." Tr. at 10:5-16 (Girdner).

82. "[T]his court, for example does that second process, what's called Auto Accept." Tr. at 10:17-18 (Girdner).

83. "The second system is what's called a press queue system." Tr. at 10:21-22 (Girdner).

84. "The press queue in its generic form is the equivalent of the wood box." Tr. at 10:25-11:1 (Girdner).

85. "Are you aware of how these courts prevent confidential information from being sent to the queue?" Tr. at 11:7-9 (Edwards), "Yes. The e-file manager sorts the new cases going into the review queue by case type," Tr. at 11:10-12 (Girdner).

86. "I don't believe you can file a case without identifying a case type," and "the e-file manager [...] filters into the queue the public case types when they're filed." Tr. at 11:10-15 (Girdner).

87. "I very rarely see a delay of even 24 hours in the federal court. And in fact, I can see cases that are field outside of business hours; they seem to turn up in PACER right away." Tr. at 56:9-12 (Prieskop).

88. The State courts of Arizona and Utah also provide "on-receipt access." Tr. 9:21-10:1 (Girdner).

### 7. <u>Tyler Technologies' Press Review Queue Feature.</u>

89. Tyler Technologies is able to configure its system so that filings are viewable "before they are accepted by the court." Email from Tyler Technologies' Client Executive Colleen Reilly to James A. Noel, Court Executive Officer for the Second Judicial District at 64-65, filed July 30, 2021 (Doc. 2-2)("Reilly Email").

90. Tyler Technologies' "Press Review Queue" provides on-receipt access to the public and press. <u>See</u> Tr. at 11:22-12:7.

91. The Press Review Queue enables "the e-file manager" to "filter the public case types into the queue, and that's the Press Review Queue," which is "prior to processing." Tr. at 12:21-25 (Girdner).

92. "The configuration is in [Tyler Technologies'] database, so it is something Tyler would need to do." Reilly Email at 65.

93. "There is no cost associated with this work." Reilly Email at 65.

94. "The Court would tell [Tyler Technologies] the location and case types that would be made accessible, and we do the configuration." Reilly Email at 65.

95. Tyler Technologies recommends that pre-acceptance access "be available only through a courthouse kiosk or computer." Reilly Email at 65.

96. Tyler Technologies recommends that users viewing court documents before they are accepted by the court "come to the courthouse to get access to the kiosk to look at the documents .... That way you can maintain control over who is looking and when." Reilly Email 65.

97. Tyler Technologies warns, "If you give out a user name and password, there is no way to guarantee that the user name and password are not shared." Reilly Email at 65.

98. The "latest communication" Pepin had from Reilly "is that [the Press Review Queue] would cost [NMAOC] $108,000." Tr. at 148:24-149:5 (Pepin).

### <u>PROCEDURAL BACKGROUND</u>

Courthouse News filed a complaint and a motion for a preliminary injunction on July 30, 2021, arguing that the Defendants are violating Courthouse News' First Amendment rights to access court documents. <u>See</u> Complaint at 1; PI Motion at 1-2. The Defendants responded on September 7, 2021. <u>See</u> Response at 1. Courthouse News filed its reply on September 20, 2021. <u>See</u>

Plaintiff Courthouse New Service's Reply In Support of Motion for Preliminary Injunction at 1, filed September 20, 2021 (Doc. 22)("Reply"). The Court held a hearing on the PI on September 28, 2021. See Clerk's Minutes.

### 1. **The Complaint.**

**\*11**  1. On July 30, 2021, Courthouse News filed its Complaint for Preliminary and Permanent Injunctive and Declaratory Relief. Courthouse News alleges that Defendants New Mexico Administrative Office of the Courts, Administrative Office Director, Arthur Pepin, the First Judicial District Court Clerk's Office, and First Judicial Court Clerk Kathleen Vigil ("Defendants") are violating (i) the First Amendment of the United States Constitution, and brings suit pursuant to 42 U.S.C. § 1983; (ii) federal common law, and brings suit pursuant to 42 U.S.C. § 1983; and (iii) Article 2, Section 17 of the New Mexico Constitution, N.M. Const. art. 2 § 17. See Complaint ¶¶ 56-66, at 21-22.

2. Courthouse News alleges that their reporters' access to new court filings has deteriorated since New Mexico moved to an e-filing system in 2012. See Complaint ¶ 1, at 1-2; id. ¶¶ 28-29, at 9-10. Courthouse News alleges that "the means for providing access on receipt are readily available to Defendants" and could be provided in the form of a "press review queue" developed by Tyler Technologies, the same company from whom the New Mexico courts lease their e-filing software. Complaint ¶ 33, at 11. Courthouse News asserts that Tyler Technologies will provide this technology to New Mexico courts at no cost. See Complaint ¶ 35, at 12.

3. Courthouse News alleges that New Mexico courts' "no-access-before-process" policy causes harm to them because it delays their access to newsworthy stories. Complaint ¶¶ 37, 40, at 12-13. Courthouse News cites as one example of harm suffered a twenty-four-hour delay to access a complaint that the New Mexico Environment Department filed against the United States Department of Energy over delays in environmental cleanup at the Los Alamos National Laboratory. Complaint ¶ 40, at 13.

4. Courthouse News argues that Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 10, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986)("Press-Enterprise"), and the persuasive authority of a case Courthouse News brought in the United States Court of Appeals for the Fourth Circuit, see Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021), create a "Right of Contemporaneous Access" to newly filed civil complaints. See Complaint ¶¶ 42-43, at 14-15.

5. Courthouse News suggests that the Court apply the Press-Enterprise two-part "history" and "logic" test which the Supreme Court applies to find a right of access in a criminal proceeding here in the context of access to civil complaints. Complaint ¶ 41, at 13. Courthouse News contends that there is a tradition of access to civil complaints "throughout the nation's courts and specifically in New Mexico's courts during the era of paper filing." Complaint ¶ 42, at 14. Courthouse News argues that the Press-Enterprise test's logic prong is met, because the public's ability to be informed about civil complaints "serves a significant positive role in understanding the work of the courts." Complaint ¶ 43, at 14. Courthouse News asserts that there is a "presumption in favor of public access to judicial records." Complaint ¶ 44, at 15 (quoting Courthouse News Serv. v. Jackson, C.A. No. H-09-1844, 2009 WL 2163609 at *9 (S.D. Tex. July 20, 2009)(Harmon, J.)).

6. Courthouse News argues that the right of access to court records attaches upon the court's receipt of the filing, and that, once that right attaches, public access must be "contemporaneous." Complaint ¶ 45, at 15. Courthouse News maintains that, "once the right of access attaches, denial of the right must serve an 'overriding interest' and be 'narrowly tailored.' " Complaint ¶ 48, at 16 (quoting Press-Enterprise, 478 U.S. at 7, 106 S.Ct. 2735). Courthouse News contends that the State's interest here is only "clerical work." Complaint ¶ 48, at 16.

**\*12**  7. Courthouse News proposes that it is possible for New Mexico courts to provide "access on receipt," because e-filing software is able to do the work of "clerks at an intake window," such as "identifying [the] court, case type, payment, and much more." Complaint ¶ 53, at 18. In an automated system, based on the case "type" that the filer designates, "the e-filer automatically sorts the new, non-confidential complaints into a review queue that serves the same function as the stack of new complaints on top of the cabinet behind the clerk's counter." Complaint ¶ 53, at 18. Courthouse News contends that Tyler Technologies is willing to provide the press review queue to New Mexico courts for no additional cost. See Complaint ¶ 54, at 18.

8. Courthouse News contends that the Defendants are violating Courthouse News' First Amendment right to "timely access to public court records" and are acting under color of State law. Complaint ¶ 56-57, at 19. Courthouse News contends that the Defendants are violating their "right of access to public court records guaranteed by federal common law." Complaint ¶ 60, at 19-20. Courthouse News asserts that the Defendants are violating Article 2, Section 17 of the New Mexico Constitution by denying them "timely access to new civil court complaints," and through the:

> Defendants' elevation of themselves above the news media to a favored position with respect to the publication of public court records, in order to extract income from them, deprive members of the press, including Courthouse News and by extension its subscribers, of their right of access to public court records secured by the free press provision of Article 2, Section 17 of the New Mexico Constitution.

Complaint ¶ 64, at 20.

9. Courthouse News contends that it has "no adequate and speedy remedy at law to prevent or redress Defendants' unconstitutional actions, and will suffer irreparable harm as a result of Defendants' violation of its First Amendment rights," Complaint ¶ 58, at 19, its federal common law rights, see Complaint ¶ 62, at 20, and its violation of the New Mexico Constitution, see Complaint ¶ 66, at 21. Courthouse News requests a preliminary and permanent injunction against the Defendants, and declaratory judgment pursuant to 28 U.S.C. § 2201. See Complaint at 21.

### 2. The PI Motion.

10. On July 30, 2021, Courthouse News filed its PI Motion. See PI Motion at 1; Plaintiff Courthouse New Service's Memorandum of Law in Support of Motion for Preliminary Injunction, filed July 30, 2021 (Doc. 2-1)("PI Memo."). In its PI Memo., Courthouse News argues that: (i) it is likely to succeed on the merits of its First Amendment claim, and (ii) that Courthouse News will suffer irreparable harm if the Court does not issue an injunction. See PI Memo. ¶ 54, at 20; id. ¶ 20, at 7-8. Courthouse News argues that, when weighing the factors of a First Amendment PI case, "the pivotal factor is the likelihood of success because, if established, irreparable injury is presumed." PI Memo. ¶ 19, at 7 (citing Heideman v. South Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)).

11. Courthouse News argues that "the press and the public hold a First Amendment right of access to public court records, including civil complaints, that attaches when they are filed with a court," PI Memo. ¶ 20, at 7, and that "right can only be overcome by an overriding governmental interest in closure, and that closure must be narrowly tailored to the concern the state has identified." PI Memo. ¶ 20, at 7-8. Courthouse News contends that "every federal circuit to consider the First Amendment right of access ... ha[s] concluded that the right of access to judicial records extends to both civil and criminal proceedings," PI Memo. ¶ 22, at 8, and that, where "the First Amendment right of access applies, it attaches upon receipt," PI Memo. ¶ 23, at 9.

*13 12. Courthouse News argues that the "experience" prong of the Press-Enterprise test requires timely access to civil petitions, because, " 'historically, courts have openly provided the press and general public with access to civil complaints.' " PI Memo. ¶ 25, at 10 (quoting Courthouse News Serv. v. Schaefer, 440 F. Supp. 3d 532, 557 (E.D. Va. 2020)). Courthouse News similarly argues that the Press-Enterprise test's "logic" prong is met, because "federal courts have consistently held that access to court records is vital to an open, democratic government and an informed citizenry." PI Memo. ¶ 27, at 11 (quoting Bernstein v. Bernstein Litowitz Berger & Grossmann LLP, 814 F.3d 132, 141 (2nd Cir. 2016)).

13. Next, Courthouse News argues that there is no "overriding interest" that justifies limiting the right of access, and that restrictions are not "narrowly tailored." PI Memo. ¶ 34, at 14 (quoting Press-Enterprise, 478 U.S. at 9, 106 S.Ct. 2735). Courthouse News asserts that the interest at stake here is the "state's interest in clerical processing," PI Memo. ¶ 34, at 14, and that, "[t]he clerical work of Defendants, while important to the orderly administration of justice, is not an interest that overrides the First Amendment right of timely access," PI Memo. ¶ 35, at 14. Courthouse News asserts that the "no-access-before-process-policy" it attributes to the Defendants is not narrowly tailored. PI Memo. ¶ 36, at 15. Courthouse News suggests

that the Defendants can accomplish their clerical work in a more narrowly tailored manner, see PI Memo. ¶ 36, at 15, by "direct[ing] their e-file vendor to install the same press review queue installed in other courts," PI Memo. ¶ 37, at 15.

14. Courthouse News rejects the idea that confidentiality concerns justify "no-access-before-process" policies, because, "[i]n New Mexico, as in every state in the nation with the exception of Vermont, the responsibility to redact e-filings is placed solely and entirely on the filer." PI Memo. ¶ 49, at 19 (citing N.M. Dist. Ct. R. Civ. Proc. 1-079(D)). In New Mexico, filers must "designate the type of case they are filing," and "courts all around the nation, including this Court, are able to screen for non-public filings while making the public filings available at the time of receipt." PI Memo. ¶ 50, at 19.

15. Courthouse News argues that it will suffer "irreparable harm without injunctive relief" and contends that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." PI Memo. ¶ 54, at 20 (quoting Heideman v. South Salt Lake City, 348 F.3d at 1190 (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Finally, Courthouse News argues that injunctive relief is in the public interest, because there is "an important First Amendment interest in providing timely access to new case-initiating documents." PI Memo. ¶ 55, at 21 (quoting Courthouse News Service v. Tingling, No. 17 C 7933, 2016 WL 8739010 at *20 (S.D.N.Y. Dec. 16, 2019)(Ramos, J.)).

### 3. **The Defendants' Response.**

16. The Defendants filed the Response to Plaintiff's Motion for Preliminary Injunction on September 7, 2021. See at 1. The Defendants affirm that "press access to court documents is vital to the democratic process and that the press should be afforded access to these court documents as soon as is practicable." Response at 1. The Defendants contend that the NMAOC and court clerks work to "ensure expeditious administrative procedures between receipt and acceptance." Response at 2.

 **\*14**  17. While the Defendants support Courthouse News' desire to have "expedient access to newly-filed, non-confidential, civil complaints," they counter that this access is "already available immediately to the press and public upon filing and acceptance." Response at 2. The Defendants respond to Courthouse News' request to access complaints immediately upon receipt or submission -- as opposed to upon acceptance -- by arguing that the State has "a strong governmental interest in maintaining an administrative process ... to ensure the protection of the litigants and the smooth operation of the judiciary." Response at 2.

18. The Defendants respond to data Victoria Prieskop, a reporter for Courthouse News Services, offers, by stating that it "fails to take weekends or holidays into account, and fails to demonstrate a consistent methodology for determining when the case was 'available for review.' " Response at 3 (quoting Declaration of Victoria Prieskop in Support of Plaintiff Courthouse News's Motion for Preliminary Injunction ¶¶ 15-16 at 7, filed July 30, 2021 (Doc. 2-3)("Prieskop Decl.")). The Defendants claim that, contrary to Courthouse News' assertions that Tyler Technologies would implement a press review tool for free, Tyler Technologies would charge NMAOC "approximately $108,000 annually." Response at 6 (citing Noel Decl. ¶ 16, at 7).

19. The Defendants describe the review process that filings undergo once an attorney submits them on Odyssey File & Serve:

   a. "The document is sent to a review queue for clerical review in the court in which the pleading will be filed." Response at 7.

   b. Clerks then "ensur[e] the document is in the correct court, verify[ ] the pleading type has been correctly identified, assign[ ] a case number, and verify[ ] the pleading is not subject to an order to seal, an order for free process, or rejection for some reason." Response at 7 (citing Noel Decl. ¶¶ 6, 14, at 3-4, 7).

20. The Defendants argue that "[o]nce all of the information is verified and any confidential information is redacted or sealed, the clerk 'accepts' the pleading and renders it part of the docket, wherein it becomes an official court record." Response at 7 (citing Noel Decl. ¶¶ 6, at 3-4; id. ¶ 14, at 7). The Defendants assert that there is "no delay between acceptance and viewing by the press as long as members of the press have a free account to view accepted pleadings in SOPA." Response at 7. The Defendants assert that the average time for "administrative processes" -- "the average time between attorneys clicking 'submit'

on Odyssey File & Serve to the point when the pleading is accepted by the clerk" -- is 7.14 hours, and the median time is 35 minutes. Response at 8 (citing Noel Decl. ¶¶ 8, 10, at 4-5).

21. The Defendants argue that Courthouse News cannot succeed on the merits of its First Amendment claim because "the federal court does not have subject matter jurisdiction over a challenge to a New Mexico Supreme Court Order" and should abstain under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Response at 9. Because Orders of the New Mexico Supreme Court and Rules of Civil Procedure require clerks to review electronically submitted complaints, the Defendants urge the Court to abstain. Response at 9-10 (citing N.M.R.A. 12-307.2; Supreme Court Order 17-8500-001).

22. The Defendants assert that "the date and time that the filer submits the electronic filing envelope will serve as the filing date and time for the purposes of meeting any filing deadline," Response at 9-10 (quoting NMRA 12-307.2(F)), but the filings are not "actually 'filed' or 'accepted' until the clerk's office determines that they do not improperly include excluded documents," Response at 10 & n.8 (citing Ennis v. Kmart Corp., 2001-NMCA-068, ¶ 7, 131 N.M. 32, 33 P.3d 32, 36).

 **15  23. The Defendants note that the clerks must determine that filings do not include improperly one of the "ten categories of excluded documents" listed in NMRA 1-079(C)(1)-(10), including documents containing confidential information. Response at 10. The Defendants assert that the Supreme Court of New Mexico's Order No. 17-0085-001 "does not allow press access to confidential information," and that, while rules 1-079 and 1-005.2 do not "require a clerk to screen for protected personal identifier information (PPII)," they "do imply that the clerk is able to reject, or return to the filer, a pleading if it includes information that should be sealed or otherwise remain confidential." Response at 10 (citing Supreme Court of New Mexico, Order No. 17-0085-001, In the Matter of the New Mexico Judiciary Case Access Policy for Online Court Records 14-17 (February 20, 2017), filed September 7, 2021 (Doc. 19-1)("Order No. 17-0085-001")).

24. The Defendants argue that Younger abstention is "appropriate in situations where federal courts would interfere with pending 'civil proceedings involving certain orders ... uniquely in furtherance of the state courts' ability to perform their judicial functions.' " Response at 11 (quoting Sprint Commc'n, Inc. v. Jacobs, 571 U.S. 69, 134 S. Ct. 584, 591, 187 L.Ed.2d 505 (2013)). The Defendants imply that an order from the Supreme Court of New Mexico is "an ongoing, standing order" which furthers the state courts' ability to perform their judicial functions and argue that the order "implicates an important State interest" in screening pleadings that are confidential. Response at 11. The Defendants assert that Courthouse News should bring its claim in State court, which has concurrent jurisdiction over § 1983 claims, and should seek to enjoin the Supreme Court of New Mexico's Order there. Response at 11-12.

25. The Defendants point to the United States Court of Appeals for the Seventh Circuit's reversal of a district court's decision not to abstain on a similar claim brought by Courthouse News, concluding that a State has "a substantial interest in ... running its own court system." Response at 12 (citing Courthouse News Serv. v. Brown, 908 F.3d 1063, 1073 (7th Cir. 2018)). The Defendants point to Younger abstention's underlying principle of comity, which "is particularly significant when federal courts are asked to decide how state courts should conduct their business." Response at 12-13. The Defendants argue that New Mexico courts "are best positioned to interpret their own orders, ... and to craft an informed and proper balance between the state courts' legitimate institutional needs and the public's and the media's substantial First Amendment interest in timely access to court filings," and urge the Court to abstain from this case. Response at 13 (citing Courthouse News Serv. v. Brown, 908 F.3d at 1074).

26. The Defendants next argue that New Mexico courts already offer "immediate press access to all pleadings once the pleadings are accepted," which requires a free "tier one" account on SOPA. Response at 14. The Defendants assert that a First Amendment right does not attach to "newly-*submitted*" rather than newly-accepted civil complaints. Response at 14 (emphasis in original). The Defendants cite the United States Court of Appeals for the Ninth Circuit's opinion in Courthouse News Serv. v. Planet, 947 F.3d 581, 594 (9th Cir. 2020), in asserting that there is a "qualified right of timely access to newly-filed nonconfidential civil complaints." Response at 14-15 (quoting Courthouse News Serv. v. Planet, 947 F.3d at 594).

27. The Defendants continue to cite the Ninth Circuit's opinion in Courthouse News Serv. v. Planet for the proposition that this qualified right of access "does not entitle the press to immediate access to those complaints," and that this qualified right of access may include "[s]ome reasonable restrictions resembling time, place and manner regulations ...." Response at 14-15 (quoting Courthouse News Serv. v. Planet, 947 F.3d at 585). The Defendants also point to a recent decision from the United States Courts of Appeals for the Fourth Circuit, which concludes that limitations on access that resemble reasonable time, place, and manner restrictions are not subject to strict scrutiny. Response at 15 (citing Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)).

 **16**  28. The Defendants next argue that NMAOC survives Press-Enterprise's two-prong test, which requires that the State's interest in "the fair and orderly administration of justice would be impaired by immediate access, and [...] that no reasonable alternatives exist to 'adequately protect' that government interest." Response at 16-17 (quoting Press-Enterprise, 478 U.S. at 14, 106 S.Ct. 2735). The Defendants assert that clerks are performing cursory and necessary checks, and that it would "be a significant hardship" to "make these complaints available a few hours sooner" than is currently the case. Response at 17. The Defendants dispute Courthouse News' characterization that their processing delay -- where "93% of pleadings are made available within 8 business hours" -- is significant, and question whether such a delay needs any justification. Response at 18.

29. The Defendants argue that any injunction requiring a reduction in processing time "would not be in the public interest," because NMAOC is already "in compliance" with the Fourth Circuit's standard of making the complaints available as expeditiously as possible. Response at 19. The Defendants compare their statistics favorably with those the court disapproved in Courthouse News Serv. v. Schaefer and argue that other jurisdictions "have resorted to an earlier receipt deadline to increase their rate of documents accepted the same day of submission." Response at 19 (citing Courthouse News Serv. v. Schaefer, 2 F.4th at 327, 329).

30. The Defendants assert that the midnight filing deadline is necessary to accommodate logistical and technical difficulties arising in a large and rural State such as New Mexico, and that "eliminating this concession for the sole purpose of marginally improving AOC's filing statistics would serve no practical purpose and would not be in the public interest." Response at 20. The Defendants argue that the gap between submission and acceptance could only be narrowed in one of three ways: (i) an order compelling the e-file service to provide pre-acceptance access to Courthouse News; (ii) to forgo NMAOC's clerk review process and allow Courthouse News to access unreviewed documents, in violation of New Mexico Supreme Court Order 17-8500-001; or (iii) for NMAOC to hire "significantly more staff to process incoming complaints." Response at 22-24.

31. First, the Defendants argue that implementing Tyler Technologies' press review tool would require "significant resources to obtain and implement." Response at 20. Second, the Defendants argue that removing clerk review of documents would endanger vulnerable parties, go against New Mexico law and procedural rules, and cause confusion to the public if documents have to been withdrawn after being made public. See Response at 21. The Defendants note that, currently, attorneys or parties may contact the clerk, and amend or withdraw pleadings before they are accepted, because, after it is accepted, it "becomes a part of the court record and cannot be amended without a judicial action." Response at 21-22 (citing Noel Decl. ¶ 14, at 7). If media organizations are able to access documents that are submitted but not accepted, the Defendants argue, the public would be confused about the nature of ongoing litigation if those documents were subsequently revised because of deficiencies or other changes. See Response at 22. Third, the Defendants claim that keeping the review process but narrowing the time gap would require significant numbers of additional staff, or that implementing the press review tool would cost $108,000 a year as well as costs for NMAOC's own "testing, validation, and implementation" process, both of which would require the New Mexico legislature's approval. Response at 11.

32. The Defendants urge the Court that, should the Court issue an injunction, it should issue a "sizeable" bond pursuant to rule 65(c) of the Federal Rules of Civil Procedure, which would cover the cost of Defendants' implementation of the changes Courthouse News seeks.

**4. Courthouse News' Reply.**

**\*17** 33. Courthouse News urges the Court not to abstain, arguing that there is no "ongoing state judicial proceeding," and that the New Mexico Supreme Court Order in question does not conflict with the relief Courthouse News seeks. Reply at 2. Courthouse News argues that New Mexico Supreme Court Order 17-8500-001 is "not judicial in nature, nor is it the type of proceeding to which Younger might apply." Reply at 3. Courthouse News argues that the Defendants' abstention argument is based on Seventh -- and not Tenth -- Circuit precedent, so it is not binding here. See Reply at 4.

34. Courthouse News contests the Defendants' characterization of the Supreme Court of New Mexico's Order as requiring clerks to "review electronically submitted complaints before determining whether to reject or accept them." Reply at 5-6 (quoting Response at 9-11). Courthouse News counters the Defendants' suggestion that rule 1-079(C) NMRA requires this screening by stating that sealed cases "are automatically sealed without a motion or order," and "are excluded from the types of cases that can be e-filed with the New Mexico courts." Reply at 6.

35. Courthouse News asserts that "a court clerk lacks the discretion to reject pleadings for technical violations." Reply at 6 (quoting Ennis v. Kmart, 2001-NMCA-068, ¶ 10, 131 N.M. 32, 33 P.3d 32, 36). Courthouse News notes that the Defendants' list of rejection reasons "does not identify inclusion of confidential information as a basis for a clerk to reject a filing," although it identifies sealed documents as such as basis. Reply at 7 (citing Rejection Reasons at 19-20, filed September 7, 2021 (Doc. 19-1). Courthouse News argues that the First Amendment right of access attaches "to new civil complaints when they are filed with the court," and that the Defendants cannot "invent a new definition for when a complaint is filed -- ie. when it is 'accepted.' " Reply at 7 (quoting Response at 14).

36. Courthouse News argues that New Mexico courts "recognize that a document is filed when it is 'delivered' to the court clerk," Reply at 7-8 (quoting Town of Hurley v. New Mexico Mun. Boundary Comm'n, 1980-NMSC-083, ¶ 11, 94 N.M. 606, 608, 614 P.2d 18, 20), and that other jurisdictions share this definition of "filed," the Ninth Circuit in particular, Reply at 8 (citing Klemm v. Astrue, 543 F.3d 1139, 1142 (9th Cir. 2008); Courthouse News Serv. v. Planet, 2016 WL 4157210, \*13 (C.D. Cal. May 26, 2016)). Courthouse News urges the Court to conclude that the First Amendment right of access attaches at the time of submission, rather than at the time of acceptance, of civil complaints. See Reply at 9.

37. Courthouse News contests the Defendants' framing of their request as being for immediate access; instead, Courthouse News counters that "the question is whether Defendants' policy of withholding access to new civil petitions until after processing and 'acceptance' can survive constitutional scrutiny," given that such delays are subject to "Press-Enterprise scrutiny." Reply at 9. Courthouse News argues that the Defendants' screening policy does not survive constitutional scrutiny, and that the Defendants' data does not "refute Courthouse News' evidence of delays." Reply ay 10. Courthouse News critiques the docket currency reports attached to Judge James Noel's affidavit as being vague and inapposite. See Reply at 11.

38. Further, Courthouse News argues that any delays to public access to civil complaints cannot be justified under constitutional scrutiny; it contends that the Defendants have failed to identify a statute or rule which prevents them from providing "pre-processing access" to new complaints. Reply at 12. Finally, Courthouse News counters the Defendants' assertions about the cost of Tyler Technologies' press review tool by pointing to Pepin's "acknowledgment in his 2018 Memorandum to the Justices of the Supreme Court of New Mexico that Tyler can install a press queue 'at no cost to the courts.' " Reply at 12 (quoting Pepin Memorandum at 21, filed July 30, 2021 (Doc. 2-2)("Pepin Memo.").

### 5. The PI Hearing.

**\*18** 39. The Court held a hearing on September 28, 2021. See Clerk's Minutes. The Court invited Courthouse News to speak in support of its request for a PI. See Tr. at 3:6-8 (Court). The Plaintiffs first called William Girdner, the Editor of Courthouse News, to testify. See Tr. at 4:24 (Edwards); id. at 5:16-17 (Girdner). Girdner described the process Courthouse News reporters used to review paper filings before the courts used an electronic filing system. See Tr. at 7:15-22 (Girdner). Girdner stated that Courthouse News is seeking "[o]n-receipt access, also described as contemporaneous access," but that Courthouse News is not seeking immediate, instantaneous access to new civil complaints. Tr. at 8:5-14 (Girdner). Girdner seeks access to filings "after the case is received and before it's docketed; what's now called processing." Tr. at 8:15-18 (Girdner). When questioned whether

he seeks "the same level of access that was provided before electronic filing," Tr. at 8:19-20 (Edwards), Girdner replied: "That's traditional access," Tr. at 8:21 (Girdner).

40. Girdner described the news cycle as a daily cycle where the press reports on events in the morning and during the day, and the public consumes the news in the evening. See Tr. at 9:1-9 (Girdner). Girdner stated that gaining access to newly filed civil complaints within twenty-four hours or forty-eight hours is not sufficient because, by then, "It's old news, it's stale, and it's -- yeah, current news is what's vibrant and strong and resonates." Tr. at 9:12-14 (Girdner). Girdner seeks this level of access only for newly filed civil complaints, and not also for subsequent filings in existing cases. See Tr. at 9:15-17 (Edwards); id. at 9:18-20 (Girdner).

41. Girdner described how other courts, such as the United States District Court for the District of New Mexico, and the State courts of Arizona and Utah provide "on-receipt access." Tr. at 9:23-10:1 (Girdner). Girdner described a Tyler Technologies product called the Press Review Queue which would provide on-receipt access to the public and press. See Tr. at 12:1-7 (Girdner). The Press Review Queue enables "the e-file manager" to "filter the public case types into the queue, and that's the Press Review Queue," which is "prior to processing." Tr. at 12:21-25 (Girdner).

42. Girdner stated that the Press Review Queue is "normally implemented for free," and described how Tyler Technologies had implemented a Press Review Queue in San Mateo, California, free of charge. Tr. at 13:7-8 (Girdner); id. at 13:11-13 (Girdner); id. at 13:23-25 (Girdner). Other vendors, such as the one which implemented a Press Review Queue in Arizona, charged $12,500.00 to set up the system from scratch. See Tr. at 14:5-7 (Girdner); id. at 14:10-14 (Girdner). Girdner described his efforts to request a Press Review Queue for New Mexico Courts before this litigation by approaching NMAOC and the Supreme Court of New Mexico. See Tr. at 15:3-7 (Girdner); id. at 15:12-15; id. at 15:18-21 (Girdner). Girdner read from Pepin Memo.: "I confirmed that Nevada, Georgia, and California have had Tyler install at no cost to the courts a press queue as Mr. Girdner requests of New Mexico." Tr. at 17:1-16 (Girdner)(quoting Pepin Memo. at 21).

43. Girdner discussed lawsuits that Courthouse News has brought in other jurisdictions. See Tr. at 26:4-29:16 (Girdner). Girdner stated that the difference between what SOPA provides and the Press Review Queue that Courthouse News seeks is that "documents flowing into SOPA are delayed past processing. If they were not delayed, if they were upon submission, it would be a fantastic press queue," Tr. at 31:2-7 (Girdner), and that "the cases populated to SOPA are only after clerical and administrative processing occurs," Tr. at 32:20-23 (Edwards).

44. Girdner described some of the safeguards which ensure that confidential or sealed documents are not made available to the press or public, such as permissions-based access, which can be withdrawn if a reporter discloses PPII or other confidential or sealed information, and user non-disclosure agreements. See Tr. at 33:19-34:8 (Girdner); id. at 36:16-19. Another safeguard is a case type filter -- an e-file manager allows the filer to choose whether the case is public or non-public, and non-public cases are diverted from the press review queue. See Tr. at 38:5-17 (Girdner).

**\*19** 45. In discussing the paper filing system, Girdner admitted that Courthouse News reports would have access to a filed document only after the clerk had reviewed and stamped the document:

Q. At what point during that process did Courthouse News Services used to be able to obtain the document?

A. Right after it came across the counter.

Q. Before or after the clerk stamped it?

A. After. We would not take it out of the clerk's hand.

Tr. 45:7-13 (Girdner, Lecocq).

46. Courthouse News next called Victoria Prieskop, a reporter for Courthouse News. See Tr. at 50:17-51:7 (Prieskop). Prieskop described the process of reviewing new civil complaints filed before the e-filing system became prevalent between 2012 and 2014 in New Mexico. See Tr. at 52:14-53:12 (Prieskop). Prieskop alleges that she sometimes had access to documents that had not yet been process or docketed. See Tr. at 53:1-7 (Prieskop)("I would go through both the docketed cases and the cases that had been received but not yet fully proceeded."). Prieskop asserts that her access to civil complaints is worse now than before e-filing. See Tr. at 55:16-18 (Prieskop). Prieskop compared New Mexico's e-filing system with the federal PACER e-filing system, which enables her to see cases filed as soon as they are submitted, even if this review is outside of business hours. See Tr. at 56:9-14 (Prieskop).

47. Prieskop described the process by which she created the Media News Logs which were attached as Exhibit B-1 and B-2 to her declaration. See Tr. at 57:8-61:13 (Prieskop)(citing February to June Log; July to September Log, admitted as Exhibit 5). Prieskop described the contents of the Santa Fe Log. See Tr. at 62:1-63:9 (Prieskop).

48. Next, the Defendants called their first witness, Laura Orchard, a senior IT project manager for NMAOC. See Tr. at 73:1-25 (McDonald, Orchard). Orchard described the e-filing system that New Mexico uses. See Tr. at 76:7-81:22 (Orchard). Upon cross examination, Orchard admitted that the percentage of statewide civil filings accepted on the same date as submission from the top row of the Defendants' Summary Table is wrong and should read 67.47 percent instead of seventy-nine percent. See Tr. at 94:7-23 (Orchard). Orchard also admitted that, based on the numbers from the Defendants' Summary Table, the percentage of statewide civil district filings accepted on the same date as submission was 69.68 percent and not seventy-nine percent. See Tr. at 96:10-23 (Orchard). Orchard also admitted that, based on the numbers shown from the Defendants' Raw Data, the percentage of statewide civil district initial filings accepted the same days as submission should read sixty-five percent, instead of seventy-nine percent. See Tr. at 96:10-13 (Orchard).

49. The Defendants next called Arthur Pepin, NMAOC's Director. See Tr. at 102:15-25 (Lecocq, Pepin). Pepin presented information about the work of the NMAOC, the Judicial Information Division ("JID"), JTECH, which is the statewide technology council, and the Online Access Subcommittee ("OAS"). See Tr. at 103:17-105:21 (Pepin).

50. Pepin stated that part of NMAOC's job is to ensure public access to documents under the New Mexico Inspection of Public Records Act ("IPRA"), but without compromising PPII. Tr. at 108:11-20 (Pepin).

 *20  51. Pepin described his understanding of NMAOC's goal of ensuring the efficient operation of the judicial system. See Tr. 117:23-119:11 (Pepin). Pepin described the reasons why clerks need to screen court filings rather than use an automated process, including the screening process that clerks have to do when self-represented litigants file documents, and for screening documents for PPII. See Tr. 130:1-134:7 (Pepin).

52. Pepin stated that, although Tyler Technologies was offering the Press Review Queue for free in 2018 when he wrote the Memorandum, the "latest communication" he has from Tyler Technologies, "from Ms. Reilly, the same person here, is that it would cost us $108,000." Tr. at 148:24-149:5 (Pepin). In addition, Pepin stated that "[t]he costs to us are much more significant than the $108,000." Tr. at 149:7-8. Pepin continued:

> Certainly, it would take staff time, staff who are already assigned duties, they would have to stop them from doing. The same thing with money. I'd have to take money from somewhere to pay for this if there is a financial cost to it. And then it seems to me that we would have to figure out how to comply with whatever order had directed us to adopt the press queue in a way that also complied with our other statutory obligations, our obligations to protect information and make sure things that get filed are filed appropriately and all that. It also seems that when a proposed filing -- not a proposed filing, that's a different technical term -- when a complaint is submitted for filing, if it gets rejected, we'd somehow have to try to pull that back, or I don't know exactly. We'd have to do some kind of monitoring so that documents that had gone through this queue came out of it, or we notified the parties that, in fact, this is not a document the court accepted.

But there would be costs in terms of time and interactions with Tyler. I don't know much about technology. But what I've learned in 15 years is it always takes more time and costs more money than you expect. Not necessarily the check I have to write to Tyler, but in terms of spending limited resources we have at JID and elsewhere. We have to train our clerks, we have to retrain them in how we're going to run the system, what this queue does. I can't just have a new queue out there, and they would see it, and they would say -- I have to train them about it, notify them, all that kind of thing. There would be costs there in time and talent.

Tr. at 149:15-150:23 (Pepin).

53. Pepin expressed concerned that,

The sooner the access goes, back in the system, the greater risk that we are publishing information either that we should keep confidential or in a way that, you know, gives access to confidential information. And I think I said this before, the reason why attorneys are filers is because they have to listen to the orders of the Court, and what they say. And others, you know, we don't have any control [over] the press, or whoever might be the press. I have no concerns about CNS. They appear to be a top-flight superb First Amendment press organization. But I doubt an order would limit us in ways that we could keep restricting information in the way we do now at least for things that have been filed, been accepted. So things would get out there to other folks who call themselves press, or who would try to save their right of access, the same as that of CNS. But if we do, we'd have to be compliant.

**\*21**  Tr. at 152:10-153:4 (Pepin).

54. Pepin stated that the possibility of rescinding access to users who publicized sealed or confidential information would not be enough protection, because "the more attenuated you get from lawyers, who are under the Supreme Court ... to others who might qualify as press, the less likely it is you're able to exercise a kind of protection you want to exercise on what should be kept private." Tr. at 154:6-12 (Pepin).

55. Pepin stated that, in a unified court system, one county by itself "couldn't decide to do what you are asking on their own in this state, in New Mexico. It would have to be a determination by the Supreme Court that the statewide system, would make these documents accessible at the time – at the point you're asking." Tr. at 159:8-17 (Pepin).

56. The Defendants next called Suzanne Winsor, the IT Odyssey Support Manager for the NMAOC's JID. See Tr. at 174:11-21 (McDonald, Winsor). Among other things, Winsor's department supports the Odyssey Public Access application ("OPA"), which is designed to help self-represented litigants create forms or pleadings to be filed in the court and is accessed in the kiosks of courthouse lobbies. See Tr. 175:22-176:3 (Winsor); id. at 179:6-10 (Winsor). Winsor testified about the screening process that clerks perform in the current e-filing system. See Tr. at 180:9-183:1 (Winsor).

57. The Defendants next called Monica Baca, a Deputy Court Executive Officer with the Second Judicial District court. See Tr. at 196:7-17 (McDonald, Baca). Baca testified that her office processes around 1800-2000 filings a day, see Tr. at 197:25-198:3 (Baca), and testified about the work of the clerks in her office and in particular, for what clerks screen filings. See Tr. at 198:16-205:25 (Baca).

58. Finally, the Defendants called Judge James Noel, who is a District Court Judge for the Thirteenth Judicial District Court of New Mexico, and was formerly a Court Executive Officer for the Second Judicial District Court. See Tr. at 213:1-16 (Lecocq, Noel). Judge Noel testified about the attempts that Courthouse News made to get NMAOC to install a Press Review Queue before the current litigation. See Tr. at 223:20-225:10 (Noel).

**CONCLUSIONS OF LAW**

## LAW REGARDING FEDERAL-QUESTION JURISDICTION

1. Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction. See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974); Chavez v. Kincaid, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998). A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. There is a federal question if the case arises under the Constitution, laws, or treaties of the United States. See 28 U.S.C. § 1331. Whether a case arises under a federal law is determined by the "well pleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13, 57 S.Ct. 96, 81 L.Ed. 70 (1936)). This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 10, 103 S.Ct. 2841 (citing Taylor v. Anderson, 234 U.S. 74, 75-76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914)). The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action. See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 25-26, 103 S.Ct. 2841. The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). See Sandoval v. New Mexico Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("Merrell Dow is the Controlling law when invoking subject matter jurisdiction" when a right under state law turns on construing federal law). District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810, 106 S.Ct. 3229.

 **\*22** 2. In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.' " Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)). If the resolution turns on a substantial question of federal law, the federal question must also be "contested." Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005). Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." 542 U.S. at 313, 124 S.Ct. 2531. Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts. 542 U.S. at 313, 124 S.Ct. 2531. See Darr v. N.M. Dep't of Game & Fish, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314, 125 S.Ct. 2363)); Bonadeo v. Lujan, 2009 WL 1324119, at *7-9 (D.N.M. April 30, 2009).

## LAW REGARDING YOUNGER ABSTENTION

3. "Generally, federal courts must exercise their jurisdiction when available. However, principles of 'equity, comity, and federalism' motivate a 'longstanding public policy against federal court interference with state court proceedings.' " Rocky Mountain Gun Owners v. Williams, 671 F. App'x 1021, 1024 (10th Cir. 2016)(quoting Steffel v. Thompson, 415 U.S. 452, 460-61, 94 S.Ct. 1209, 39 L.Ed.2d 505, (1974), and citing Younger v. Harris, 401 U.S. 37, 43-45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)("Younger"); Sprint Comm'cns, Inc. v. Jacobs, 571 U.S. 69, 73, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013)("Sprint")). The framers of the Constitution designed a system in which

there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

Younger, 401 U.S. at 44, 91 S.Ct. 746.

4. Under the abstention doctrine that the Supreme Court of the United States articulates in Younger, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief. Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)). A court in the Tenth Circuit should abstain from entertaining cases which implicate the Younger doctrine, so long as an adequate opportunity is afforded in the State court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291. This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)). The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' rather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief." Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

5. For Younger abstention to be appropriate, the Tenth Circuit has ruled that three conditions must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432, 102 S.Ct. 2515; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78. See Bellotti v. Baird, 428 U.S. at 143 n.10, 96 S.Ct. 2857 (noting that when all of the conditions mandating abstention clearly exist in the record, courts should address application of the Younger abstention doctrine sua sponte; Morrow v. Winslow, 94 F.3d at 1390-91 & n.3. Before examining the three-factor test, the Court first must address whether this case is one that allows for Younger abstention at all. The Supreme Court has defined the appropriate set of cases narrowly: "Circumstances fitting within the Younger doctrine, we have stressed, are 'exceptional'; they include ... [i] 'state criminal prosecutions,' [ii] 'civil enforcement proceedings,' and [iii] 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." Sprint, 571 U.S. at 73, 134 S.Ct. 584 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)).

*23  6. The Tenth Circuit subsequently has "applie[d] [Younger] to three categories of state cases." Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 670 (10th Cir. 2020). See Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017)(noting that Sprint "significantly limited the reach of Younger to only" three situations, and that Sprint "also discounted reliance on the three factors outlined" in Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 433-434, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)("Middlesex")); MacIntyre v. JP Morgan Chase Bank, No. 12-CV-2586-WJM-MEH, 2015 WL 1311241, at *2 (D. Colo. Mar. 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that Sprint significantly cabined the breadth of Younger abstention as it has been applied in this circuit."); Brumfiel v. U.S. Bank, N.A., No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. Dec. 11, 2014)(Martinez, J.)("[I]n Sprint, the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that applied Younger abstention using substantially the same analysis as in [Amanatullah v. Colo. Bd. Of Med. Examiners, 187 F.3d 1160 (10th Cir. 1999)][.]"); Conry v. Barker, No. 14-CV-02672-CMA-KLM, 2015 WL 5636405, at *6 (D. Colo. Aug. 11, 2015)(Mix, M.J.).

7. In Sprint, the Supreme Court clarified that "[t]he three Middlesex conditions ... were not dispositive; they were, instead, additional factors appropriately considered by the federal court before invoking Younger." Sprint, 571 U.S. at 81, 134 S.Ct. 584 (emphasis in original). In Hunter v. Hirsig, 660 F. App'x 711 (10th Cir. 2016)(unpublished)("Hunter"), the Tenth Circuit continued to use similar factors to determine whether Younger abstention is non-discretionary and "must be invoked absent extraordinary circumstances." Hunter, 660 F. App'x at 714-15. "Younger and its progeny require federal courts to abstain from

exercising jurisdiction if (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state proceeding provides an adequate forum to hear the plaintiff's federal claims, and (3) the state proceeding involves important state interests." Hunter, 660 F. App'x at 714 (citing Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d at 1163).

8. The Tenth Circuit applies the three Sprint categories within its analysis of the first prong -- whether there are "ongoing state administrative proceedings." Hunter, 660 F. App'x at 715. It explained that "[t]he first condition -- ongoing state administrative proceedings -- involves two subparts: the proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference," where the three Sprint categories define "type." Hunter, 660 F. App'x at 715 (emphasis in the original). See Hunter, 660 F. App'x. at 716 ("As for the *type* of proceeding, the Supreme Court has held that Younger applies to 'particular state civil proceedings that are akin to criminal prosecutions.' ")(emphasis in the original)(quoting Sprint, 134 S. Ct. at 588).

9. Once a court determines that the case is appropriate for Younger abstention, a court must then analyze the second and third elements: (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432, 102 S.Ct. 2515); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001). When all three elements mandating abstention clearly exist in the record, courts may and should address Younger abstention doctrine's analysis sua sponte. See Bellotti v. Baird, 428 U.S. 132, 143 n.10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)("Abstention may be raised by the court sua sponte."); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

 **24**  10. Younger abstention is not discretionary once its criteria are met. See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because " 'application of the Younger doctrine is absolute ... when a case meets the Younger criteria,' there is no discretion for the district court to exercise."). When the Younger abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation. Deakins v. Monaghan, 484 U.S. 193, 202, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988). For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action. See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended). See also Younger, 401 U.S. at 43, 91 S.Ct. 746 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

11. On the other hand, where a State court can address a plaintiff's cause of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the State court proceeding. In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007)(unpublished), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights. See 242 F. App'x at 613. The parent had requested a federal district court to issue an order regarding his parental rights and right to child support payments, and to award the parent monetary damages compensating him for his past child support payments. See 242 F. App'x at 611. Additionally, the parent alleged that the Colorado State trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the State court officials adjudicating his State custody case. 242 F. App'x at 613. The Tenth Circuit ruled that the district court was right to abstain from hearing the parent's case under Younger. See Wideman v. Colorado, 242 F. App'x at 614. The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing. 242 F. App'x at 614. Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues. 242 F. App'x at 614. Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigate any federal constitutional issues that may arise ... in the Colorado state proceedings." 242 F. App'x at 614. Thus, where the Younger abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing. 242 F. App'x at 614.

12. According to the Tenth Circuit, ordinarily, a state proceeding is no longer "ongoing" when "the time for appeal has run." Hunter, 660 F. App'x at 715 (citing Bear v. Patton, 451 F.3d 639, 642 (10th Cir. 2006)("[I]f a lower state court issues a judgment and the losing party allows the time for appeal to expire, then the state proceedings have ended.")). "[R]egardless of when [a state court's] judgment became final, ... a necessary concomitant of Younger is that a party in [the federal plaintiff's] posture must exhaust his state appellate remedies before seeking relief in the [federal] District Court ...." Hunter, 660 F. App'x at 715 (quoting Huffman v. Pursue, Ltd., 420 U.S. 592, 608, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975)).


**LAW REGARDING 42 U.S.C. § 1983 CLAIMS**

**\*25**  13. § 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. § 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights ....' " (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998))). § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(second alteration in original) (quoting Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at \*11 (D.N.M. March 30, 2010)(Browning, J.)).

14. The Supreme Court clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Consequently, there is no respondeat superior liability under § 1983. See Ashcroft v. Iqbal, 556 U.S. at 676, 129 S.Ct. 1937 ("Because vicarious liability is inapplicable to Bivens[7] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

**\*26**  15. The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at \*25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v.

Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676, 129 S.Ct. 1937. The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights ... secured by the Constitution ...."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983). The Tenth Circuit has noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link ... between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy ... -- express or otherwise -- showing their authorization or approval of such misconduct.' " Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)).

16. The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed. See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371, 96 S.Ct. 598). The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to " 'crush the nascent labor organizations.' " Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371, 96 S.Ct. 598).

## LAW REGARDING 42 U.S.C. § 1988

17. § 1983 "and its fee-shifting provision, 42 U.S.C. § 1988, seek to encourage attorneys to litigate civil rights violations." Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *13 (D.N.M. June 13, 2012)(Browning, J.). Section 1988(b) provides: "[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). "[T]here are two elements in deciding whether to award attorney's fees. First, the party seeking fees must qualify as a 'prevailing party.' Second, the fee itself must be 'reasonable.' " Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir. 1997)(quoting 42 U.S.C. § 1988(b)).

*27 18. For the purpose of determining attorney's fees, a court may determine that plaintiffs are "prevailing parties ... if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (internal quotation marks omitted)(citation omitted). In Farrar v. Hobby, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the Supreme Court later elaborated on this description:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff. Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party. In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. at 111, 113 S.Ct. 566 (citations omitted)(internal quotation marks omitted)(alterations omitted). The Supreme Court has stated that "this is a generous formulation that brings the plaintiff only across the statutory threshold." Hensley v. Eckerhart,

461 U.S. at 433, 103 S.Ct. 1933. See Copar Pumice Co., Inc. v. Morris, 2012 WL 2383667, at *19 (concluding that Copar Pumice qualified as a prevailing party under the "generous formulation" that the Supreme Court set in Hensley v. Eckerhart). The district court must then determine what fee is "reasonable." Hensley v. Eckerhart, 461 U.S. at 433, 103 S.Ct. 1933; Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1210 (D.N.M. 2011)(Browning, J.)("Once a court determines that a party is a prevailing party, it must then determine what amount of reasonable attorney's fees should be awarded.").

19. "To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate." Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)(citing Blum v. Stenson, 465 U.S.886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); Hensley v. Eckerhart, 461 U.S. at 433, 103 S.Ct. 1933). This lodestar figure "provides an objective basis on which to make an initial estimate of the value" of an attorney's services. Hensley v. Eckerhart, 461 U.S. at 433, 103 S.Ct. 1933. While the Court "agrees that attorneys' fees should be adequate to attract competent counsel," they should "not be so large that it is a windfall for attorneys -- who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims." Obenauf v. Frontier Financial Group, Inc., 785 F. Supp. 2d at 1214. The prevailing party requesting an award of its fees must submit evidence to support its claim of time spent and rates claimed. See Hensley v. Eckerhart, 461 U.S. at 434, 103 S.Ct. 1933. If the evidence is inadequate, the district court may reduce the fee award accordingly. See Hensley v. Eckerhart, 461 U.S. at 434, 103 S.Ct. 1933. See also Ysasi v. Brown, 2015 WL 403930, at *14 (D.N.M. Jan. 7, 2015) (reducing the plaintiffs' counsel's requested fees because the time records were of poor quality, lacked detail, and were general in their wording).

*28  20. A district court may also adjust the lodestar to reflect a plaintiff's overall success level. See Jane L. v. Bangerter, 61 F.3d at 1511 (citing Hensley v. Eckerhart, 461 U.S. at 435-36, 103 S.Ct. 1933). "In making such adjustments, however, Hensley requires that lower courts make qualitative comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success." Jane L. v. Bangerter, 61 F.3d at 1511. The district court must consider the relationship between the fees awarded and the degree of success obtained and must make a qualitative assessment to determine when limited results will nonetheless justify full recovery or to what extent a plaintiff's "limited success" should reduce the lodestar. Jane L. v. Bangerter, 61 F.3d at 1511. "There is no precise rule or formula" for making such determinations. Hensley v. Eckerhart, 461 U.S. at 436, 103 S.Ct. 1933. In Hensley v. Eckerhart, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. 461 U.S. at 435, 103 S.Ct. 1933.

21. Furthermore, when a plaintiff brings related claims, failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant, interrelated claim. See Hensley v. Eckerhart, 461 U.S. at 440, 103 S.Ct. 1933 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); Jane L. v. Bangerter, 61 F.3d at 1512. Claims are related when they are either based on "a common core of facts" or based on "related legal theories." Hensley v. Eckerhart, 461 U.S. at 435, 103 S.Ct. 1933. In both cases, the district court should refrain from reducing the amount of the prevailing party's attorney's fee award. See Jane L. v. Bangerter, 61 F.3d at 1512. The Tenth Circuit has "refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a common core of facts." Jane L. v. Bangerter, 61 F.3d at 1512 (internal quotation marks omitted)(quoting Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir. 1993)(holding that the trial court abused its discretion in reducing attorney's fees for a plaintiff who prevailed under some provisions of the Equal Pay Act, but failed on her Title VII and state law claims)). The Tenth Circuit has also recognized that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." Jane L. v. Bangerter, 61 F.3d at 1512 (quoting Hensley v. Eckerhart, 461 U.S. at 435, 103 S.Ct. 1933).

## LAW REGARDING PRELMINARY INJUNCTIONS

22. "It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted). To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (1984). Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 19, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008))). The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972). "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné Citizens Against Ruining Our Environment v. Jewell, 839 F.3d 1276, 1282 (10th Cir.2016). "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.' " Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.) (quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963)). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005).

**\*29** 23. "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]' " Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395, 101 S.Ct. 1830). In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006)("O Centro")). Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009). Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result ... place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.' " Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] ..., 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at \*40 (D.N.M. Jan. 15, 2016). When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to

be in accord or not in accord with the parties' legal rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975). "The meaning of this category is self-evident." Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41. With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

24. "[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]" United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING BONDS FOR PRELIMINARY INJUNCTIONS

**\*30** 25. Under rule 65(c), the Court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States and its officers and agencies are exempt from this requirement. See Fed. R. Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable"). See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security' " and may, therefore, impose no bond requirement. RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

## RELEVANT LAW REGARDING THE FIRST AMENDMENT

26. The First Amendment states: "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. amend. I. The First Amendment secures the "freedom of expression upon public questions." New York Times Co. v. Sullivan, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). According to Justice Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary." Whitney v. California, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927). The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty." Whitney v. California, 274 U.S. at 375, 47 S.Ct. 641. The Framers firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile." Whitney v. California, 274 U.S. at 375, 47 S.Ct. 641. Justice Brandeis noted that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates. See Whitney v. California, 274 U.S. at 375, 47 S.Ct. 641. Robust public discussion is a "political duty" and is a "fundamental principle of the American government." Whitney v. California, 274 U.S. at 375, 47 S.Ct. 641. Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

27. The First Amendment, however, is not an absolute bar on government intervention. "No law," does not actually mean "no law." U.S. Const. amend. I. See Dennis v. United States, 341 U.S. 494, 503, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other values and considerations"); Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002)(stating that, " '[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content,' " but "this principle, like other First Amendment principles, is not absolute")(quoting Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)). Although the First Amendment speaks in absolutist terms, courts have long recognized that governments constitutionally can restrict speech and the press under certain conditions. See Holder v. Humanitarian Law Project, 561 U.S. 1, 26-29, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). Justice Oliver Wendell Holmes, Associate Justice of the Supreme Court of the United States of America, notes in his famous example: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic." Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Not all speech is protected speech. See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); Miller v. California, 413 U.S. 15, 23, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment."). "[N]ot all speech is of equal First Amendment importance." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). The extent to which the government may limit access to information or restrict speech "depends on the nature of the forum." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). See Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)(concluding that certain content-neutral time, place, and manner restrictions are constitutional). Moreover, the First Amendment's speech and press protections limit both state and federal government action. See Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); Near v. Minnesota, 283 U.S. 697, 706, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The First Amendment regulates "government regulation of private speech" and not government speech or purely private speech regulations. Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). The First Amendment does not compel either the government or private persons to supply information. See Shero v. City of Grove, 510 F.3d 1196 (10th Cir. 2007). See In re Santa Fe Natural Tobacco Co. Mkting. & Sales Practices and Products Liab. Litig., 288 F. Supp. 3d 1087, 1168-73 (D.N.M. 2017)(Browning, J.).

### 1. Access to Court Proceedings and the First Amendment.

**\*31**  28. The First Amendment does not mention explicitly a right of access to court proceedings. See U.S. Const. amend. I. Nevertheless, the Supreme Court has extended a public right of access to criminal trials pursuant to the First Amendment. See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 602-04, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). The Supreme Court states:

> [W]e have long eschewed any "narrow, literal conception" of the First Amendment's terms ... for the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment Rights.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 603-04, 102 S.Ct. 2613 (quoting NAACP v. Button, 371 U.S. 415, 430, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 579-80, 591 n.16, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The Supreme Court has emphasized that the right of access to criminal trials is important, because "the criminal trial has historically been open to the press and general public," and because such public access "plays a particularly significant role in the functioning of the judicial process and the government as a whole." Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 605-06, 102 S.Ct. 2613. Accordingly,

> Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits

the public to participate in and serve as a check upon the judicial process -- an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience. Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606, 102 S.Ct. 2613. Because one of the First Amendment's "major purpose[s]" is to "protect the free discussion of governmental affairs," the Supreme Court recognizes a right of access to criminal trials. Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). By protecting this right, the First Amendment "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 604, 102 S.Ct. 2613. The Supreme Court cautions, however, that, "although the right of access to criminal trials is of constitutional stature, it is not absolute." Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606, 102 S.Ct. 2613. Still, the standard that the government must meet to garner closure is hefty, requiring satisfaction of strict scrutiny. See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606-07, 102 S.Ct. 2613.

29. The First Amendment does not protect an absolute right to access court documents or court proceedings. See Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. 1, 11-12, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606, 102 S.Ct. 2613. The right is not absolute, because, as the Supreme Court notes, it takes "little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly." Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8, 106 S.Ct. 2735. "[T]he right to inspect and copy judicial records is not absolute." Nixon v. Warner Commc'n, Inc., 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The Supreme Court states: "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." Nixon v. Warner Commc'n, Inc., 435 U.S. at 598, 98 S.Ct. 1306. Consequently, there is a "qualified" "right of public access" if two "considerations of experience and logic" are met. Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 10, 106 S.Ct. 2735. First, a judicial proceeding or record must "have historically been open to the press and general public." Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8, 106 S.Ct. 2735. Second, public access must play a "significant positive role in the functioning of the particular process in question." Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8, 106 S.Ct. 2735. The right of access is qualified, but the presumption of access may be overcome " 'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 9, 106 S.Ct. 2735 (quoting Press-Enterprise Co. v. Superior Ct. of Calif., Riverside Cnty., 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). See United States v. Gonzales, 150 F.3d 1246, 1256 (10th Cir. 1998)). This test is known as the "experience and logic" test. See Lanphere & Urbaniak v. Colo., 21 F.3d 1508, 1512 (10th Cir. 1994).

 *32  30. The "experience and logic" test does not afford the press a special right of access to court or government documents not available to the public. See Lanphere & Urbaniak v. Colo., 21 F.3d at 1511. The United States Court of Appeals for the Tenth Circuit has twice assumed without deciding that the "experience and logic" test applies to non-criminal court records and proceedings. See United States v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997); United States v. Gonzales, 150 F.3d at 1256. In doing so, however, the Tenth Circuit reiterated that there is "not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so the scope of such a right." United States v. McVeigh, 119 F.3d at 812.

31. The "experience and logic" test does not require disclosure of a criminal defendant's address or telephone number. Lanphere & Urbaniak v. Colo., 21 F.3d at 1512. In Lanphere & Urbaniak v. Colo., the Tenth Circuit concluded that a First Amendment right of access exists only in "limited situations" where a " 'tradition of accessibility implies the favorable judgment of experience' ... and where 'public access plays a significant positive role in the functioning of the particular process in question.' " Lanphere & Urbaniak v. Colo., 21 F.3d at 1512 (quoting Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8, 106 S.Ct. 2735). Allowing access to documents that contain a defendant's "address and/or phone number," especially when those documents are sought for that reason specifically, would stretch the First Amendment's principles "well beyond their current bounds." See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512. The Tenth Circuit, therefore, notes specifically that it "declines" to find a First Amendment right to access court documents which contain a criminal defendant's address or telephone number. See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512. See also United States v. Jager, No. CR-1531 JB, 2011 WL 13285416,

at *4 (D.N.M. June 23, 2011)(Browning, J.)("[T]he 'interests of personal privacy' of the innocent third parties is 'sufficiently compelling to overcome the presumption of access.' " United States v. Jager, No. CR-1531 JB, 2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)(quoting United States v. Sattar, 471 F. Supp. 2d 380, 388 (S.D.N.Y. 2006)(Koeltl, J.)).

32. Similarly, the "experience and logic" test does not mandate press access to suppressed evidence. United States v. McVeigh, 119 F.3d at 812-13. Assuming without deciding that the "experience and logic" test applies beyond the criminal context, the Tenth Circuit determined that, although there is a "qualified right of access" to a suppression motion, that right "does not extend to the evidence actually ruled inadmissible in such a hearing." United States v. McVeigh, 119 F.3d at 813. The public's interest in understanding court proceedings is the guiding principle. See United States v. McVeigh, 119 F.3d at 813. The Tenth Circuit reasoned that accessing suppressed evidence is "not necessary to understand the suppression hearing, so long as the public is able to understand the circumstances that gave rise to the decision to suppress." United States v. McVeigh, 119 F.3d at 813. Moreover, the Tenth Circuit noted that disclosing suppressed evidence would harm the criminal process, because it would expose the "public generally, as well as potential jurors, to incriminating evidence that the law has determined may not be used to support a conviction." United States v. McVeigh, 119 F.3d at 813. A district court's decision to seal only "those portions of the motion and exhibit that contain materials ... ruled inadmissible," therefore, did not run afoul of the First Amendment, because "both the press and the public had ample opportunity to understand the circumstances surrounding" the inadmissible material. United States v. McVeigh, 119 F.3d at 813-14.

**\*33**  33. The First Amendment does not require that the press have access to Criminal Justice Act, 18 U.S.C. § 3006A, ("CJA") materials, including "CJA-related vouchers, backup documentation, motions, orders, and hearing transcripts." United States v. Gonzales, 150 F.3d 1246, 1253 (10th Cir. 1998). When the Albuquerque Journal contended that it has a First Amendment right to access CJA materials, the Tenth Circuit applied the "experience and logic" test, and concluded that neither history nor logic supported the Albuquerque Journal's contention. United States v. Gonzales, 150 F.3d at 1256-61. First, there is "no history, experience or tradition of access" requiring the "release at any time of backup documentation, motions, orders, and hearing transcripts regarding requests for CJA assistance." United States v. Gonzales, 150 F.3d at 1258. Second, public access to these records does not "play a *significant role* in the functioning of the CJA process" and would, in fact, play "a *negative* role." United States v. Gonzales, 150 F.3d at 1259 (emphasis in original). Further, the Tenth Circuit concluded that there is no common-law right of access to CJA materials, because the CJA statutory scheme would supersede any common-law right. See United States v. Gonzales, 150 F.3d at 1263.

34. Neither the Supreme Court nor the Tenth Circuit has decided that Press-Enterprise Co.'s "experience and logic" test applies to civil complaints. Moreover, if restriction on public access to a government document or record is not a complete bar, but instead resembles a "time, place, and manner" restriction, then a court does not apply strict scrutiny. See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 607 n.17, 102 S.Ct. 2613. Time, place, and manner restrictions on press access to court documents are constitutional where they are "content-neutral, narrowly tailored, and necessary to preserve the court's important interest in the fair and orderly administration of justice." Courthouse News Serv. v. Planet, 947 F.3d 581, 585 (9th Cir. 2020). See Ward v. Rock Against Racism, 491 U.S. at 791, 109 S.Ct. 2746 (concluding that content-neutral time, place, and manner restrictions are constitutional if they are narrowly tailored to serve a significant government interest, and leave open ample room for the information to be communicated other ways).

35. Where the "experience and logic" test is satisfied -- and, therefore, there is a First Amendment right to access -- there is a necessary "right to timely access." Courthouse News Serv. v. Planet, 947 F.3d at 594. The right to timely access does not swallow the entire time, place, and manner analysis. See Courthouse News Serv. v. Planet, 947 F.3d at 594. As a result, a right to access timely information does not entitle the press to "immediate, pre-processing access to newly filed complaints." Courthouse News Serv. v. Planet, 947 F.3d at 594. See Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)(concluding that the First Amendment "does not require perfect or instantaneous access"). The qualified right "attaches when the complaint is filed," but does "not entitle the press to immediate access to those complaints." Courthouse News Serv. v. Planet, 947 F.3d at 585. The Ninth Circuit states:

Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged. After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration. The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

Courthouse News Serv. v. Planet, 947 F.3d at 596. The qualified right of access does "not require perfect or instantaneous access," because it leaves room for courts to delay access when "same-day access would be impracticable." Courthouse News Serv. v. Schaefer, 2 F.4th at 328. Neither "inconsequential delays" nor delays caused by "extraordinary circumstances" infringe the qualified right of access. Courthouse News Serv. v. Schaefer, 2 F.4th at 328. Rather, the First Amendment requires newly filed civil complains be available "as expeditiously as possible." Courthouse News Serv. v. Schaefer, 2 F.4th at 329. For example, "overnight delay in access to complains filed during the last ninety minutes of the court's public hours" does not violate the First Amendment. Courthouse News Serv. v. Planet, 947 F.3d at 599.

## 2. Newsgathering and the First Amendment.

**\*34** 36. While newsgathering has some First Amendment protection, its protection does not include necessarily a right to access all news-worthy information. The Supreme Court has noted that, although "there is an undoubted right to gather news 'from any source by means within the law,' " that right is limited, by its terms, to the ability to gather information from sources legally that are legally available to the public. Houchins v. KQED, Inc., 438 U.S. 1, 10-12, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978)(quoting Branzburg v. Hayes, 408 U.S. 665, 681-82, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)). "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." Branzburg v. Hayes, 408 U.S. at 684, 92 S.Ct. 2646. First Amendment protection of newsgathering, which ensures that the government does not "violate the First Amendment by deterring news sources from communicating information," does not provide a right of access beyond the public's general access to a particular source. Houchins v. KQED, Inc., 438 U.S. at 10-12, 98 S.Ct. 2588 (citing Branzburg v. Hayes, 408 U.S. at 680, 92 S.Ct. 2646). Thus, there is "no basis for the claim that the First Amendment compels others -- private persons or governments -- to supply information."[8] Houchins v. KQED, Inc., 438 U.S. at 10-11, 98 S.Ct. 2588.

37. The Supreme Court has also found that an international passenger who asserted that the Secretary of State's refusal to validate his passport to travel to Cuba violated his First Amendment right to "travel abroad" so as to acquaint himself "first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies," had not suffered a First Amendment violation. Zemel v. Rusk, 381 U.S. 1, 16-17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). The Supreme Court explained:

There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.

Zemel v. Rusk, 381 U.S. at 16-17, 85 S.Ct. 1271.

38. According to the Tenth Circuit, it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control." Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)(citing Houchins v. KQED, Inc., 438 U.S. 1, 9, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978)). "This applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public." Smith v. Plati, 258 F.3d at 1178 (citing Houchins v. KQED, Inc., 438 U.S. at 11, 98 S.Ct. 2588; Pell v. Procunier, 417 U.S. 817, 834, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Saxbe v. Wash. Post Co., 417 U.S. 843, 850, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); Branzburg v. Hayes, 408 U.S. at 684-85, 92 S.Ct. 2646; and Zemel v. Rusk, 381 U.S. at 17, 85 S.Ct. 1271). See Okla. Hosp. Ass'n v. Okla. Pub. Co., 748 F.2d 1421, 1425 (10th Cir. 1984)("Thus, the Supreme Court has recognized that, whatever the extent of protection

warranted newsgathering, it is no greater than the right of the general public to obtain information." (citing Pell v. Procunier, 417 U.S. at 834, 94 S.Ct. 2800)).


## ANALYSIS

**\*35**  As a threshold matter, the Court determines that Younger abstention is not appropriate in this case under Tenth Circuit precedent. Next, the Court concludes that Courthouse News has a qualified right of timely access to newly filed non-confidential civil complaints, which attaches when a complaint is filed, or submitted, to the State courts. The Court defines the right of timely access by looking at what access was traditionally provided to the press in the days of paper filing, because the right of timely access is based on history and experience, and concludes that a limit of five business hours comes the closest to replicating traditional access in the paper filing system. The Court applies "more relaxed" scrutiny in determining whether the right of timely access has been violated. Courthouse News Serv. v. Planet, 947 F.3d at 595. Based on data submitted and testimony provided by both parties at the hearing, the Court concludes that the Defendants have likely violated Courthouse News' right of timely access. Because Courthouse News is likely to succeed on the merits of a traditional right of access claim, it is appropriate to grant Courthouse News' preliminary injunction insofar as it enjoins the Defendants from denying access to newly filed civil complaints past five business hours.


## I. THE COURT WILL NOT ABSTAIN UNDER YOUNGER BECAUSE THE REQUESTED INJUNCTION WOULD NEITHER INTERFERE WITH NOR ENJOIN AN ONGOING STATE PROCEEDING.

The Defendants suggest that, because the Supreme Court of New Mexico's Order No. 17-8500-001 is an ongoing, standing order, there is an "ongoing state proceeding" for Younger abstention purposes. Response at 11. For the Court to abstain under Younger, this proceeding: (i) must interfere with an ongoing state judicial proceeding; (ii) must involve important state interests; and (iii) the state proceeding must provide an adequate opportunity to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432, 102 S.Ct. 2515; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78). See also Bellotti v. Baird, 428 U.S. at 143 n.10, 96 S.Ct. 2857 (noting that if all three conditions mandating abstention exist clearly in the record, courts should address Younger abstention sua sponte); Morrow v. Winslow, 94 F.3d at 1390-91 & n.3. Before examining the three-factor test, the Court first must address whether Younger abstention is applicable. Circumstances warranting Younger abstention are " 'exceptional' " and include " 'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.' " Sprint, 571 U.S. at 73, 134 S.Ct. 584 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368, 109 S.Ct. 2506).

Asking whether Younger requires abstaining is appropriate here. Sprint's third category is most relevant. Sprint notes that Younger abstention may be appropriate in " 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.' " Sprint, 571 U.S. at 73, 134 S.Ct. 584 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368, 109 S.Ct. 2506). Courthouse News' Complaint is aimed squarely at New Mexico state courts' operational procedures that carry out judicial functions, and not at New Mexico courts' ability to perform judicial functions. An injunction would affect New Mexico's entire court system -- not just one state court proceeding -- because it may require changes to the State's e-filing software, or may require the State to hire additional staff to more quickly process documents. Either way, an injunction would alter the operating procedures of clerks across the State. As a result, this case's circumstances befit considering Younger abstention. See Sprint, 571 U.S. at 73, 134 S.Ct. 584.

This case does not "interfere with an ongoing state judicial proceeding." J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291. The Tenth Circuit recently emphasized that "Younger does not mechanically require abstention whenever a state court conducts contempt proceedings in a related matter. Rather ... the 'exceptional circumstances' requiring abstention under Younger's third category are present only when the relief requested from the federal court would enjoin or otherwise interfere with such proceedings." Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 672 (10th Cir. 2020)(citing ReadyLink Healthcare, Inc. v.

State Comp. Ins. Fund, 754 F.3d 754, 759 (9th Cir. 2014))(stating that Younger abstention is appropriate only if "the federal action would have the practical effect of enjoining the state proceedings"). As the United States Court of Appeals for the Seventh Circuit notes in Courthouse News Serv. v. Brown, 908 F.3d 1063 (7th Cir. 2018)("Brown"), "[t]he situation here is not a traditional Younger scenario: there is no individual, ongoing state proceeding that plaintiffs seek to enjoin." Brown, 908 F.3d at 1072. As in Brown, Courthouse News seeks an injunction requiring court clerks to release newly filed complaints to the press at the moment they are submitted to the Court, and before the clerks process them and before the New Mexico courts deem them to be "accepted." Complaint at 21. See Brown, 908 F.3d at 1065. Courthouse News' requested injunction would neither interfere with nor enjoin the substance or merits of any one particular state proceeding; rather, it would speed up press and public access to the documents -- civil complaints in particular -- through which all state proceedings happen. Because Courthouse News does not seek to interfere with the substance of even a single state court proceeding, an injunction affecting only the speed of the State's processing of civil complaints would not "interfere with an ongoing state judicial proceeding." J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291. See ReadyLink HealthCare, Inc. v. State Compensation Ins. Fund, 754 F.3d at 759 (stating that that Younger abstention is appropriate only if "the federal action would have the practice effect of enjoining the state proceedings").

**\*36** Because the Court concludes that the requested injunction would not interfere with an ongoing state judicial proceeding, it need not address whether the state proceeding involves important state interests or whether it provides an adequate opportunity to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291. The Court acknowledges, however, that the State has a legitimate interest in regulating and operating its statewide e-filing system "to ensure the protection of the litigants and the smooth operation of the judiciary." Response at 2. Similarly, New Mexico State courts would afford "an adequate opportunity ... to raise the federal claims," J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291, and Girdner's "belie[f that] it would be futile" to raise Courthouse News' claims in State court in New Mexico, because "it would be asking the same court system that is denying the access to turn around and say that that denial is unconstitutional," Tr. 41:9-12 (Girdner) is not enough to come to federal district court rather than state court. Being unsuccessful does not mean that the State does not provide an adequate forum for Courthouse News' claims.

Analyzing a similar issue, the Seventh Circuit in Brown decided that Younger abstention is appropriate. See Brown, 908 F.3d at 1073. Relying on SKS & Associates, Inc. v. Dart, 619 F.3d 674 (7th Cir. 2010), the Seventh Circuit declined to exercise jurisdiction and interfere with state-court filing processes. See Brown, 908 F.3d at 1073. The Seventh Circuit notes that it is

important for federal courts to have "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief the National Government will fare best if the States and their institutions are left free to perform their separate function in their separate ways."

Brown, 908 F.3d at 1073 (quoting SKS & Associates, Inc. v. Dart, 619 F.3d at 676). In particular, the Seventh Circuit states that Younger relies on a "deeper principle of comity: the assumption that state courts are co-equal to the federal courts and are fully capable of respecting and protecting [Courthouse News'] substantial First Amendment rights." Brown, 908 F.3d at 1074. According to the Seventh Circuit, this principle "takes on special force" when, as here, a federal court is "asked to decide how state courts should conduct their business." Brown, 908 F.3d at 1074. Also analyzing a similar issue, but without a case from the United States Court of Appeals for the Eight Circuit analogous to SKS & Associates, Inc. v. Dart, 619 F.3d 674, the Honorable Henry E. Autrey, United States District Judge for the United States District Court for the Eastern District of Mississippi, agreed with the Seventh Circuit and chose to abstain. See Courthouse News Serv. v. Gilmer, —— F. Supp. 3d ——, ——, 2021 WL 2438914, at \*8 (E.D. Mo. June 15, 2021)(Autrey, J.).

The Court does not agree with the Seventh Circuit's conclusion. The Seventh Circuit is correct that State courts are capable of protecting First Amendment rights. See Tafflin v. Levitt, 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). The Seventh Circuit is also correct that State courts do and should have discretion to conduct their own business as they see fit. These considerations, however, do not outweigh a federal courts' authority "to say what the law is." Marbury v. Madison, 5 U.S. 137, 178, 1 Cranch 137, 2 L.Ed. 60 (1803). Moreover, the Seventh Circuit's conclusion does not square with the Tenth Circuit's treatment of Younger -- the Tenth Circuit has no analogue to SKS & Associates, Inc. v. Dart, 619 F.3d 674. Federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress," so, in the absence of a congressional directive, federal courts should not decline lightly to carry out their obligation. Quackenbush v. Allstate Ins. Co., 517 U.S. 706,

716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). The Seventh Circuit's reasoning, therefore, is better directed at Courthouse News than at federal courts, because Courthouse News could easily have filed this same action in the New Mexico courts. Courthouse News chose to file in federal court, however.

 **\*37**  The Court is also mindful of the Seventh Circuit's concerns about federal-court oversight of state procedures. The Seventh Circuit noted that, while not directly on point, the Supreme Court's reasoning in O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), is instructive. See Brown, 908 F.3d at 1071-73. In particular, the Court is aware that the Supreme Court cautions against injunctions that might lead to "an ongoing federal audit of state ... proceedings which would indirectly accomplish the kind of interference that" Younger "sought to prevent." O'Shea v. Littleton, 414 U.S. at 500, 94 S.Ct. 669. Here, however, there is little risk of an "ongoing federal audit" or "a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state ... proceedings." O'Shea v. Littleton, 414 U.S. at 500, 502, 94 S.Ct. 669. See Courthouse News Serv. v. Planet, 750 F.3d at 792.

Younger does "not mechanically require abstention," even when State courts are involved. Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 672 (10th Cir. 2020). Because Younger requires abstention only in "exceptional" circumstances, the Court is reluctant to attempt to expand Younger to require abstention whenever a State institution is alleged to have acted unconstitutionally. Sprint, 571 U.S. at 73, 134 S.Ct. 584. The Court declines to extend Younger far enough to risk concluding that, whenever a State court is involved, the only federal court that can determine the legality or constitutionality of the State's procedure is the Supreme Court, or to risk creating an exception to both federal-question jurisdiction, see 28 U.S.C. § 1331, and the Supremacy Clause, see U.S. Const. art. VI cl. 2. The Court, therefore, agrees with the Ninth Circuit's conclusion that an injunction requiring State courts to make civil complaints available more quickly to the press does not require abstention under Younger. See Courthouse News Serv. v. Planet, 750 F.3d at 792.


**II. THE STATE OF NEW MEXICO VIOLATES COURTHOUSE NEWS' RIGHT OF TIMELY ACCESS WHEN IT DOES NOT PROVIDE PRESS ACCESS TO NEWLY FILED NON-CONFIDENTIAL CIVIL COMPLAINTS WITHIN FIVE BUSINESS HOURS OF THEIR SUBMISSION.**

Courthouse News has a qualified right under the First to access non-confidential civil complaints. The First Amendment does not protect an absolute right to access court documents or court proceedings. See Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. 1, 11-12, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986)("Press-Enterprise II"); Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606, 102 S.Ct. 2613; Nixon v. Warner Commc'n, Inc., 435 U.S. at 598, 98 S.Ct. 1306 ("[T]he right to inspect and copy judicial records is not absolute."). Under Press-Enterprise II, there is a "qualified" "right of public access" if two "considerations of experience and logic" are met. Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2735. First, a judicial proceeding or record must "have historically been open to the press and general public." Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. Second, public access must play a "significant positive role in the functioning of the particular process in question." Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. The right of access is qualified, but the presumption of access may be overcome " 'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. 2735 (quoting Press-Enterprise Co. v. Superior Ct. of Calif., Riverside Cnty., 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). See United States v. Gonzales, 150 F.3d 1246, 1256 (10th Cir. 1998)). This test is known as the "experience and logic" test. Lanphere & Urbaniak v. State of Colo., 21 F.3d 1508, 1512 (10th Cir. 1994).

 **\*38**  The Tenth Circuit has twice assumed without deciding that the "experience and logic" test applies to non-criminal court records and proceedings. United States v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997); United States v. Gonzales, 150 F.3d at 1256. In assuming without deciding, however, the Tenth Circuit reiterated that there is "not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so the scope of such a right." United States v. McVeigh, 119 F.3d at 812. Neither the Supreme Court nor the Tenth Circuit has decided that Press-Enterprise II's "experience and logic" test applies to civil complaints.

Here, Courthouse News has shown that access to newly filed non-confidential civil complaints "ha[s] historically been open to the press and general public" under the first prong of Press-Enterprise II's experience and logic test. 478 U.S. at 8, 106 S.Ct. 2735. The Court heard testimony from witnesses for both Courthouse News and the Defendants that, before the advent of e-filing, reporters accessed newly field complaints after they had been filed with the clerk of the court. See Girdner Decl. ¶ 12, at 5; Noel Decl. ¶ 5, at 3; See Tr. at 52:22-53:8 (Prieskop); See Tr. 45:7-13 (Girdner). Girdner testified that Courthouse News began reporting in New Mexico around 2005. See Tr. at 8:2-4 (Girdner). Other courts have made similar findings: "[T]he district court found that 'there is no dispute that, historically, courts have openly provided the press and general public with access to civil complaints.' " Courthouse News Serv. v. Schaefer, 2 F.4th 318, 326 (4th Cir. 2021)(quoting Courthouse News Serv. v. Schaefer, 440 F. Supp. 3d 532, 557 (E.D. Va. 2020)). See Courthouse News Serv. v. Glessner, No. 1:21-cv-00040-NT, ─── F.Supp.3d ───, ───, 2021 WL 3024286 at *15, 2021 U.S. Dist. LEXIS 132894 at *37 (D. Me. July 16, 2021)(Torresen, J.)("The experience prong of the Press-Enterprise test supports a finding of a public right of access to civil complaints."). The Court concludes that access to newly filed non-confidential civil complaints, therefore, historically has been open to the press and the general public.

Under the second prong, public access must play a "significant positive role in the functioning of the particular process in question." Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. The Court finds persuasive the description of the importance of public access to civil complaints by the Honorable Nancy Torresen, United States District Judge for United States District Court for the District of Maine:

> In a civil case, the complaint provides the subject matter of a filed lawsuit and sets the framework for all subsequent court action. Allowing access to these initiating records allows the public to understand the litigation and puts the public in a position where it can evaluate the quality and honesty of the judiciary. Such access therefore plays a significant positive role in the court system.

Courthouse News Serv. v. Glessner, ─── F.Supp.3d at ───, 2021 WL 3024286 at *15, 2021 U.S. Dist. LEXIS 132894 at *38. The Court concludes that the public and the court system benefit not only from press access to newly-filed complaints, but also from press reporting on subsequent filings and the ultimate resolution of cases. Given, however, that Courthouse News is seeking here only a timely right of access to newly filed civil complaints, the Court limits its analysis to those pleadings. Because the public's access to civil complaints plays a positive and necessary role in the courts' functioning, the Court agrees that the Press-Enterprise II test's logic prong is met here. The Court further determines that: (a) Courthouse News has a qualified right of timely access, which attaches when a complaint is submitted; (b) the right of timely access is defined in the light of historic, traditional access, so that denying access to civil complaints for more than five hours past their submission violates Courthouse News' right to timely access; and (c) a "more relaxed" form of scrutiny than strict scrutiny applies.

### A. COURTHOUSE NEWS HAS A QUALIFIED RIGHT OF TIMELY ACCESS TO NEWLY FILED CIVIL COMPLAINTS, WHICH ATTACHES UPON SUBMISSION OF THOSE COMPLAINTS.

*39 Although neither the Supreme Court nor the Tenth Circuit has yet held that there is a constitutional right of access to civil complaints, the Court determines that Courthouse News has a right of timely access to newly field civil complaints. Where the "experience and logic" test is satisfied -- and, therefore, there is a First Amendment right to access -- there is a necessary "right to timely access." Courthouse News Serv. v. Planet, 947 F.3d at 594. Although there is an absence of specific guidance from the Supreme Court or the Tenth Circuit on the scope of the right to timely access, the Court agrees generally with the Fourth and Ninth Circuits' delineations of that scope. According to the Ninth Circuit, a right to timely access does not entitle the press to "immediate, pre-processing access to newly filed complaints." Courthouse News Serv. v. Planet, 947 F.3d at 594. See Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)(concluding that the First Amendment "does not require perfect or instantaneous access"). The press never had such a right; the press did not have the right or ability to take the hard copies from the clerk's hands as soon as the plaintiff handed the complaint to the clerk. See Tr. 44:19-45:13 (Girdner). A clerk reviewed, stamped and processed the complaint first. The qualified right "attaches when the complaint is filed" in a traditional sense -- when it is in the court's possession -- but does "not entitle the press to immediate access to those complaints." Courthouse News Serv. v. Planet, 947 F.3d at 585. The Ninth Circuit states:

Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged. After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration. The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

Courthouse News Serv. v. Planet, 947 F.3d at 596. The qualified right of access does "not require perfect or instantaneous access," but it does require contemporaneous access -- something in line with what the press has traditionally enjoyed. See Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2735 Contemporaneous means that complaints filed during a day should generally be available that day. The First Amendment requires that newly filed civil complaints be available "as expeditiously as possible." Courthouse News Serv. v. Schaefer, 2 F.4th at 329. Complaints filed in the morning and early afternoon should generally be available to the press before 5:00 p.m. The great bulk of complaints should be available to the press on the day that they are filed. That is the rule, and the exception should not swallow the rule. As the day gets later, it may be more difficult to get the complaint filed to the press on that same day; and the press never had access to complaints filed after hours. For those, the press must have access to those early the next day. An "overnight delay in access to complaints filed during the last ninety minutes of the court's public hours" does not violate the First Amendment. Courthouse News Serv. v. Planet, 947 F.3d at 599. The Court regards these kinds of delays as "inconsequential delays." Courthouse News Serv. v. Schaefer, 2 F.4th at 328. This qualified right of access leaves some limited room for courts to delay access when "same-day access would be impracticable." Courthouse News Serv. v. Schaefer, 2 F.4th at 328.

The Court agrees with the Ninth Circuit that the right of access attaches when the complaint is filed -- which in the language of the NMAOC and Tyler Technologies is when the complaint is "submitted" by the filer. See Courthouse News Serv. v. Planet, 947 F.3d at 585; Tr. at 77:9-81:7. Given that the First Amendment right of access to civil complaints must be grounded in a historic level of access under Press-Enterprise II, the Court looks to the level of access given to the press before New Mexico courts adopted e-filing for guidance. As the record reflects, reporters did not have instantaneous access to newly filed civil complaints before 2012. Reporters had access to complaints after they had been received, reviewed, and stamped by the court clerk, and after they were placed in a box or rack for the reporters to view. See Tr. at 45:7-13 (Girdner). As Girdner testified at the PI hearing, he seeks "the same level of access that was provided before electronic filing" Tr. at 8:19-20 (Mr. Edwards), that is: "Traditional access," Tr. at 8:21 (Girdner).

**\*40** Girdner testified in another case that, "Traditionally, members of the press covered new litigation in major metropolitan areas around the country by sending reporters to the courthouse towards the end of each day to review civil complaints that had been filed that day. Trial Tr. at 35:2-10, 36:13-22 (Girdner)." Courthouse News Serv. v. Schaefer, 440 F. Supp. 3d 532, 538 (E.D. Va. 2020). In Courthouse News Serv. v. Schaefer, Girdner testified further that:

Q. When you were covering the federal courthouse in Los Angeles in the mid '80s, were there other reporters also covering the courts?

A. There were about seven reporters. It got more crowded when there was a big trial, but on a day-to-day basis there were seven reporters.

Q. So how did you and the other members of the press see newly filed civil litigation in those days?

A. When I started working there, I found a tradition which was that all of us would troop downstairs to the clerk's office around 4:30, and we would go up to the intake clerk and we would ask her for the stack of new civil complaints from that day, and we would also check the stack of rulings and opinions for that day. And the result was that we book-ended the work of the court: We saw the new business on the one end, and we saw the conclusion, the judgments, the rulings and the opinions at the other end.

Transcript of Proceedings at 34:19-35:10 (Hibsher, Girdner)(Bench Trial), Volume 1, at 35, filed February 6, 2020 (Doc. 96 in Courthouse News Serv. v. Schafer, No. 2:18-CV-0391, (E.D. Va.)). As far as the Court can tell, reporters did not historically expect immediate access to all complaints as they were filed, but expected to view the complaints filed during the day at the

end of that day. Although most of the civil complaints were processed and put in the press box on the same day, and usually within minutes, the Court understands that, when complaints were filed towards the end of the business day, they would not be available to the press box until the following business day.

Because, traditionally, reporters would not have same day access to newly filed civil complaints filed towards the close of regular business hours -- or indeed after business hours -- in the traditional system of paper filing, the Court declines to define "timely access" as access on the same day or date as filing under the new e-filing system -- at least for those complaints field late in the day or outside business hours. The Court notes that, traditionally, clerks took no more than a minute or two to accept payment for and review complaints when they were filed manually. See Tr. at 54:13-15 (Prieskop). Similarly, under normal circumstances in New Mexico courts' e-filing system, the review process is also the work minutes. Courts cannot use an unjustifiably lengthy bureaucratic process as an excuse to withhold access to complaints that should otherwise be made public in a timely manner. Courts must make complaints available " 'as expeditiously as possible.' " Courthouse News Serv. v. Schaefer, 2 F. 4th at 328 (quoting Doe v. Public Citizen, 749 F.3d 246, 273 (4th Cir. 2014)). While the Court agrees with the Fourth Circuit that neither "inconsequential delays" nor delays caused by "extraordinary circumstances" infringe the qualified right of access, the clerk cannot use bureaucratic rules or policies to justify delaying access to most complaints. Courthouse News Serv. v. Schaefer, 2 F.4th at 328.

### B. THE COURT DEFINES THE OUTER LIMIT OF TIMELY ACCESS AS FIVE BUSINESS HOURS BETWEEN SUBMISSION AND ACCEPTANCE OF COMPLAINTS.

 **\*41**  Based on the historic access which reporters enjoyed before e-filing, as described above, the Court defines the outer limit of timely access as: access provided within five business hours of filing a complaint. In Tyler Technologies' terminology -- adopted at the PI Hearing by the NMAOC -- a complaint must be "accepted" within five business hours of it being "submitted." See Tr. at 87:21-88:25 (Orchard). Business hours should be calculated based on the State courts' regular working hours: the "timely access clock" would run, therefore, between 8:00 a.m. and 5:00 p.m., Monday through Friday, excluding weekends and holidays. The Court concludes that this standard comes closest to the traditional right of access that the press had to civil complaints with the paper filing system: it takes into account the fact that most complaints filed in the morning would be available to the press at the end of the business day, around 4:30 p.m., and also the reality that complaints filed later in the day would be available only the next morning. By defining the time access in business hours, this standard also takes into account the important interest New Mexico has in allowing complaints to be filed after business hours. Because revoking after-hours e-filing[9] is one way other jurisdictions have tried to meet a same day or same date access requirement, see Response at 19-20, the Court is careful to note that the timely access clock does not run overnight, allowing the Defendants to preserve this important feature of e-filing.

### C. THE COURT WILL APPLY "RELAXED" OR "RIGOROUS" SCRUTINY, AND NOT STRICT OR INTERMEDIATE SCRUTINY, TO DETERMINE WHETHER THE DEFENDANTS ARE VIOLATING COURTHOUSE NEWS' RIGHT OF TIMELY ACCESS.

While strict scrutiny applies to the outright denial of a qualified First Amendment right of access, "limitations on the right of access that resemble 'time, place and manner' restrictions on protected speech, would not be subjected to such strict scrutiny." Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 607 n. 17, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (quoting Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 63, n.18, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)). The right of access at issue here is a qualified right and not a fundamental right, and the conduct in question is not the denial of that right, see Courthouse News Serv. v. Planet, 947 F.3d at 596, but a limitation which resembles the "time" aspect of a time, place, and manner restriction. As a result, the Court does not apply strict scrutiny, but "more relaxed scrutiny," Courthouse News Serv. v. Planet, 947 F.3d at 595. The access delay caused by the Defendants' review process, which Courthouse News challenges, does not amount to a traditional time, place and manner restriction; the traditional time, place and manner analysis is inapposite. The right at issue is not a right of access, but a right of timely access.

As the Ninth Circuit states: " 'Once we have determined that a qualified First Amendment right of access to newly filed nonconfidential civil complaints exists, a presumption of access arises under Press-Enterprise II that may be restricted only if closure is essential to preserve higher values and is narrowly tailored to serve those interests.' " Courthouse News Serv. v. Planet, 947 F.3d at 595 (quoting Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. 819). According to the Ninth Circuit, "the Press-Enterprise II 'balancing test' is 'rigorous' but not strict, scrutiny." Courthouse News Serv. v. Planet, 947 F.3d at 596 (quoting Leigh v. Salazar, 677 F.3d 892, 900 (9th Cir. 2012)). While, in Press-Enterprise II, the denial of access to transcripts was at issue, here, the challenged conduct is not denial of access, but rather, delayed access. The Ninth Circuit framed the Press-Enterprise II test in Courthouse News Service v. Planet as follows: "To survive Press-Enterprise II's two-prong balancing test, Ventura County must demonstrate first that there is a 'substantial probability' that its interest in the fair and orderly administration of justice would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest." Courthouse News Serv. v. Planet, 947 F.3d at 596. That framing, however, assumes that the right to timely access is a right of immediate access. Because the right at issue is the qualified right of timely access to newly filed civil complaints and is based on historic access, the Court reframes the issue:

   **\*42**  To survive Press-Enterprise II's two-prong balancing test, [New Mexico courts] must demonstrate first that there is a "substantial probability" that its interest in the fair and orderly administration of justice would be impaired by [making complaints available -- or accepted -- within four business hours of their submission], and second, that no reasonable alternatives exist to "adequately protect" that government interest.

Courthouse News Serv. v. Planet, 947 F.3d at 596.

Because the Court only now has defined the right of timely access in specific terms, it is unfair to state that the Defendants have not demonstrated, either in the pleadings or at the hearing, that making all newly filed complaints available within five business hours would impair their interest in the fair and orderly administration of justice: indeed, the Defendants built their defense around Courthouse News' requested pre-processing access. Instead, the Court acknowledges that New Mexico's interest in processing complaints falls within its interest in the "fair and orderly administration of justice," but concludes that such an interest does not extend beyond processing the complaint for longer than five business hours. Courthouse News v. Planet, 947 F.3d at 596. Because the Defendants offer data showing that their average processing time for initial filings was 8.82 hours, not taking into account whether the complaint was filed after hours, the Court concludes that the Defendants will be able to meet this test without impairing their interests. See Defendants' Raw Data at 32.

   **D. BASED ON THE DATA THAT BOTH PARTIES SUBMITTED AT THE HEARING, THE COURT CONCLUDES THAT THE DEFENDANTS ARE LIKELY VIOLATING COURTHOUSE NEWS' RIGHT OF TIMELY ACCESS.**

Courthouse News has shown that it is likely to succeed on the merits of its claim that the Defendants are violating Courthouse News' right of timely access to newly filed civil complaints, defined here as the right to access complaints within five business hours of their submission. Neither Courthouse News' nor the Defendants' data broke down the amount of time between the submission and acceptance of a complaint in business hours. The Court notes, however, that the Defendants' Raw Data spreadsheet shows a date and time stamp for both the submission and the acceptance of a complaint; based on this information, the Defendants' spreadsheet calculated the number of minutes and hours which elapsed between submission and acceptance of each complaint, but in calculating this elapsed time, the Defendants' spreadsheet did not account for -- specifically, did not deduct -- any hours and minutes that elapsed outside of regular business hours. See Defendants' Raw Data at 1. As a result, the Court cannot determine the extent to which the Defendants are violating Courthouse News' right of timely access. However, spot checks the Court performed of the data demonstrate that, while in the vast majority of these cases, the Defendants have been within the five-business-hour limit of timely access, there are be instances where, even deducting time elapsed outside business hours, the Defendants delayed processing of the complaints beyond five business hours. See Findings of Fact 76-79.

   **III. THE COURT WILL DENY COURTHOUSE NEWS' REQUEST FOR AN INJUNCTION REQUIRING PRE-PROCESSING ACCESS TO ALL COMPLAINTS, BUT WILL GRANT ITS REQUEST FOR AN INJUNCTION**

**REQUIRING TIMELY ACCESS TO COMPLAINTS, AS DEFINED BY HISTORY AND EXPERIENCE TO BE WITHIN FIVE BUSINESS HOURS.**

 **\*43** The Court denies the injunctive relief that Courthouse News seeks, which would direct New Mexico to implement immediate, pre-processing access to newly filed civil complaints, but grants Courthouse News' injunction requesting timely access, defined as access to complaints within five business hours of their submission. To be successful in its motion for a PI, Courthouse News must make four showings: (i) that Courthouse News is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to Courthouse News if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause" the New Mexico court system; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]' " Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395, 101 S.Ct. 1830). In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006)("O Centro II")). Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009). Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result ... place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.' " Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] ..., 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *40. When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the Court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975. "The meaning of this category is self-evident." Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41. With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).


First, the Court concludes that neither Courthouse News -- nor the public in general -- will suffer irreparable injury if it does not issue an injunction requiring New Mexico courts to make newly filed -- or submitted -- complaints available before they are processed -- or accepted. As discussed above, the right of timely access to civil complaints is a qualified one, and it is one that history and experience both defines and determines. The history and experience of news reporting show that the press had access to newly filed civil complaints after they were processed, and that this access was generally same-day access, but it was often the next day if the complaints were filed later in the day. Because there was no historic right of access to complaints before they were processed by the clerk, failing to enjoin the Defendants to give pre-processing access to complaints does not create constitutional injury. Because the Supreme Court defines the First Amendment right of timely access in terms of "experience and logic," the loss of something they did not have cannot injure the press or the public. See Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2735. On the other hand, Courthouse News has shown that it is likely to suffer irreparable injury unless the Court enjoins the Defendants from withholding complaints beyond the number of hours which history and experience demonstrate is timely. Because the Court takes into account the litigants' ability to file outside business hours, it determines that timely access can be measured as access within five business hours of the submission of a complaint. Because the Court determines

that it is likely that Courthouse News will succeed on the merits of its timely -- but not immediate or pre-processing -- access claim, "irreparable injury is presumed" in a First Amendment case. Heideman v. South Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)).

 **\*44**  Second, the threatened injury of having news of civil complaints delayed by a few minutes or hours does not outweigh the damage and disruption that an injunction to provide instant access would create. Requiring the New Mexico courts to change their systems overnight would cause significant disruption to the courts. If New Mexico courts must implement a system that makes civil complaints available more timely, it must be allowed to do so in a way that enables a smooth and efficient transition, and allows it to procure the resources that it needs to make this change.

Third, the Court acknowledges that instant, pre-processing access to civil complaints may serve the public interest, but the inadvertent disclosure of confidential information that may result from a change to pre-processing access does not serve the public when the legal community in New Mexico potentially has come to rely on the ministerial checks the clerks perform. On the other hand, an injunction requiring timely access within five business hours would not be adverse to the public interest, because the clerks would continue to process complaints and ensure that they contain no inadvertent confidential information.

Finally, Courthouse News has not shown that it will succeed on the merits of requiring immediate, pre-processing access to newly filed civil complaints: such a right was not part of the First Amendment, nor can it be found in the experience of news reporting. Unlike its request for pre-processing access, Courthouse News likely will likely succeed on the merits in seeking timely access to newly filed civil complaints, as experience shows to be generally same-day, with an outer limit of five business hours between the submission and acceptance of a complaint. The Court is mindful that "the limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]' " Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395, 101 S.Ct. 1830). While the Tenth Circuit has stated that mandatory preliminary injunctions that "alter the status quo" are disfavored preliminary injunctions, here, the Court's limited injunction will not change the status quo, if the Defendants' data is accurate. Similarly, because the Defendants may not be far from meeting the right to timely access standard that the Court concludes that the First Amendment requires, and because they already have all of the systems in place, the injunction does not compel any extra activity on their part, but rather prohibits the withholding of civil complaints beyond what the Court concludes the First Amendment right requires -- a five-business-hour limit.

## IV. THE COURT WILL NOT REQUIRE COURTHOUSE NEWS TO SECURE A BOND.

The Court will not require Courthouse News to secure a bond. Under rule 65(c), the Court may secure a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States, and its officers and agencies, are exempt from this requirement. See Fed. R. Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable"). See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security' " and may, therefore, impose no bond requirement. RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

 **\*45**  The Defendants request a "sizeable bond" from Courthouse News to pay for "the installation, use, and maintenance of a press-review tool, and increase its staff resources." Response, at 23. In light of the determination that the Defendants are violating Courthouse News' First Amendment rights, the Court concludes that the Defendants are not required to secure a bond to ensure that the State of New Mexico complies with the Constitution. See Goyette v. City of Minneapolis, 338 F.R.D. 109, 121 (D. Minn. 2021)("Courts have concluded that a bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment."). Moreover, while the Defendants have indicated that the press-review tool will cost $108,000.000, there is also some evidence that it will cost nothing. The Court finds by a preponderance of evidence that the addition of Tyler Technologies' Press Review Queue will not cost the Defendants anything

to purchase. In any event, the Court is not mandating that the State use or purchase that software. The Court's injunction is more modest, saying that the State must make non-confidential civil complaints available to the press more consistently in a contemporaneous manner. The State remains free to decide how to speed up that process. Further, the Defendants have not quantified the cost of an increase in staff resources. The parties have not presented the Court with much, if any, concrete information regarding the cost of any potential adaptations. See Requirement of Security for the Issuance of a Preliminary Injunction or Temporary Restraining Order, 11A Fed. Prac. & Proc. Civ. § 2954 n. 48 (3d ed.)("The district court cannot simply set an injunction bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select.")(citing Starsurgical, Inc. v. Aperta, LLC, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011)(Adelman, J.)). Indeed, it may be the case that the Defendants do not need to install new software or hire new staff to comply with the Court's injunction. Accordingly, the Court will not require Courthouse News to secure a bond.

**IT IS ORDERED** that: (i) Plaintiff Courthouse News Service's Motion for Preliminary Injunction, filed July 30, 2021 (Doc. 2)("PI Motion") is granted in part and denied in part; (ii) the Defendants are enjoined from withholding press access to newly filed non-confidential civil complaints for longer than five business hours; and (iii) the PI Motion is otherwise denied.

### All Citations

--- F.Supp.3d ----, 2021 WL 4710644

### Footnotes

1    Unlike the Defendants' data, Courthouse News' data does not show the percentage of cases accepted within twenty-four hours. See February to June Log at 1.

2    Courthouse News' data does not show the percentage of cases accepted within twenty-four hours. See July to September Log at 1.

3    Courthouse News' data does not show the percentage of cases accepted within twenty-four hours. See Santa Fe Log at 1.

4    Neither Courthouse News' data nor the Defendants' data shows what percentage of cases were submitted between 5:00 p.m. and 11:59 p.m. -- or during the weekends or holidays -- which would, in the traditional paper filing system that Courthouse News uses for comparison, have been filed and accepted the next business day. Without that breakdown, it is not possible for the Court to compare the amount of delay caused by the current electronic filing system with the amount of delay inherent in the traditional paper filing system, which Courthouse News uses as a reference point. Both Courthouse News' and the Defendants' data contain date and time stamp information, and both parties presumably have access to a calendar, and so this analysis is possible theoretically. Nonetheless, based on the snapshot of data from the Defendants' Summary Table and Defendants' Raw Data -- which shows a twenty-eight percent discrepancy between the number of cases that were accepted on the same day or date as submission, sixty-five percent, and the percentage of cases that were accepted within twenty-four hours of submission, ninety-three percent -- the Court presumes that the percentages of cases in Courthouse News' Logs would similarly be higher if they had tracked the number of cases accepted within twenty-four hours of their submission. The Court therefore determines that both parties' failure to analyze the number of cases filed outside regular business hours slants the data in favor of Courthouse News' position, but can make no separate finding of fact on the basis of this omission.

5    The report states that the average number of days is "0," which the Court assumes means less than one day. Although the Defendants did not move for the admission of this document at the hearing, the Court determines that it is helpful in determining the facts, and Courthouse News' data from within that same timeframe does not contradict it: if 69.46 percent or 70.46 percent of cases are processed on the same day, see February to June Log at 1; July to September Log at 1, then the statement that the average time for processing was zero days -- meaning less than one day -- also can be correct.

6    Although the Defendants were impeached on the accuracy of their Summary Table (which included copied and pasted figures and percentages, the Defendants were not impeached by Courthouse News on their Raw Data.

7    In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389, 91 S.Ct. 1999. Thus, in a Bivens action, a plaintiff may seek damages when a federal

officer acting in the color of federal authority violates the plaintiff's constitutional rights. See Bivens, 403 U.S. at 389, 91 S.Ct. 1999. See also Ashcroft v. Iqbal, 556 U.S. at 675-76, 129 S.Ct. 1937 (stating that Bivens actions are the "federal analog" to § 1983 actions).

8      As the Tenth Circuit has noted:

    [T]he "Supreme Court has recognized that the First Amendment guarantees access to government records pertaining to criminal proceedings if (1) there has been a tradition of access to the information and (2) public access benefits the functioning of the particular process in question. See, e.g., Press–Enter. Co. v. Superior Court, 478 U.S. 1, 8 [106 S.Ct. 2735, 92 L.Ed.2d 1] (1986)(finding a conditional right of access to California pre-trial criminal proceedings). Cf. Journal Pub. Co. v. Mechem, 801 F.2d 1233, 1236-37 (10th Cir. 1986)(applying a similar analysis to coverage of certain aspects of a civil trial)."

    Smith v. Plati, 258 F.3d 1167, 1178 n.10 (10th Cir. 2001).

9      New Mexico courts' after-hours filing policy allows for timely filings by attorneys or self-represented litigants who may face obstacles because of unreliable internet service -- or other logistical or technical difficulties that arise from working in rural areas -- to meet filing deadlines such as statutes of limitations. See Response at 20.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 8739010 (S.D.N.Y.) (Trial Transcript)
United States District Court, S.D. New York.

COURTHOUSE NEWS SERVICE, Plaintiff,

v.

Milton TINGLING, Defendant.

No. 16 Civ. 8742 (ER).

December 16, 2016.

**Hearing on Plaintiff's Motion for Preliminary Injunction**

For the plaintiff: William J. Hibsher, Jacquelyn N. Schell and Daniel H. Lewkowicz.

For the defendant: Lee A. Adlerstein.

Before: Hon. Edgardo Ramos.

THE COURT: Good afternoon. Everyone can be seated.

This matter is on for a show cause hearing for preliminary injunction brought by Courthouse News Service seeking to enjoin the clerk of the court of the New York State Supreme Court, New York County, from essentially withholding newly filed complaints while certain administrative tasks are conducted.

We will begin with you, Mr. Hibsher. You can remain seated if you wish. If you have a microphone, speak directly into the microphone. Or you can stand, as you wish.

MR. HIBSHER: Thank you, your Honor. Your Honor, Courthouse News Service reports on civil cases filed in federal and state courts throughout the country. With the Court's permission, I would like to reserve some rebuttal time for after my adversary speaks.

THE COURT: Sure.

MR. HIBSHER: Thank you.

Until the advent of electronic filing in the New York State courts, CNS had access to nearly all civil complaints by the end of each day on which they were filed. But with e-filing, perhaps counterintuitively, there are now substantial delays in access to newly filed cases in New York supreme. New York supreme is one of the country's most prolific and most important courts. On average, CNS sees less than two-thirds of the cases filed. One out of three cases filed each day are withheld from CNS and from the public. Often the delay is greater than one day.

THE COURT: Is it ever greater than one day if it's a regular workday, not a weekend or a holiday?

MR. HIBSHER: Yes, your Honor. The sampling that we provided in both the complaint and in the Angione affidavits lists the numbers of complaints that are produced on the same day. Then there is a second column in paragraph 24 of the Angione affidavit which says one-day delay, and then a third column which says third-day delay.

For example, on January 12th, 2016, which was a Tuesday, 58 percent of the cases were made available to the public and the press on the same day but 42 percent of those Tuesday cases were not. The sampling that we provided shows a number of instances in which weekday filings were not made available on the same day.

THE COURT: I asked whether it took more than a day. Using that example that you just provided, were there any cases that were withheld until the Thursday, say?

MR. HIBSHER: I think the several-day delays occurred on weekends and/or holidays joined by weekends. Usually, it's a next-day filing. As you know, this is a sampling. We did not go through every single filing comprehensively. Here we are on January 22nd. 69 cases were filed. That must have been a Friday, your Honor.

I can go through the data and supplement my remarks with a response to that question, but as I stand here, I don't know for sure whether the delays in filings on nonweekend and holiday days were greater than one day.

THE COURT: That is my understanding. If that is the case, you're getting every complaint within 24 hours, say?

MR. HIBSHER: Cases are filed in the morning. I think it would be better to say that we are getting cases filed on non-Friday weekdays that do not precede a holiday by the end of business the next day. It may not be 24 hours. It may be 30 hours or more. I'm splitting hairs, but I want to be clear about what the delay is.

The delay is important. It may not seem like a major delay, but access to judicial documents is essential to public understanding the court process. This is a concept that has been developed by a number of cases, beginning in 1980 with the Supreme Court's Richmond News and culminating with the Bernstein decision in the Second Circuit this year, which made clear that complaints are entitled to constitutional access under the First Amendment.

Despite the nature of the delay, it is well known that news quickly goes stale. It is the function of the press to report on news promptly largely because the news worthiness of a story is often fleeting. The loss of a First Amendment right of access to court documents, which we think Bernstein clearly establishes here, even for minimal periods, constitutes irreparable injury under the First Amendment.

Those lines are not just my words. Those lines are taken from the Supreme Court and the Second Circuit cases, which we cited in our brief.

THE COURT: Is there authority within the Second Circuit that defines how quickly access has to be provided?

MR. HIBSHER: Lugosch in the Second Circuit referred to immediate access. Bernstein quotes Lugosch and says once a First Amendment right of access attaches, the access must be immediate. The Supreme Court uses the word "immediate." Fresh Grove in the Seventh Circuit, one of the leading cases in this area, uses the words "immediate" and "contemporaneous."

There are no cases in the Second Circuit which parse this particular factual issue, but Bernstein makes clear that a complaint is entitled to First Amendment protection. All of the cases dealing with First Amendment access, whether they arise in connection with sealing or with limited access to certain kinds of judicial proceedings, all talk about the First Amendment right of access being one that is immediate.

When we are talking about the media and the fleeting nature of the news, and particularly when we are in a setting like New York City, which is the media capital, and a court like the supreme court in New York County, where so many of the cases are of incredible importance, a delay of one day is really a news cycle.

We put into our moving papers three newsworthy examples of cases which were filed on one day. Trump v. Univision was one. The filing attorney received a received stamp from the system that receives electronically filed documents, and within an hour or two a page 6 online New York Post had a story of Trump suing Univision for its cancellation of the of the Miss Universe pageant. The Courthouse News Service and the public did not see that case for 22 hours.

THE COURT: You just said the New York Post ran the story.

MR. HIBSHER: It did.

THE COURT: So the public therefore had access to the story.

MR. HIBSHER: The public that reads New York Post had it. But the single media outlet was fed that unprocessed and unofficial copy of the complaint. We have copies of it in our reply declarations which show the copy that the lawyer who filed it received on the day it was filed as well as the official copy 22 hours later the next day.

The lawyer who filed that complaint undoubtedly fed that complaint to the media outlet of his or her choice. Did it become public after the lawyer did that? Perhaps. But Courthouse News Service, which has hundreds of subscribers, many of which are media outlets, did not have that case available and was questioned by many of its subscribers as to why it did not.

THE COURT: Why is that of First Amendment significance? I understand that if the complaint had not been made available at all. But the fact that a newspaper had it and made it available immediately, doesn't that assuage the concern that the public not have access to it?

MR. HIBSHER: On the contrary. The fact that a litigant or a lawyer can feed a filed complaint, which is a judicial document and to which he has received a received stamped from the court, can feed that document to a media outlet of choice is a kind of unevenhandedness that I believe the First Amendment seeks to eliminate.

THE COURT: Do you think that the First Amendment seeks to create a level playing field for newspapers, radio stations, news outlets, etc.?

MR. HIBSHER: I think the law considers the press to be a surrogate for the public. It doesn't discriminate. It considers the press in general to be a surrogate for the public, and I think there is an assumption that the press will be treated evenhandedly. I have not seen a case which parses this particular issue out.

THE COURT: I asked the series of questions because you appear to base your argument at least in part on the fact that Courthouse News Service is being harmed. But it will always be the case that a litigant will or may favor one media outlet or another. There is certainly nothing that courts can do about that, whether you are getting immediate access or not. For example, a litigant can give a draft of a complaint that is going to be filed to a favored reporter.

MR. HIBSHER: This is true. The difference, however, is this when a litigant gives a draft of a complaint, whether it is to encourage settlement or for any other reason, that litigant is giving an unofficial copy of the complaint. The litigant does not have the protection of the privilege that one gets when one has filed information in a publicly filed complaint. The recipient has no certainty that the complaint will ever be filed. And that is a process that we have seen since litigation began. Drafts of complaints are exchanged for all sorts of reasons.

When it is an official court document -- Bernstein makes this very clear -- a First Amendment right attaches at the moment that it becomes an official court document. Cases that we cite in our brief are really eloquent in talking about the press's role in informing the public and particularly informing the public on the institution of the judiciary.

The news cycle is fleeting. When there is a delay of one day or when a litigant is allowed to provide a copy of an official court document that he has received a stamp on but the public has not yet seen to a particular news outlet, we believe that creates a First Amendment violation.

THE COURT: Why are you here alone? Why is CNS here alone?

MR. HIBSHER: Your Honor, we have litigated this issue in several federal courts around the country. We talked in our papers about the Central District of California case called Planet, a Southern District of Texas case as well. In some of those cases amici have come in that have been representatives of the press. The Planet case went to the Ninth Circuit two times. And there were numerous representatives of news organizations that joined those cases.

At this stage, particularly in the preliminary stage, we did not reach out to news organizations to try to solicit that interest. We were hopeful that the issues that we articulate in this case would be resolved amicably. We talk about our efforts to do that in our papers, and we continue to be hopeful that that is a possibility.

THE COURT: You say preliminary. Certainly it is preliminary at least at the stage of this litigation. But the papers that you submitted indicate that you have been trying to get the clerk to provide you with this access going back to at least I think it was July of last year.

MR. HIBSHER: Correct.

THE COURT: Were any efforts made to bring in fellow newspaper --

MR. HIBSHER: No, your Honor, we have not made an effort in this jurisdiction toward that end. It is possible, if this case continues, that this will be an issue that we will certainly make other media aware of. That may follow. But we have not made that effort, we have not been turned down. That is the status on that one.

THE COURT: You provide in your papers comparisons of what other courts do, including this court and other states around the country. Can you give me a rundown, one or two, of what the other New York City counties do.

MR. HIBSHER: All the counties in New York City follow the processing rules that are followed here. By "here" I mean New York supreme. This is a statewide issue. The numerosity of filings and the importance of filings in New York County far outweigh any of the other counties in New York State.

THE COURT: If I issue the injunction that you request, who will it affect? What courts will it affect?

MR. HIBSHER: It will affect New York supreme court, your Honor, and it will affect the clerk of New York County.

THE COURT: All right.

MR. HIBSHER: Your Honor, the defendant in their responding papers does not deny that his administrative processing causes delays, nor does he take issue with the sampling data that we included in our moving papers, though he characterizes it as misleading.

THE COURT: And exaggerated.

MR. HIBSHER: And exaggerated. He talks about the numbers of weekend filings that are included in our sampling. We believe that once the court allows electronic filings after hours and on weekends and once the filings that occur during those times become official court records, as they do instantaneously when they receive a received stamp and the statute of limitations is

tolled under the law, that we have a right to see those documents. In the end, relatively few cases are filed on the weekend. I think weekends and holidays only constitute about 3 percent of all of the cases filed.

THE COURT: If I read the papers correctly, the New York supreme court closes at 5:00.

MR. HIBSHER: Correct.

THE COURT: But you may still file complaints electronically after 5 o'clock.

MR. HIBSHER: 24-7, your Honor.

THE COURT: Including weekends?

MR. HIBSHER: Including weekends and holidays.

THE COURT: As I understand it, if you file electronically after 5:00 p.m. on a particular day, the complaint is deemed filed as of the following business day. Am I correct about that?

MR. HIBSHER: No, your Honor. It is deemed filed as of the moment that you electronically file it.

THE COURT: What access do you want? If something is filed at 8 o'clock in the evening or on a Sunday morning, what are you looking for with respect to those filings?

MR. HIBSHER: We would like to see those complaints as we do in this courthouse and in the vast majority of federal courts where the complaints go on to PACER for the entire world to see.

The defendant is concerned about revealing complaints that may not have been processed because some of those complaints may have incorrect venues or they may be matrimonial actions that are filed in New York supreme improperly. Our response to that is that there are safeguards in place when you file electronically that alert the filer and there are laws in place that place the burden on the filer to redact personal information and to make certain that a matrimonial action is not filed.

What we are asking for here is not Internet instantaneous access. What we are asking for is timely access upon filing. Traditionally, the press room at New York supreme stays open long after the courthouse closes. There is a terminal in that press room. It is the very same terminal onto which cases, after they are processed, flow.

What we are asking the defendant to do is to make cases that are filed with the Court and are official court documents available to the press and public upon receipt in a timely way. That is the injunction that the district court in Planet in the Central District of California issued.

In the Jackson case in the Southern District of Texas the court issued an injunction requiring the clerk to provide same-day access. In Planet the judge issued an injunction that required the court to provide timely access but precluded administrative processing before access and effectively provided same-day access. That is what we are seeking here.

THE COURT: I'm just trying to see what an injunction would look like. If something is filed on a Sunday morning -- I know this building is open 24-7.

MR. HIBSHER: The press room in this building is open 24-7.

THE COURT: What is the story across the street? Does the building shut down?

MR. HIBSHER: The building shuts down at 5:30, when the last security guard leaves. But people are allowed to remain in the supreme court building, and there is an exit which people who stay late use, including members of the press who are in the building before the closes and who stay late.

THE COURT: For a Sunday morning filing, Sunday morning electronic filing, are you requesting that the building be open for the press or remain open for the press?

MR. HIBSHER: Not necessarily. That filing can be made available electronically, and it could be made available just to credentialed reporters.

THE COURT: Off-site, remotely?

MR. HIBSHER: Off-site. It could be done on-site. But we are not asking the court to open its doors at 8 o'clock on Sunday.

THE COURT: Do you have that access now, remote access?

MR. HIBSHER: We have remote access to the official filings now on the New York State website where cases flow, and we have access in the press room to cases that are processed. What we would ask for is either on-site or remote access. It doesn't have to be made available to the public until the clerk of the court has an opportunity to do whatever processing it deems necessary, and those cases which have been filed with the court and are judicial documents would be made available to the press in that manner.

It is not exactly what you have in the Southern District, where cases flow immediately onto PACER for the world to see 24-7. We would be very content with something sub-stantially less than that. Our issue here is not that we put these cases on the Internet for the world to see.

The kinds of data that the clerk says in his papers he is concerned about catching, like improper venue cases stamped Kings County supreme and somehow the lawyer files it in New York supreme, we would get to see that under the injunction that I propose, and the clerk of the court would have an opportunity after it goes public to do whatever the clerk of the court needs to do to claw that back or to inform the filer that it was a Kings County document improperly filed.

THE COURT: I take it, and I think you made a reference to it in your papers, that New York State laws, court rules, applicable regulations put the onus on the litigants to make sure that that type of information -- Social Security numbers, identities of minor sexual abuse victims, for example -- that type of information is not put in filings or, if it is, it is put in some redacted fashion, correct?

MR. HIBSHER: Correct. The same sort of rules exist in the federal system, which put the burden on the filer to redact privacy information. When one files in the state system, in New York supreme, one is repeatedly reminded about the redaction rules. One has to check a box saying that I have read the redaction rules and I have complied with those rules.

THE COURT: If you want to file electronically a matrimonial matter, could you?

MR. HIBSHER: We appended to the reply affidavit screenshots of what the filer sees. The categories do not include matrimonial. I asked my colleagues, who do this all the time, that very question: could you file a matrimonial action if you really wanted to? The answer is perhaps. You might check off tort and file a matrimonial action as a tort. Under the proposal that I am asking your Honor to order, that is a matrimonial action that would then be made available to the press.

However, this is a First Amendment case. There is a First Amendment right of access that has attached. The law is very clear that once that occurs, the burden shifts to the defendant to show that he has an overriding interest, that that interest is essential to preserve higher values, and that is narrowly tailored to preserve that interest.

The defendant has to come forward with facts to illustrate the harm that he has hypothesized in his papers. He is the filer. Presumably he has the data on the errant filings that he describes in his complaint. He has the numbers on the matrimonial actions that have erroneously been filed, e-filed, in state supreme court and would, had the clerks of his department not caught them, have been made public in violation of the law.

THE COURT: How many are there, do you know? Do you have a sense of how many actions are picked up by this review process that the clerk goes through?

MR. HIBSHER: I do not have a sense because the defendant's papers are completely silent on any data at all. The cases which we cite make very clear that the harm that they allege in support of a process that prevents access under the First Amendment has to be provided, has to be illustrated with empirical evidence. There is no data whatsoever in their papers. They have not met a key element of their burden to show what this harm is.

THE COURT: Even assuming for the sake of argument that filing something improvidently because of venue would equal the value of allowing the press prompt access, assuming those two values -- poor venue, First Amendment access -- are essentially equal, for the sake of argument we don't have a sense as to whether or not people are filing in the wrong venue so often that it begins to trump the First Amendment right?

MR. HIBSHER: I do not have any sense of numerosity. Having gone through the filing instructions several times now, I would be very surprised if very many matrimonial actions are filed as tort actions or real estate actions or any other actions in New York supreme.

THE COURT: What about the situation where the administrative review picks up a Social Security number, say?

MR. HIBSHER: Good example. There is a specific law in New York that puts the burden on the filer to redact that information, which we cite in on you papers. The e-filing prompts make very clear that Social Security numbers and other private information has to be redacted and reminds the filer -- who is typically an attorney who has an account with the court system; when he presses that submit button, he has to have an account -- reminds the attorney that he has to comply with those redaction rules.

As I read the defendant's declaration in this case, I must say I do not see a declarative statement that the defendant's office reviews the pages of a complaint to find out if they contain Social Security numbers or other private information. They certainly suggest that they review papers for venue and for attorney's signature and for proper captions so the captions don't say "et al."

Attorney's signatures are taken care of in the e-filing system because when you press submit, you are effectively signing the document. In the old days the cashier collected your fee for the index number. The electronic system is accomplishing that task as well.

The kind of thing that the statute which he cites might require him to review, something like improper venue, is the sort of thing that we believe could not possibly override the First Amendment entitlement that we have.

THE COURT: I think they either said this or suggested this in this their papers, and I will ask them the same thing. Part of your argument is that before e-filing, CNS and other news organizations had same-day access to all of the complaints that were filed on a particular day prior to the type of processing they are doing now and not letting you see until they process?

MR. HIBSHER: Let me clarify. The defendant took issue with a certain part of that contention in our moving papers. What we are saying is that prior to e-filing we saw virtually 100 percent of all the filings on the same day. The system was that if you were a lawyer, if you were a clerk at a law firm, you went up to the cashier's office, you paid your money, you handed that cashier your papers.

The cashier might have done a quick, cursory review, might have looked at venue, for example, and said, counselor, this says Kings County, go across the river, collected your money. They might have looked for an attorney's signature. But that was it.

We are not suggesting that there was absolutely zero quick processing that occurred in the pre-electronic filing era. What we are saying is we had 100 percent access during that time. When e-filing came into being, the commission, which really studied the process, made very clear that the kind of access that existed prior to e-filing, access to court documents -- they were very specific before the Bernstein decision on complaints -- needed to continue unimpaired and uninterrupted. That is not what has happened here.

The rules which they cite, even if they are abiding by those rules, are rules that cannot under the law, to use your Honor's word, trump the First Amendment. The Second Circuit says, "Obviously, a statute cannot override constitutional right." The constitutional right here is absolutely crisp.

THE COURT: In other words, those rules say that the clerks have to take certain steps; it does not say that it cannot provide access to the press until those steps are taken?

MR. HIBSHER: Exactly. None of those rules say that the clerk has to do anything prior to releasing documents to the press or the public. The rules that require the clerk to do anything, if they do, and I think there is a bit of an argument there, are very limited to things like venue, signature of attorney. The Social Security number piece is something that I have looked at very closely, and I did not find it in the current rules as an obligation placed on the clerk's office to actually do.

Our position is that when we have a clear constitutional right and when there is a conceded delay, a conceded withholding of complaints, on many days -- though it is only weekend days and holidays where the delay goes on for several days -- on many days we see access that goes below the 66 percent average and by a good deal.

In his affidavit the clerk of the court very candidly says there are emergencies. There is one person or two people who do this, they get sick.

We think the First Amendment requires a much higher standard. The weekend filings, our papers describe some of the cases that we didn't see for three and four days. They didn't rise to the notoriety of Trump v. Univision, but they were very important cases that our subscribers would be very interested in knowing about in our daily litigation reports.

I don't know if your Honor wants me to address their abstention argument.

THE COURT: Briefly, if you will.

MR. HIBSHER: The abstention argument, relying on the Younger-O'Shea doctrine, we think is inapplicable here. That doctrine really contemplates a federal court action that will interfere with ongoing state court adjudications. That is not what this case is about. What we are looking for is a simple order directing the clerk to provide timely access. It is the very order that was issued in the Jackson case and in the Planet case.

In the Planet case the district actually granted an abstention motion, and the circuit court reversed. In reversing the abstention order, the Ninth Circuit relied on the Second Circuit in Hartford Courant. Neither of those cases was, by the way, discussed by the defendant in their papers.

This is not the kind of situation that Younger-O'Shea contemplates where the court is going to involve itself in conflicted workings of the state judiciary. All of the cases, and I will be brief and won't go into them, all of the cases they cited were dramatically different from the kind of injunction that we are requesting your Honor to issue.

I believe that the kind of injunction that we are asking for is what was issued in the Planet case and the injunction in Jackson, which are the only two cases dealing with delays brought on by clerks processing complaints after they were filed. The kind of injunctions issued in those cases are exactly the kind of injunction that we want here. It doesn't constitute an inappropriate interference with the workings of the state judiciary.

THE COURT: Talk about that. What type of burden, if any, would it impose on the clerk of the court, or cost?

MR. HIBSHER: Our papers say that in the course of one of the meetings that we had with the defendant, the defendant stated that providing the kind of access we are seeking would require some tweaking of the software system. Our client has been involved in transitioning from paper filing to e-filing in many courthouses around the country and has assisted in that process, and has reported that software providers are typically able to provide the kind of press-only access to new filings with relatively little expenditure, if any, and relatively little expense.

It does not require that they keep the courthouse open. If they want to limit access to credentialed press, that is something that is very easy to accomplish.

THE COURT: Let me ask you very quickly about that. Hasn't the concept of credentialed press expanded tremendously in recent years? Can't I start a blog now and declare myself to be press?

MR. HIBSHER: I'm not certain about that, your Honor. Both this courthouse and the Supreme Court New York County have certain requirements before an individual member of the press will be issued a press pass: not required to leave their telephones at the desk downstairs, admitted to the courthouse much more easily than other members of the public.

I have to assume that with the application to achieve that end, there needs to be some written support from a bona fide media outlet. Might it be a blog? Perhaps. That is the sort of detail that I feel very confident the clerk of New York County will be able to address appropriately and will be able to protect the kinds of concerns that they may have about complaints which contain errant information being made available immediately to the general public.

THE COURT: Thank you.

MR. HIBSHER: Thank you, your Honor.

THE COURT: Mr. Adlerstein, how are you?

MR. ADLERSTEIN: Well, thank you, your Honor.

I can start by advising your Honor where New York State is in terms of its policies and practices in this area and where County Clerk Tingling is. The last thing that New York State, through its announced policies, has embodied in its court rules and the last thing that Judge Tingling really wants to do is to have significant delays in documents that are accepted by the court for filing disseminated to the press and public. I think that all of us in this courtroom are cognizant of the First Amendment requirements and are sensitive to them and want to operate within the bounds that they provide.

However, New York State has very sensible policies that are embodied in its court rules and its statutes. Two of the court rules were cited in our papers. One is the one that says that in accordance with the C.P.L.R. provision -- and I'm quoting from New

York court rule 202.5(d)(1) -- the court clerk, the county clerk, as appropriate, shall refuse to accept certain kinds of papers for filing. The provision goes on to enunciate what the various aspects are that the county clerk ought to be looking for.

Mr. Hibsher in his papers and oral presentation focuses about change or some kind of major change that supposedly took place when e-filing went into existence. The court rules are promulgated by the administrative board of the court, which is made up of the chief judge of the state, the chief administrative judge, and all of the presiding justices of the four Appellate Divisions.

It promulgated those rules for e-filing that have a provision that says no later than the close of business on the business day following the electronic filing of a document there should be notification that goes out with regard to that particular document.

THE COURT: What does that mean?

MR. ADLERSTEIN: We have discussed with county clerk Tingling this aspect very carefully. What it means is that when a party, whether it be during the business day or whether it be in the evening or whether it be on the weekend, submits a pleading to the court for filing, what occurs is that there is a review that takes place by a person.

It's not done electronically. The review process is not done electronically. It is done by a person who zeros in on the provisions in the administrative regulation that I quoted earlier telling the court clerk that the court clerk has an obligation to review pleadings for certain possible defects.

At that point when the county clerk is to review that document and no later than the business day following that presentation of the document by the intended filer, the county clerk should do those processes and make a determination of whether or not an index number can be issued for that pleading. It is the issuance of the index number that the county clerk does, after a person has eyeballed the pleading, that then puts it into the system for general dissemination.

THE COURT: That's a policy that, and I want to be careful how I say this, has no particular legal import, correct?

MR. ADLERSTEIN: It has a very critical administrative impact.

THE COURT: I understand that. But the types of examples that are discussed in the papers and the types of things that the clerks appear to be reviewing for seem to me to be somewhat ministerial. Right?

MR. ADLERSTEIN: They are largely ministerial. If someone were to catch a pleading that was filed that is really a matrimonial action and it is couched in the pleadings as something else, that might be able to be rejected and then straightened out. There could be some unusual situations.

However, there is this directive that the county clerk is supposed to look for things that the court system regards to be important before the issuance of an index number.

THE COURT: Like some typo in the caption?

MR. ADLERSTEIN: Not a typo in the caption, your Honor. One of the provisions talks about the absence of a full recitation of the parties who are in the caption. For instance, if somebody sues ten people and puts John Doe, et al., the clerk rejects it because the court doesn't know who the other parties are.

THE COURT: Is a complaint a judicial document?

MR. ADLERSTEIN: Usually, I would say yes. However, it's not accepted for filing until somebody actually reviews it and it's given an index number. Whether it's a judicial document before that happens, I think that's not the word of art that's used in the regulations.

THE COURT: In the New York State regulations?

MR. ADLERSTEIN: The regulations are set up so that it is presented by the intended filer, there is an opportunity for a person to review the document, and at that time, if the document is deemed to be free of the defects, it goes in.

The answer would have to be I think on balance it is not a judicial document until the court system says it is by issuing an index number.

THE COURT: Is the filing of the document an event of legal significance at all in your mind?

MR. ADLERSTEIN: It would be for statute of limitations purposes. Here is how it operates. If the document is deemed to be acceptable so that it gets an index number, then it is deemed to have been filed for statute of limitations purposes when it was first presented. However, if it is rejected, the document is rejected, it is not deemed to be presented for statute of limitations purposes until it is accepted as having been valid at the time it was presented. That's how that mechanism operates.

THE COURT: In New York State if you file a complaint on the last day of the statute and it has an et al. but otherwise is a valid complaint, the next day the clerk can decline to accept that document, and that litigant is out of luck on the statute?

MR. ADLERSTEIN: The litigant may be, your Honor. I know that there exists equitable tolling provisions that people can go into court and request to have documents deemed to be filed and that becomes a judicial determination, not something that the clerk does.

THE COURT: What about this afternoon? What if there is a Christmas party going on across the street at the clerk's office at 60 Centre and they are not able to get to the complaints that came in, say, by noon? That person can be out of the box because there wasn't a person at the clerk's office to review the complaint in the afternoon?

MR. ADLERSTEIN: I think there are people in the clerk's office in the afternoon, your Honor, for paper documents that are submitted. But electronically it's deemed to have been received at the time it is electronically presented, and then it is checked out by a person when the court opens on the next business day or the same business day, and at that time there is an index number that is given.

The important principle is that it has been the practice uniformly that a person eyeballs the document before the index number is issued, and it is done because of the kind of provision that I mentioned earlier. It operated that way, your Honor, during the time it was exclusively paper. I think County Clerk Tingling clarified in his affidavit in response to counsel's papers that it was never a laying in front of the press or public pleadings before they were reviewed and then were given an index number.

THE COURT: Do you have a sense as the clerk's office does this review, of the hundreds of complaints that are filed, how many times they have to kick complaints back because of some venue issue or because of some et al. issue or some lack of signature issue?

MR. ADLERSTEIN: Yes. The assessment that I have heard, your Honor, is that it is a very modest proportion, a very modest percentage. I haven't been given an actual percentage. What we are talking about is the clerk's office wanting to be careful, when it takes in a case and assigns it an index number, to know that it really belongs to the court and that there is at least some essential structure. And this is not just made up by County Clerk Tingling. This is in accordance with the regulation that the administrative board of the courts has promulgated.

THE COURT: I understand that. Let me ask you this. Obviously, there is a concern on the part of the clerks that documents be properly formatted and contain whatever essential elements are required by the regulations. But you say it's a modest number that are rejected on that basis. Talk about the First Amendment and how -- and it clearly affects the First Amendment -- how you can justify that process in the face of the fact that what you are doing is essentially a ministerial review and, second, that the risk that is involved seems to me to be so relatively miniscule: a complaint gets through and they've got the wrong venue.

MR. ADLERSTEIN: Your Honor, I think this gets to the question that your Honor asked of counsel why aren't more people here. I think County Clerk Tingling's papers exemplify the fact that counsel has really exaggerated the problem. You do not see people complaining out there that they are not getting access to New York State court pleadings either uniformly or with a degree of promptness which is acceptable. That's not the intention with respect to the way that it is administered certainly. And the numbers that were contained in the affidavit that was submitted by plaintiff here we showed were exaggerated because they included weekends.

THE COURT: They took out the weekend and holiday papers.

MR. ADLERSTEIN: They did. But there is something very interesting about the numbers. They created a new chart. They had an initial chart which had on it one column which was one-day, and then the second one was two-day plus. When we called them on the fact that they were including weekends and holidays, they took out the two-day plus column, and instead having a one-day column, they created a new column called one-day plus.

If you take a look at the numbers that they accumulated, they come up with a figure of overall statistics of 2 or more days' delay, and it is pretty much the same number of matters which were filed on Fridays. I think Mr. Hibsher mentioned when your Honor gave an example that it was a Friday that they were talking about with respect to the one-day plus column --

THE COURT: Generally, and you folks will correct me if I'm wrong, if you look just at Monday through Thursday, there was still a significant percentage of complaints that they were not seeing because of this administrative review process, correct?

MR. ADLERSTEIN: There would be cases that would be filed at the end of the day. Mr. Hibsher is not asking, I don't believe, for personnel to be assigned to work in the courthouse past 5 o'clock. He has advised your Honor that the plaintiff is not looking to keep the courthouse open past 5 o'clock. We put in our papers that there is a lot of budgetary considerations that apply there.

THE COURT: Tell me about those. It sounds as if all that is really required is maybe an additional terminal and some software that would allow them -- I don't even know if it is additional software, because apparently they have remote access now -- allow them to remote access at an earlier period of time.

MR. ADLERSTEIN: That creates some difficulties about how you set that up, about who is going to come in to get that access and trying to make distinctions between how people are going to get credentialed, whether or not favoring the credentialed press over the public in terms of the access that the public would have to documents. You would have to have all of those determinations resolved.

Basically, what you are talking about is departing from the very important operating principle that New York State courts have had going forward and that is called for under the regulations, which is that when a document is submitted for filing and to commence a litigation -- and it would need to be during normal business hours because the court is not going to easily hire people to work overtime and so on in order do this -- it would need to be reviewed by a person before it is accepted for filing and then disseminated. That's what the regulations say.

THE COURT: You can still do that, right, without preventing the press from having access? You can do all that and I'm sure you will do all that.

MR. ADLERSTEIN: You can have people working 24 hours a day, I suppose.

THE COURT: Unless I'm completely misreading both sets of papers, that's not what they are asking for and that is not what would be required. Essentially what would be required is before your staff gets through something that is e-filed, it gets made available to the press, at least to the press.

MR. ADLERSTEIN: Your Honor, if I may add one thing?

THE COURT: Sure.

MR. ADLERSTEIN: We have direct filing by pro ses. They can apply to be able to e-file and then they can e-file. You have the difficulty that would pertain that you don't know what a pro se complaint is going to look like when it comes in.

I'm not sure how the federal courts handle the pro se registration process and what the pro se clerk does with pro se complaints and whether they are made immediately available by the federal court as soon as they hit the computer or whether a pro se can just go ahead and file from the outside and register without any kind of supervision so that those complaints are eyeballed by a person before they are distributed to the general public, but I suspect they might not be.

THE COURT: I think you are probably right. I think it also depends on whether they are in forma pauperis or not.

MR. ADLERSTEIN: Yes. You have those kinds of situations where they are pro se complaints as well.

THE COURT: That is also an easy software fix, isn't it?

MR. ADLERSTEIN: I don't know. I don't know what kind of programming you would need to do in order to put in a registration of all attorneys and have software be able to recognize who is filing. Think there are some difficulties there of a practical nature that are not necessarily so easy in terms of setting it up.

THE COURT: Mr. Adlerstein, the case law that has been presented here is fairly unanimous against the position that you are taking. How do you want me to analyze the cases that they have cited from California and Texas? How do you suggest that I analyze the state courts' procedures in light of Second Circuit authority about a complaint and the Second Circuit said yes, the filing of a complaint -- first of all, a complaint is very easily determined to be a judicial document; it was an easy determination by the Second Circuit. You seem to have a little trouble with it.

MR. ADLERSTEIN: I think, your Honor, the Second Circuit cases have not dealt with this kind of a situation where you are talking about this kind of very quick processing. You are talking about principles relating to what kinds of documents would be deemed to be a judicial document so that they would need to be available to the public. The court enunciated the word "immediate" without putting a definition on it. We submit to the Court that the New York State courts have already a policy which is consistent with the First Amendment in terms of the next business day.

THE COURT: The next business day is immediate?

MR. ADLERSTEIN: I think it is immediate enough under the First Amendment. Secondly, if you take a look at the cases in California, the district court in California, which had the most recent opinion on the case on remand from the Ninth Circuit, said it need not be the same day. They are not going to declare that there is a constitutional requirement that it has to be on the same day. The Ninth Circuit, when it remanded, expressed some skepticism about how immediate it was going to have to be, whether it would have to be on the same day. So it is not resolved there. I'm told that the litigation is actually still going on in California.

Secondly, the clerk in California was absolutely intransigent. Take a look at the district court opinion. The first page talks about the fact that he withheld documents from the press for weeks and that there was something going on there relating to him and the way that he was handling things to deliberately obstruct the press.

Here we have nothing of the kind. We have a New York State court system which is operating pursuant to regulations. The last thing that County Clerk Tingling wants to do is to hold up these documents. What we are talking about is the very principle of able to have a person during business hours review the document before it is assigned the index number and distributed to the press or public. And I'm told that once it is available, it is available to the entire public.

THE COURT: I understand that. That's precisely what we are talking about.

MR. ADLERSTEIN: You are inquiring about the case law being possibly against our position. I submit to the Court that it doesn't come anywhere close to our situation, to a state entity which is handling itself as responsibly as New York State does.

THE COURT: As I understand at least one of the cases, it is a state court where the court presented what he or she believed to be a very reasonable position: that once complaints are received, they need to be reviewed, and only when that administrative review takes place will they be made available not only to the press but to everyone else. That is precisely what we are talking about here, isn't it?

MR. ADLERSTEIN: Not really. We put in our brief that what the clerk was going through there were many more steps, things like putting labels on files, getting paper files set up before documents would be made available to the press.

THE COURT: What is the danger here, Mr. Adlerstein? What is the danger of providing immediate access to filings? What would be the damage to the general public, the people of New York County?

MR. ADLERSTEIN: Your Honor, there has been a determination that's been made by the administrative board that the administrative board wants the county clerks to look at some things before filings are completed. There has been a determination by the administrative board that the public dissemination should be done by the next business day.

It is clear that many, many are provided the same day, and even within a very, very short period of time, just a few minutes. When you have the clerk there and they are working on these things, there is no holdup. It's provided. Counsel may have shown a couple of instances where there was an issue, but this really isn't the pattern. It is not what the City of New York is all about. It's not what the county clerk is all about.

THE COURT: I understand that they don't mean to hold up anything in an improper way. Still, the percentage that are not provided, even when you discount holidays even when you discount weekends, the percentage that are not provided on the same day is substantial. By "substantial" I mean more than 25, 30 percent. Correct?

MR. ADLERSTEIN: It depends on how you measure same day. If something comes in at 3:00 or 4:00 in the afternoon and the county clerk doesn't have personnel on hand to be able to process those until the next business day, it will get done at 9:30 or 10:00.

THE COURT: Just so we are clear: something comes in at 3:30 in the afternoon on Monday, same day is Monday.

MR. ADLERSTEIN: I understand. What I'm saying is yes, there will be instances where something will come in in the later part of the afternoon and it won't be looked at until the following business day, as New York State regulations permit under their prescription, and it will be done. I think the objective of the county clerk is not to sit on those types of instruments until the very end of the next business day.

THE COURT: I wasn't making any suggestion that it is.

MR. ADLERSTEIN: It gets done very early in the morning, when there are people there to do it.

It is pointed out to me, your Honor, that if that is going to be the definition, we are not sure that the numbers that have been put out there by the plaintiff, you are talking about something that arrives at 3:30 in the afternoon and then gets done by 10:00 in the morning, is really part of the numbers that they are throwing out there.

THE COURT: I don't intend to draw any bright-line definition. Thank you.

MR. ADLERSTEIN: You're very welcome.

THE COURT: Mr. Hibsher.

MR. HIBSHER: Thank you, your Honor. I think I heard for the first time what the alleged harm would be if the policy of reviewing before access is provided to the press and public is granted, and it has been characterized as modest. We don't have numbers. We pointed out in our papers and I said before that the cases make very clear that empirical data needs to be presented to illustrate the kind of harm that the defendant alleges in order to meet its burden under the shifting in this kind of First Amendment entitlement case.

I also would like to say that the rule that Mr. Adlerstein points to which provides for notification by the end of the next business day is inadequate under the First Amendment. When you asked me about delays before, I was looking for a particular quote that I wanted to mention. It comes from the Globe Newspaper case. That case said that delaying access for as little as a day delays access to news, and that delay burdens the First Amendment. So the next business day is not acceptable. That is an issue which this case presents for your Honor to decide.

The particular regulation that Mr. Adlerstein points you to, however, says that the filer will be electronically notified by the end of business the next day. That is too late. If it's a complaint, the filer is the plaintiff and the plaintiff will be notified the next business day. We do not think that that rule, even if they were adhering to it all the time, really meets the First Amendment obligations that they have here.

You asked Mr. Adlerstein about when a document becomes, I believe your words were, an official court document. He conceded that when a document is filed, it tolls the statute of limitations. But he provided a hypothetical in which the clerk might review the document and reject it and then arguably the filer would not have the benefit of the statute of limitation.

They did not cite any cases in their brief to that end, nor did they comment on the Appellate Division, Third Department case that we cited in footnote 6 of our moving brief on page 15, which presents this very question: whether a petition was filed for statute of limitations purposes upon arrival at the clerk's office or upon an assignment of an index number.

That is the Johnson case, which concluded that on arrival at the check's office is when the filer benefits from the tolling of the statute of limitations. It's not exactly what we are talking about, but it's pretty close in New York law. I did not see anything in their papers that explicated the argument that Mr. Adlerstein makes today with any kind of legal citations.

You also asked about pro se filings in the federal court. My understanding is that that is done by paper, that pro ses do not electronically file. There is a paper desk, and the press has access to pro se filings as soon as they are done. If your Honor wishes, I can get you a supplemental declaration on that point.

Mr. Adlerstein talked about the Planet case in the Central District of California. He described the clerk there as being intransigent. I think that is probably a fair characterization at the beginning of the case. The case went on for years. It went up to the Ninth Circuit two times.

But when Judge Otero, from the Central District of California, issued the injunction that he did last May, I believe. At that time the clerk was contending that they were providing same day access in 97 percent of the filings. The system had completely changed from the days of intransigence. They were photocopying cases as soon as they came in. They were scanning them, and they were providing much improved access.

Yet Judge Otero said that the access they were providing was not adequate. He directed them to provide timely access upon receipt -- this is the language of the order -- and precluded the clerk from doing any administrative process before providing access. I think the reason was that he was not persuaded that the kinds of things they were looking for really rose to the kind of potential harm that would overcome the First Amendment right of access, and the kinds of things that the New York County Clerk is looking for similarly do not do that.

You asked me earlier where are all the members of the press. CNS has 27 hundred subscribers. Many press outlets are our clients. They look to us to provide reports on civil litigation. Some of these litigations are not the most newsworthy cases. You don't see many reporters in the press room either in New York supreme or even in the Southern District. In a certain sense not only is CNS as a media outlet a surrogate for the public, it is also a surrogate for the press. It is like the AP wire service.

So, the significance to CNS of the kinds of delays that we are seeing, the 30 percent delays to next-day cases being provided after the news cycle has really come to an end is really enormous.

Implicit in one of the questions was a question about CNS's motivation in seeking this First Amendment right. What Lugosch in the Second Circuit said of this question is that consideration of the newspaper's ultimate interest in the case should not affect the weight of the presumption, the First Amendment presumption. Those interested in monitoring the courts may well learn of and use the information, whatever the motive of the reporting journalist.

No one is impugning the motive of CNS here. But the fact is that motive is not the issue at all. There is a First Amendment right to a filed judicial document, which admittedly tolls the statute of limitations. The delay of a substantial number for one day and of those filed in the evening and on weekends for several days is not acceptable under the First Amendment, and respectfully I do not believe that the defendant has met its burden.

THE COURT: Thank you.

MR. ADLERSTEIN: Your Honor, may I?

THE COURT: Absolutely.

MR. ADLERSTEIN: I wanted to comment on just one or two points very briefly. In terms of this constitutionality argument relating to the regulations that I had cited, in plaintiff's opening papers there was no recognition provided for the regulations. There was no request that anything be struck down for constitutionality purposes.

One of the reasons that we mentioned to the Court the principles of abstention and comity was just this very thing. We ask the Court take into consideration the important constitutional value that lies with regard to a federal court providing for measures which are going to change operations in a state court and that a federal court would be careful about those things and measure constitutional principles on that plane.

I think if we are talking about the Court potentially making a ruling that the regulation that was enunciated by the administrative board may not pass constitutional muster, we ought to see it in that light. We think it does.

THE COURT: First of all, I don't think that plaintiffs are asking me to declare the regulations unconstitutional. The regulations, constitutional or not, they are not asking me to touch. The only things that they are asking is, sure, go through your process, but you've got to allow access at an earlier point in time.

MR. ADLERSTEIN: When we brought up in regulations, they suggested in their papers that the Court could well declare the regulations to be improper for constitutional purposes. That was an argument that was presented in their papers, and they cited case law to that effect.

THE COURT: Okay.

MR. ADLERSTEIN: Also, the very fact about will this be limited to New York County, obviously, something that will happen in one county could well affect what happens in all. The consequences in terms of court operations in the New York State courts in the broad sense could be much broader than Mr. Hibsher would suggest. I request that in weighing these various values that have been presented here, your Honor take that into consideration.

Lastly, with regard to the Fourth Department case that was cited, I had explained that the statute of limitations seemed to be tolled when it was presented. However, it's not considered to be valid until it is assigned an index number, so it reverts to the date of presentation for statute of limitations purposes, which is not inconsistent with what counsel has argued.

THE COURT: I'm sorry. I lost you on that last point.

MR. ADLERSTEIN: In other words, the principle about statute of limitations is when the document is presented to the court by the filer, if the courts deem the document to be acceptable and it gets an index number on a later date, it's deemed to be filed on the date that it was first presented. It is dependent on it being found to have been valid when presented by the fact that that document gets an index number. That principle I think is consistent with the case law that Mr. Hibsher has presented.

MR. HIBSHER: Your Honor, C.P.L.R. 304(c) says that a document tolls the statute of limitations upon filing. There is no language in that provision that says upon filing and after review by the clerk's office and the affixing of an index number, and there is nothing in the defendant's answering papers that says anything along these lines that certainly provides any authority for that conclusion. That may be their argument, but there is nothing in the law that says that.

If I'm a plaintiff who files a case that gets kicked back because I only had the first name or I had five names and then said et al., and they reject it the next day, which is beyond the statute of limitations, you can be certain that I'm going to litigate that issue and create some law on this point, which I do not believe exists. We have looked at it. The only case that came close was the Third Department case that we cited in our brief and that I mentioned before.

We are not seeking a declaration that rule 202.5(b)(d) is unconstitutional. That rule does not require the clerk to withhold publication of a filed court complaint to the press. That rule merely requires the clerk to do some processing by the next business day and to notify the filing party.

You didn't see a request for a declaration of unconstitutionality as to that rule in our papers because we don't believe that that is necessary. We believe that we are entitled to access upon filing without review, and that may translate into access on the same day that a case is filed.

MR. ADLERSTEIN: Your Honor, for C.P.L.R. purposes, if I may, the date of filing is considered to be the date the index number is issued. The regulation says the clerk shall refuse to accept for filing documents that are defective in the ways that are outlined by that regulation. I ask the Court to take that into consideration when dealing with this particular point.

THE COURT: Give me five, ten minutes. I'll be out with a decision. Please don't go far.

(Recess)

THE COURT: It is the Court's conclusion that plaintiff's motion for preliminary injunction will be granted. I find that the clerk may not prevent the press from accessing newly filed documents because of its review and logging procedures.

However, the Court will look to the party in the first instance to devise a procedure whereby the press will have timely access to those documents, whether that means constant feed or feed during business hours only or remote feed or otherwise. Again, I will leave it up to the parties in the first instance, as there has been no particular method that's been presented to the Court.

Let me first talk about abstention. I did consider this issue very seriously, and I find that abstention not required. The defendant in its papers argued that the Court should abstain because it would require the type of federal court oversight forbidden under the principle of comity articulated in *O'Shea v. Littleton* and *Younger v. Harris.*

The Ninth Circuit has explained that *O'Shea* abstention is inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice but is appropriate where the relief sought would require the federal court to monitor the substance of individual cases on an ongoing basis to administer its judgment. Moreover, that some additional litigation may later arise to enforce an injunction does not itself justify abstaining from deciding a constitutional claim. That was in the *Planet* case, reported at 750 F.3d 776, 790-92.

As in *Planet,* this Court finds that the remedy sought by CNS poses little risk of an ongoing federal audit or a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state proceedings. Again, citing to *O'Shea,* which is reported at 414 U.S. 488. This does not present the level of intrusive relief sought in cases cited by the clerk.

Compare *Hartford Courant v. Pellegrino,* reported at 380 F.3d 83, which declined to abstain in case seeking access to docket sheets in Connecticut state court, with *Kaufman v. Kaye,* reported at 466 F.3d 83, which abstained from entertaining a request that state establish a new system for assigning appeals to justices in the Second Department; and *Wallace v. Kern,* reported at 481 F.2d 621, reversing a district court's order directing that the clerk place all pro se motions on the court's calendar.

With respect to the preliminary injunction, to obtain a preliminary injunction the moving party must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Citing *Winter v. Natural Resources Defense Council,* reported at 555 U.S. 7.

Even if the moving party can only demonstrate serious questions going to the merits rather than a likelihood of success, the preliminary injunction may nonetheless issue if the costs outweigh the benefits of not granting the injunction. Citing *Citigroup Global Markets, Inc. v. VCG Specialty Opportunities Master Fund Limited,* reported at 598 F.3d 30. CNS has demonstrated a likelihood of success on the merits.

The Second Circuit has held that complaints are judicial records that are subject to a presumption of public access under the First Amendment. Citing *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP,* reported at 814 F.3d 132. In that case the Second Circuit stated that public access to complaints allows the public to understand the activity of the courts, enhances the court system's accountability and legitimacy, and informs the public of matters of public concern.

In light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous. The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression. Each passing day may constitute a separate and cognizable infringement of the First Amendment.

Citing *Grove Fresh Distributors, Inc. v. Everfresh Juice Company,* reported at 24 F.3d 893. *See also Lugosch v. Pyramid Company of Onondaga,* reported at 435 F.3d 110, collecting cases, including Grove Fresh, and noting that our public access cases and those in other circuits emphasize the importance of immediate access where a right of access is found.

To overcome the First Amendment right of access, the proponent of sealing must demonstrate that closure is essential to preserve higher values and is narrowly tailored to serve that interest. Broad and general findings and conclusory assertions are insufficient to justify deprivation of public access to the record. Specific on-the-record findings are required. Again citing *Bernstein v. Bernstein.*

State law and court rule provide that paper filings are deemed filed for purposes of the statute of limitations upon their acceptance by the clerk's office or when filed by electronic means at the time of the electronic receipt within the New York State ECF.

Upon receipt, the clerk's office reviews the proposed filing for complains with venue, caption, case type, as well as the attorney's signature certification required by court rule. In addition, the clerk's office reviews the papers to ascertain whether they contain materials that, by operation of law, may not be made available to the general public.

After this review process is completed, new civil matters are logged with a case or docket number and sent to the clerk's filing room for storage. New case filings are not made available for viewing by the public until this review and log-in process is complete.

According to the clerk, the review process is critical to (1) establish a compliance of the filing that the requirements proposed by state law and court rules, (2) assure attorney compliance with certain of their ethical obligations in commencing legal actions in state courts, and (3) avoid mistakes in filing venue or case type, which can have serious consequences to the statutory protections to the confidentiality of parties in certain proceedings.

With respect to this, citing to the Tingling declaration at paragraph 10.

The clerk argues that the review process procedures are prescribed to prevent a narrow category of errant pleadings at the outset in order to prevent confusion and waste. In *Courthouse News Service v. Planet,* the Central District of California considered a similar review policy allegedly designed to protect the confidentiality of those filing complains and third parties, to ensure information is accurately input, to ensure that proper accounting procedures are followed, and to maintain the integrity of the case file.

The court concluded that the clerk failed to meet its burden of demonstrating that its policy of refusing to provide public and press access to newly filed complaints until they are processed is either essential to preserve higher values or is narrowly tailored to serve a substantial government interest. Accordingly, the court entered an order prohibiting the clerk from refusing to make complaints available until after they were processed and directing the clerk to make such complaints accessible to the public and the press in a timely manner from the moment they are received by the Court.

Similarly, in *Courthouse News Service v. Jackson,* the Southern District of Texas considered whether 24- to 72-hour delays in access were constitutional where the delays resulted from the clerk verifying filings for correct case number, proper court, accurate title of document, and proper category before they are made available to the public.

The court found that the delay in access to newly filed petitions in this case is not a reasonable limitation on access. Even if it were, the court found that the clerk failed to demonstrate that the 24- to 72-hour delay in access is narrowly tailored to serve such an interest and that no less restrictive means of achieving that interest exists. Accordingly, the court granted CNS's motion for a preliminary injunction and ordered the clerk to give CNS access on the same day petitions are filed.

As in *Planet* and *Jackson*, this Court finds that the clerk has failed to meet its burden of demonstrating that its policy of refusing to provide the public and press access to newly filed complaints until after they are reviewed and logged is either essential to preserve higher values or is narrowly tailored to serve that interest.

In addition, the Court finds that CNS would be irreparably harmed without the injunctive relief. As the court noted in *Lugosch* and as I indicated earlier, the loss of First Amendment freedoms even for minimal periods of time unquestionably constitute irreparable jury. That is *Lugosch* at 435 F.3d at 127.

I further find that the balance of hardships tips in CNS's favor. CNS will be denied its First Amendment right of access to new case-initiating documents unless the Court issues this preliminary injunction while the clerk has alternative constitutional ways to address its administrative concerns.

I note in this regard that this injunction in no way restricts or comments on the regulations that are in place for the clerk of the court to review and accept for filing or accept for an index number the complaints when they are filed.

Finally, I find that injunctive relief would serve the public interest. There is, of course, an important First Amendment interest in providing timely access to new case-initiating documents.

With respect to the bond, I order the plaintiff to post a bond in the amount of $5,000 by no later than Tuesday of next week. What date is next Tuesday, Ms. Rivera?

MR. ADLERSTEIN: The 20th, your Honor.

THE COURT: By Tuesday, December 20th, 5:00 p.m.

That constitutes the decision of the Court.

Mr. Hibsher, anything further?

MR. HIBSHER: No, your Honor. Thank you.

THE COURT: Mr. Adlerstein?

MR. ADLERSTEIN: Your Honor, the one thing I wonder about your Honor's ruling is how immediate it is. The county clerk is going to need to come up with a plan in combination with the court system in order to implement what your Honor has ordered. I would suggest that a time period be prescribed.

THE COURT: I'm happy to do that. Mr. Hibsher?

MR. HIBSHER: Your Honor, I don't have a position on that. I think if your Honor ordered that this preliminary injunction would take effect in 20 days, that would be adequate. I don't know what the plan is that Mr. Adlerstein is referring to.

But I can say, your Honor, that after the preliminary injunction was issued in the Jackson case, the parties met and conferred and they came to an agreed-upon permanent injunction. As you know from our papers, I'm delighted to sit down with Mr. Adlerstein to achieve that end if at all possible.

MR. ADLERSTEIN: Your Honor, we have the holidays coming up. If we are talking about some kind of a technological solution here, which is one of the possibilities I think that was thrown out, that takes a little bit of time to set up. I would request that we have until the beginning of February to confer and come up with a plan.

THE COURT: Mr. Hibsher?

MR. HIBSHER: If Mr. Adlerstein is making a representation that technological facilities to provide the kind of access that we described in our papers and in our argument will in fact occur by the beginning of February, we would be agreeable to that.

MR. ADLERSTEIN: I don't know if they can occur, but I think we can come up with a plan and define what is to be done. We are operating here without knowing for sure exactly how this is going to be set up. I think the county clerk needs some time in order to do that.

THE COURT: Why don't we set this down for a status conference -- what makes sense? -- first week in January. Between now and then I expect that the parties will have met and conferred and come up with a plan going forward. If it appears that there are going to be issues, tee them up as best as you can and bring them to my attention.

MR. ADLERSTEIN: Your Honor, could we make it the second week? The reason is the holidays.

THE COURT: I understand. Ms. Rivera?

THE CLERK: January 12, 2017, at 12:30 p.m.

THE COURT: Okay? Is there anything else?

MR. HIBSHER: No, your Honor.

THE COURT: In that event, we are adjourned. Happy holidays to everyone.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.